[No. S012721. May 6, 1991.]

JAMES SANDS et al., Plaintiffs and Respondents, v.
MORONGO UNIFIED SCHOOL DISTRICT et al., Defendants and
Appellants.

**COUNSEL**

Biddle & Hamilton, Christian M. Keiner and Terri A. DeMitchell for Defendants and Appellants.

Robert K. Skolrood, Douglas W. Davis, William C. Wood, Jr., Kronick, Moskovitz, Tiedemann & Girard and Jayne G. Benz as Amici Curiae on behalf of Defendants and Appellants.

Carol A. Sobel, Mark D. Rosenbaum and Paul L. Hoffman for Plaintiffs and Respondents.

Douglas E. Mirell and Daron L. Tooch as Amici Curiae on behalf of Plaintiffs and Respondents.

**OPINION**

**KENNARD, J.**—In this case we hold that religious invocations and benedictions at public high school graduation ceremonies are constitutionally impermissible. Our review of applicable precedent convinces us that this practice violates the guarantees found in the United States and California Constitutions that religion and government shall remain separate.

Ours is a nation composed of people of many different races and faiths. Some are Native Americans, many of whom adhere to beliefs formed here over many centuries; others are immigrants, or the descendants of

immigrants, many of whom came here to escape religious persecution. The historical fact of our diverse origins and beliefs is a vital part of our national heritage and central to the meaning of the establishment and free exercise clauses of the First Amendment to the United States Constitution. The establishment clause reflects and implements the fundamental wisdom that freedom of religion flourishes only when government observes strict adherence to the principle of separation of religion and state authority. Government-sponsored religious invocations and benedictions at public school graduation ceremonies contravene the fundamental principle of governmental neutrality and abstention in matters affecting religious beliefs and practices.

## I. FACTS

Defendant Morongo Unified School District (the District) operates four high schools: Yucca Valley High School, Twenty-Nine Palms High School, Sky High School, and Monument High School. Opening invocations and closing benedictions have been included in graduation ceremonies at Yucca Valley High School since 1968, at Twenty-Nine Palms High School since 1937, at Sky High School since 1977, and at Monument High School since 1978.

At Yucca Valley High School, the president of the graduating class, in consultation with the vice-principal, selects speakers to conduct the invocation and benediction. In 1985, a Protestant minister delivered the invocation, and a faculty member gave the benediction. In 1986, a teacher delivered the benediction, and a Protestant minister selected by the vice-principal gave the invocation.

At Twenty-Nine Palms High School, a student committee initially selects the speakers for the invocation and benediction. In 1985, a Presbyterian minister delivered the invocation, and a Catholic priest gave the benediction.

The record does not reveal how graduation speakers are initially selected at either Sky High School or Monument High School. At Monument High School's 1985 graduation ceremony, a Protestant minister delivered both the invocation and the benediction. At Sky High School, the same Methodist pastor has given the invocation and the benediction every year since that school's first graduation ceremony in 1977.

As the District's counsel acknowledged at oral argument, District officials give final approval to the selection of those who deliver the graduation prayers. Apart from a single nonreligious benediction at one high

school in one year and a religious benediction at the same school the next year, every invocation or benediction in this case has been delivered by either a Protestant minister or a Catholic priest.

With the exception of a benediction by a teacher at Yucca Valley High School in 1985, all the invocations and benedictions at issue had explicitly religious content. For example, the benediction at Yucca Valley High School in 1986 was as follows: "Will the audience please stand and join us in prayer. [¶] Dear Father, we thank You for these graduates who have meant so much to us. We thank You for their energy, their enthusiasm, their sense of humor and their sense for life. May the years never diminish these traits. [¶] We ask Your guidance as these graduates try to meet the many challenges of their future years. Grant them the strength to meet these challenges with courage, confidence and faith. [¶] We ask Your blessings so that their lives will brim with happiness and good health. And that each one experiences a life rich in friendship and rich in love. [¶] Finally, we ask these young men and women, mature in years, may they forever remain young at heart and free in spirit. We ask for these in Your name, amen."

Similarly, the invocation given that year at Yucca Valley High School concluded with these words: "Heavenly father, I thank you for the privilege it is to see these graduates going forth receiving their diplomas this evening. To celebrate this time, I pray that you would give them that blessing, that confidence, courage, vision, hope, peace and gladness, and looking forward to the days to come, the years to come being confident of what they have already been able to do in receiving this diploma. [¶] Now I pray your blessing upon them, in the name of our Lord, amen."

Plaintiffs Jim Sands and Jean Bertolette are taxpayers residing within the District. They object to the inclusion of religious invocations, benedictions, or any other religious ritual at public school graduation ceremonies in the District. After unsuccessful efforts to persuade District officials to cease the practice of including prayers at graduations, in June 1986 they brought this action for declaratory and injunctive relief prohibiting the District and its officials from including religious invocations at public school ceremonies. They proceeded under Code of Civil Procedure section 526a, which authorizes taxpayers' actions against local public entities to enjoin the unlawful expenditure of public funds. It is not disputed that the graduation ceremonies are conducted on public school property, are publicly funded, and are planned by public school administrators who also participate in the ceremonies in their official capacities.

In July 1987, while this case was pending in the trial court, the Court of Appeal held in *Bennett* v. *Livermore Unified School Dist.* (1987) 193

Cal.App.3d 1012 [238 Cal.Rptr. 819] that the inclusion of religious invocations at high school graduation ceremonies violated both the state and federal Constitutions. After the decision in *Bennett*, the parties in this case made cross-motions for summary judgment. The trial court granted plaintiffs' motion and denied the District's motion. The court entered judgment prohibiting the District and its officials from conducting or attempting to conduct religious invocations and benedictions at any public school ceremonies in the District.

The District appealed. The Court of Appeal disagreed with the *Bennett* decision and reversed the trial court's judgment. We granted review to resolve the conflict on this constitutional question.

## II. Discussion

### A. *The Establishment Clause of the United States Constitution*

#### 1. *General Principles*

■ The federal Constitution mandates that government "make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." (U.S. Const., 1st Amend.) The former provision, known as the establishment clause, forbids government affiliation with religious beliefs and institutions. The separation that the establishment clause commands between religion and government manifests and promotes respect for religious pluralism and should not be perceived as hostility or indifference to religion. As the United States Supreme Court has remarked, "No misperception could be more antithetical to the values embodied in the Establishment Clause." (*County of Allegheny* v. *American Civil Liberties U.* (1989) 492 U.S. 573, 610 [106 L.Ed.2d 472, 505, 109 S.Ct. 3086, 3110] (hereafter *County of Allegheny*).) Indeed, the establishment and free exercise clauses are complementary because scrupulous government neutrality in religious matters enhances religious freedom. As the high court has explained, "[t]he Constitution mandates that the government remain secular, rather than affiliating itself with religious beliefs or institutions, precisely in order to avoid discriminating among citizens on the basis of their religious faiths." (*Ibid*. [106 L.Ed.2d 472, 505, 109 S.Ct. 3086, 3110].)

In *Everson* v. *Board of Education* (1947) 330 U.S. 1, 15-16 [91 L.Ed.711, 723, 67 S.Ct. 504, 168 A.L.R. 1392], the United States Supreme Court's first modern case interpreting the establishment clause, the court enunciated these principles: "The 'establishment of religion' clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all

religions, or prefer one religion over another. Neither can force nor influence a person to go to or remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance. No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and *vice versa.*"[1]

Sixteen years later, in *Abington School Dist.* v. *Schempp* (1963) 374 U.S. 203, 222 [10 L.Ed.2d 844, 858, 83 S.Ct. 1560], the court synthesized the teachings of its cases into two tests: "[T]o withstand the strictures of the Establishment Clause there must be a secular legislative purpose and a primary effect that neither advances nor inhibits religion." The court thereafter consistently applied those tests and, in *Walz* v. *Tax Commission* (1970) 397 U.S. 664, 674 [25 L.Ed.2d 697, 704, 90 S.Ct. 1409], it developed a third test: the law or government action must not foster "an excessive government entanglement with religion."

One year later, in *Lemon* v. *Kurtzman* (1971) 403 U.S. 602, 612-613 [29 L.Ed.2d 745, 755-756, 91 S.Ct. 2105] (hereafter *Lemon*), the court made clear that these three tests, which have since become known collectively as the *Lemon* test, were to be applied consistently in establishment clause cases. In 1987, the high court observed that "[t]he *Lemon* test has been applied in all cases since its adoption in 1971, except in *Marsh* v. *Chambers* . . . ."[2] (*Edwards* v. *Aguillard* (1987) 482 U.S. 578, 583, fn. 4 [96 L.Ed.2d 510, 518, 107 S.Ct. 2573].) Since it made this observation, the high court has applied the *Lemon* test in every establishment clause case it has decided. (See, e.g., *Board of Education* v. *Mergens* (1990) 496 U.S. 226 [110 L.Ed.2d 191, 110 S.Ct. 2356]; *Jimmy Swaggart Ministries* v. *Board of Equalization* (1990) 493 U.S. 378 [107 L.Ed.2d 796, 110 S.Ct. 688]; *County of Allegheny, supra,* 492 U.S. 573; *Texas Monthly, Inc.* v. *Bullock* (1989) 489 U.S. 1 [103 L.Ed.2d 1, 109 S.Ct. 890]; *Bowen* v. *Kendrick* (1988) 487 U.S. 589 [101 L.Ed.2d 520, 108 S.Ct. 2562].)

In *County of Allegheny, supra,* 492 U.S. 573, Justice Kennedy, in a separate opinion, departed from the court's usual application of the *Lemon* test,

[1] The high court recently reiterated this statement as controlling law. (*County of Allegheny, supra,* 492 U.S. at p. 592 [106 L.Ed.2d at p. 493, 109 S.Ct. at p. 3100].)

[2] As discussed later in this opinion, the high court has explained that *Marsh* v. *Chambers* (1983) 463 U.S. 783 [77 L.Ed.2d 1019, 103 S.Ct. 3330] has no application to cases involving religion in the public schools.

arguing that there should be a "flexible accommodation" of religion, and that the court should look to two principles in deciding establishment clause cases: first, government may not "coerce anyone to support or participate in any religion," and second, government may not "give direct benefits to a religion in such a degree that it in fact 'establishes a [state] religion or religious faith, or tends to do so.'" (492 U.S. at p. 659 [106 L.Ed.2d at p. 538, 109 S.Ct. at p. 3136.) But a majority of the United States Supreme Court rejected this proposed reformulation of the law, concluding that it was "nothing more than an attempt to lower considerably the level of scrutiny in Establishment Clauses cases." (492 U.S. at p. 609 [106 L.Ed.2d at pp. 504-505, 109 S.Ct. at p. 3109.)

Thus, the *Lemon* test (*supra*, 403 U.S. 602) has remained controlling law for 20 years.[3] We are required to decide federal constitutional cases on the law as it presently exists. Accordingly, we apply the *Lemon* test in this case.

If a challenged governmental action fails any of the three requirements of the *Lemon* test, it is unconstitutional. (*Edwards* v. *Aguillard*, *supra*, 482 U.S. at p. 583 [96 L.Ed.2d at pp. 518-519].) Although we have doubts whether the government-sponsored prayers at issue here pass the "secular purpose" test, that question need not be addressed because we conclude that the practice of government sponsorship of graduation prayers fails both the "effect" and the "entanglement" tests of *Lemon*, *supra*, 403 U.S. 602, thus rendering the practice unconstitutional.

2. *The "Primary Effect" Test*

 Under the "primary effect" test of *Lemon*, *supra*, 403 U.S. 602, the inquiry is whether, irrespective of the government's actual objective, the

---

[3] In his dissent, Justice Panelli states that in the high court's most recent establishment clause case, *Board of Education* v. *Mergens*, *supra*, 496 U.S. 226 (hereafter *Mergens*), "the lead opinion's treatment of the *Lemon* test did not receive five votes." (*Post*, at p. 926, fn. 6.) If this statement is meant to suggest that *Lemon* no longer commands a majority in the high court, it is misleading. In *Mergens*, four justices joined the lead opinion applying *Lemon*. (*Mergens*, *supra*, 496 U.S. at pp. __ [110 L.Ed.2d at pp. 214-218, 110 S.Ct. at pp. 2370-2373] (opn. of O'Connor, J.).) Two justices applied *Lemon* in a concurring opinion. (496 U.S. at p. __ [110 L.Ed.2d at p. 224, 110 S.Ct. at p. 2379] (opn. of Marshall, J.).) And Justice Stevens did not reach the constitutional question, but indicated in a footnote his continued allegiance to *Lemon*. (496 U.S. at p. __, fn. 21 [110 L.Ed.2d at pp. 237-239, 110 S.Ct. at pp. 2390-2391] (opn. of Stevens, J.).) Only Justices Kennedy and Scalia, adhering to the views the high court had rejected in *County of Allegheny*, *supra*, 492 U.S. 573, declined to apply *Lemon*. (*Mergens*, *supra*, 496 U.S. at p. __ [110 L.Ed.2d at p. 222, 110 S.Ct. at p. 2377] (opn. of Kennedy, J.).)

Notably, Chief Justice Rehnquist and Justice White, who had joined Justice Kennedy in calling for a reformulation of the law in *County of Allegheny*, joined Justice O'Connor's opinion in *Mergens* applying *Lemon*. Far from showing that the *Lemon* test cannot command five votes in the high court, the *Mergens* decision, in which seven justices expressed their adherence to *Lemon*, convincingly demonstrates *Lemon*'s continued vitality.

practice in question conveys a message of endorsement or disapproval. (*Wallace* v. *Jaffree* (1985) 472 U.S. 38, 56, fn. 42 [86 L.Ed.2d 29, 43, 105 S.Ct. 2479]; accord, *County of Allegheny, supra,* 492 U.S. at p. 593 [106 L.Ed.2d at p. 494, 109 S.Ct. at p. 3101].) Recently, the United States Supreme Court reaffirmed that the establishment clause " 'preclude[s] government from conveying or attempting to convey a message that religion or a particular religious belief is *favored* or *preferred*.' " (*County of Allegheny, supra,* 492 U.S. at p. 593 [106 L.Ed.2d at p. 494, 109 S.Ct. at p. 3101], italics in original.)

The religious invocations and benedictions challenged here are, in whole or major part, prayers. As one federal appellate court has observed: "Prayer is perhaps the quintessential religious practice for many of the world's faiths . . . . [¶] Prayer is an address of entreaty, supplication, praise, or thanksgiving directed to some sacred or divine spirit, being, or object. That it may contemplate some wholly secular objective cannot alter the inherently religious character of the exercise." (*Karen B.* v. *Treen* (5th Cir. 1981) 653 F.2d 897, 901, affd. (1982) 455 U.S. 913 [71 L.Ed.2d 455, 102 S.Ct. 1267].) The United States Supreme Court has recognized the religious nature of prayer.[4] (*Engel* v. *Vitale* (1962) 370 U.S. 421, 424-425 [8 L.Ed.2d 601, 604-605, 82 S.Ct. 1261, 86 A.L.R.2d 1285].)

In the graduates' young lives, high school graduation is a momentous achievement; it is the culmination of many hundreds of hours of instruction, study, and academic testing. In our culture, it also marks a critical stage of passage from childhood to adulthood. For these reasons, the fact of graduation is celebrated by an official ceremony attended by the graduates and their parents and teachers. Many graduates remember the occasion for the rest of their lives.

Through its graduation ceremony, a high school acknowledges and celebrates the graduates' successful completion of its course of studies. Considered an integral part of the educational process, the graduation ceremony is

---

[4] In his concurring opinion, the Chief Justice denies that public prayers engage the listeners' hearts and minds in a meaningful or potentially divisive way. He suggests that public prayers should be upheld as constitutional because they may be perceived from the perspective of a detached critic of a cultural phenomenon or viewed as a " 'throwback to another day,' " and because references to God are " ' "weak symbols' " and " ' "almost an empty sign." ' " (*Post,* at p. 895.) We decline to construe public prayer as essentially meaningless or trivial in order to find it inoffensive to the United States Constitution.

We emphasize that this case concerns religious invocations and benedictions—that is, solemn public prayers. Contrary to the implication of Justice Panelli's dissent, neither the trial court's injunction nor our holding will forbid the singing of "God Bless America" at public events. As commonly performed, such traditional patriotic songs no longer convey significant religious meaning. It cannot be convincingly argued that prayers convey no significant religious meaning.

organized and controlled by school officials. Public high school graduation ceremonies are generally held on government property and funded with public money. Because the ceremony is organized and controlled by the government to celebrate a significant event, words spoken as part of a public high school graduation ceremony inevitably create a strong appearance of government endorsement. ■ ■ ■ ■ When a school district opens or closes the graduation ceremony with a prayer, it sends a powerful message that it approves of the prayer's religious content.[5]

■ As the United States Supreme Court has said: "The Establishment Clause, at the very least, *prohibits government from appearing to take a position on questions of religious belief* or from 'making adherence to a religion relevant in any way to a person's standing in the political community.'" (*County of Allegheny, supra,* 492 U.S. at pp. 593-594 [106 L.Ed.2d at p. 495, 109 S.Ct. at p. 3101], italics added.) Regardless of its actual purpose, when the government sponsors prayers at high school graduation ceremonies it gives the appearance of taking a position on religious questions. Through the practices challenged in this case, the government appears to prefer religion over nonreligion; appears to prefer religions that acknowledge the practice of petitionary prayer over religions that do not recognize such prayer; appears to prefer the religious belief that prayer should be public over the belief that prayer should be private; and implicitly endorses religions that address a single, anthropomorphic, and male deity over those that do not.

Recently, a federal district court held unconstitutional a practice of including prayer at a high school's graduation ceremonies that was virtually identical to the practice involved here. The court observed that students who were not members of the religions endorsed, or whose families were nonbelievers, might view the school's action as indicative of a preference for beliefs other than their own. (*Weisman* v. *Lee* (D.R.I. 1990) 728 F.Supp. 68,

---

[5] The record in this case does not disclose whether or not those attending the public high school graduation ceremonies understood the inclusion of prayers in the official program as conveying a message of governmental approval of religion. But such evidence is not necessary. The United States Supreme Court has treated the issue of whether a practice has an impermissible effect as a question of law. For example, in *County of Allegheny, supra,* 492 U.S. 573, holding that the government's display of a crèche was an impermissible endorsement of religion, the high court did not rely on evidence of how any member of the public perceived the display. Instead, the court determined as a matter of law that, by the manner in which it had displayed the crèche, the government had lent its support to the communication of a religious message. (*Id.* at pp. 597-602 [106 L.Ed.2d at pp. 497-500, 109 S.Ct. at pp. 3103-3105]; see also *Larkin* v. *Grendel's Den, Inc.* (1982) 459 U.S. 116, 125-126 [74 L.Ed.2d 297, 306-307, 103 S.Ct. 505]; *Abington School Dist.* v. *Schempp, supra,* 374 U.S. at pp. 222-224 [10 L.Ed.2d at pp. 858-859].) Here, a reasonable observer would view the inclusion of graduation prayers in an official school ceremony as signifying approval of the practice of prayer and the prayer's religious content. The message of sponsorship is unavoidable.

72-73, affd. (1st Cir. 1990) 908 F.2d 1090, cert. granted *sub nom. Lee* v. *Weisman* (1991) __ U.S. __ [113 L.Ed.2d 240, 111 S.Ct. 1305].) In our view, the same is true of parents, teachers, and guests. "When a religious invocation is given via a sound system controlled by school principals and the religious invocation occurs at a school-sponsored event at a school-owned facility, the conclusion is inescapable that the religious invocation conveys a message that the school endorses the religious invocation." (*Jager* v. *Douglas County School Dist.* (11th Cir. 1989) 862 F.2d 824, 831 [98 A.L.R.Fed. 175], cert. den. (1989) 490 U.S. 1090 [104 L.Ed.2d 988, 109 S.Ct. 2431] [holding invocations preceding public high school football games unconstitutional].)

Here, the District argues that there is no impermissible effect of endorsing a religious practice. It emphasizes that the graduation prayers occur only once a year, are brief and "nonsectarian," and are part of a ceremony that is otherwise secular. These considerations, however, cannot validate government sponsorship of this religious practice.

Although the high school graduation ceremony occurs only once a year, it is, as noted earlier, a significant event in the lives of many participants, precisely because it occurs only once in the lifetime of a graduate. Even when such a milestone in the lives of participants is not involved, courts have invalidated annual governmental practices of a religious nature (e.g., *County of Allegheny, supra,* 492 U.S. 573, [annual crèche display]; *Fox* v. *City of Los Angeles* (1978) 22 Cal.3d 792 [150 Cal.Rptr. 867, 587 P.2d 663] [annual display of lighted cross]) or instances of governmental involvement with religion that are unlikely to be repeated by the participants (e.g., *Feminist Women's Health Center, Inc.* v. *Philibosian* (1984) 157 Cal.App.3d 1076 [203 Cal.Rptr. 918] [government-sponsored religious burial rites]) when they otherwise transgress constitutional boundaries.

The brevity of the invocations is similarly insufficient to dispel the apparent message of government endorsement. (*Jager* v. *Douglas County School Dist., supra,* 862 F.2d at p. 832.) Because prayer is religious and advances religion, " 'the limited nature of the encroachment does not free the state from the limitations of the Establishment Clause.' " (*Ibid.*; see *Abington School Dist.* v. *Schempp, supra,* 374 U.S. 203, 225 [10 L.Ed.2d 844, 859-860] ["it is no defense to urge that the religious practices here may be relatively minor encroachments on the First Amendment"].) The proper focus, therefore, is not on the duration of the practice, but on its religious character. (*Ibid.*)

Nor does the predominantly secular nature of the graduation ceremony make the government's endorsement of prayer less offensive to the First

Amendment's establishment clause. On the contrary, using prayers to mark the beginning or end of the graduation ceremony, which is a ritual celebration of the completion of high school, causes religion to be closely identified with government. In other words, making religious speech an integral part of this government-controlled and otherwise secular public school ceremony produces a "symbolic union" of state and religion, an effect that the establishment clause does not permit. (See *Grand Rapids School District* v. *Ball* (1985) 473 U.S. 373, 392 [87 L.Ed.2d 267, 282-283, 105 S.Ct. 3216].)

In *County of Allegheny, supra,* 492 U.S. 573, and *Lynch* v. *Donnelly* (1984) 465 U.S. 668 [79 L.Ed.2d 604, 104 S.Ct. 1355], the United States Supreme Court evaluated the constitutionality of government displays of religious objects by considering whether the displays, in their particular physical settings, had the effect of endorsing religious beliefs.[6] In this case, the District proposes that we undertake a similar evaluation, arguing that graduation prayers are permissible because they are only a part of a ceremony that is secular overall. But the suggested approach is not useful in determining the constitutionality of graduation prayers. First, government-sponsored group religious exercises are active and participatory; for example, those attending the ceremony may be asked to "stand and join in prayer." Such practices cannot be equated with the passive display of religious objects. Moreover, under the District's logic, prayers at the beginning of the public school day would be constitutionally unobjectionable solely because they would be part of an educational experience that is predominantly nonreligious. Yet prayers at the beginning of the school day have long been held unconstitutional. (*Engel* v. *Vitale, supra,* 370 U.S. 421.)

The assertedly "nonsectarian" nature of the prayers at issue here does not render their government sponsorship constitutionally acceptable. As discussed earlier, a government practice violates the establishment clause when it appears to place the government's stamp of approval on a particular type of religious practice, such as public prayer. The United States Supreme Court has made clear that the establishment clause prohibits not only explicit denominational preferences, but also government favoritism of religion in general (e.g., *County of Allegheny, supra,* 492 U.S. at p. 593 [106

---

[6] Justice Panelli's dissent relies extensively on dictum in *Lynch* v. *Donnelly, supra,* 465 U.S. 668, holding that a city may display a nativity scene during the holiday season. *County of Allegheny,* however, contains the more recent and thorough exploration of the issue. In that case, the high court held that a nativity scene displayed on government property was unconstitutional because it communicated a religious message, and it declared that the establishment clause "at the very least, prohibits government from appearing to take a position on questions of religious belief . . . ." (*County of Allegheny, supra,* 492 U.S. 573, 594 [106 L.Ed.2d 472, 495, 109 S.Ct. 3086, 3101].) To the extent that *Lynch* and *County of Allegheny* are inconsistent, the latter case, for reasons just explained, provides more authoritative guidance on the federal establishment clause.

L.Ed.2d at pp. 494-495, 109 S.Ct. at p. 3101]), as well as government sponsorship of "neutral" prayers and religious exercises (*Engel* v. *Vitale, supra,* 370 U.S. at p. 430 [8 L.Ed.2d at p. 60]).

The inclusion of prayers in the official school ceremony cannot be justified as "accommodation" of religion. The United States Supreme Court explained in *County of Allegheny* that "[g]overnment efforts to accommodate religion are permissible when they *remove burdens* on the free exercise of religion." (492 U.S. at p. 601, fn. 51 [106 L.Ed.2d at pp. 499-500, 109 S.Ct. at p. 3105], italics added.) The practice of opening and closing a government-sponsored school ceremony with prayers does not remove any burden on the free exercise of religion. There is no free exercise right for government officials to include prayers in a public school ceremony. The high court has acknowledged that the establishment clause permits some accommodation of religion that is not mandated by the free exercise clause (*id.* at p. 613, fn. 59 [106 L.Ed.2d at p. 507, 109 S.Ct. at p. 3111]), and that there is "ample room under the Establishment Clause for 'benevolent neutrality which will permit religious exercise to exist *without sponsorship* and without interference'" (*Corporation of Presiding Bishop* v. *Amos* (1987) 483 U.S. 327, 334 [97 L.Ed.2d 273, 282, 107 S.Ct. 2862], italics added). There is no room, however, for official sponsorship under the guise of "accommodation."[7]

In this case, the District also seeks to justify its practice of incorporating prayers in its graduation programs by arguing that "no state coercive authority" is present in the graduation context. But, as we shall explain, this focus on coercion is misplaced.

(5) It has been clear for almost three decades that coercion is not an element of an establishment clause violation. In *Engel* v. *Vitale, supra,* 370 U.S. 421, 430 [8 L.Ed.2d 601, 607], the United States Supreme Court

[7]The official practice of including prayers in graduation ceremonies cannot be rendered acceptable by analogy to *Mergens, supra,* 496 U.S. 226. In *Mergens,* the United States Supreme Court upheld the Equal Access Act (20 U.S.C. §§ 4071-4074), which requires high schools to allow student-run religious clubs to meet on the same basis as chess clubs and political clubs. The court observed that high school students are "mature enough . . . to understand that a school does not endorse or support student speech that it merely permits on a nondiscriminatory basis" (496 U.S. at p. __ [110 L.Ed.2d at p. 216, 110 S.Ct. at p. 2372]), and it stressed that under the act "school officials may not promote, lead, or participate in any [high school religious club] meeting" (*id.* at p. __ [110 L.Ed.2d at p. 117, 110 S.Ct. at p. 2373]).

By contrast, in this case school officials do promote, lead, and participate in the religious ceremonies: they are directly and finally responsible for the selection of religious speakers at graduations, and in at least one instance a faculty member delivered the prayer. Here, therefore, the question is not whether high school students are mature enough to perceive that no endorsement is involved: when government-approved speakers lead students and faculty in prayer at an official school ceremony, endorsement *is* involved.

invalidated a statute that required a brief nondenominational prayer to be recited at the start of each school day. The court explained: "Neither the fact that the prayer may be denominationally neutral nor the fact that its observance on the part of the students is voluntary can serve to free it from the limitations of the Establishment Clause . . . ." (*Ibid.* [8 L.Ed.2d 601, 607].) In subsequent decisions, the high court has adhered to this holding. (See, e.g., *Abington School Dist.* v. *Schempp, supra,* 374 U.S. at p. 223 [10 L.Ed.2d at p. 858] ["The distinction between the two clauses is apparent—a violation of the Free Exercise Clause is predicated on coercion while the Establishment Clause violation need not be so attended."]; *Committee for Public Education* v. *Nyquist* (1973) 413 U.S. 756, 786 [37 L.Ed.2d 948, 970, 93 S.Ct. 2955] ["proof of coercion . . . [is] not a necessary element of any claim under the Establishment Clause"]; *County of Allegheny, supra,* 492 U.S. at p. __ [106 L.Ed.2d at p. 517, 109 S.Ct. at p. 3119] (conc. opn. of O'Connor, J., for three justices) ["To require a showing of . . . even indirect coercion, as an essential element of an Establishment Clause violation would make the Free Exercise Clause a redundancy."].)

■ Although graduation ceremonies are usually not mandatory, most graduates and their families want to and do attend them. In *Abington School Dist.* v. *Schempp, supra,* 374 U.S. 203, the high court invalidated religious exercises in schools even though "the student may absent himself from the classroom or, should he elect to remain, not participate in the exercises." (At p. 207 [10 L.Ed.2d at p. 850].) Similarly, school officials cannot avoid an establishment clause violation by permitting graduating students to forgo their own graduation ceremonies when the official program includes religious messages with which they disagree. Such a result, in which nonbelievers and adherents of minority religions would be effectively excluded from, or made to feel unwelcome at, an important public school activity, would be contrary to the proper and intended role of public schools in our society. The public school is "[d]esigned to serve as perhaps the most powerful agency for promoting cohesion among a heterogeneous democratic people . . . ." (*McCollum* v. *Board of Education* (1948) 333 U.S. 203, 216 [92 L.Ed. 649, 661, 68 S.Ct. 461, 2 A.L.R.2d 1338] (conc. opn. of Frankfurter, J.).) In other words, " '[t]he public school is at once the symbol of our democracy and the most pervasive means of promoting our common destiny. In no activity of the State is it more vital to keep out divisive forces than in its schools . . . .' " (*Edwards* v. *Aguillard, supra,* 482 U.S. at p. 584 [96 L.Ed.2d at p. 519].)

We conclude that the practice of including religious invocations and benedictions at public high school graduation ceremonies inevitably and impermissibly conveys a message that the District favors or prefers the religious beliefs expressed by the invocation and benediction speakers. "If

government is to be neutral in matters of religion, rather than showing either favoritism or disapproval . . . , government cannot endorse the religious practices and beliefs of some citizens without sending a clear message to nonadherents that they are outsiders or less than full members of the political community." (*County of Allegheny, supra*, 492 U.S. at p. 627 [106 L.Ed.2d at p. 517, 109 S.Ct. at p. 3119] (conc. opn. of O'Connor, J.).) The practice at issue fails the "effect" test of *Lemon, supra*, 403 U.S. 602, and is therefore unconstitutional.

### 3. *The "Excessive Entanglement" Test*

■ Government supervision of religious practices is fundamentally inconsistent with the concept of separation of religion and civil authority. Thus, the United States Supreme Court has said that the establishment clause forbids " 'state inspection and evaluation of the religious content of a religious organization . . . .' " (*Larson* v. *Valente* (1982) 456 U.S. 228, 255 [72 L.Ed.2d 33, 54, 102 S.Ct. 1673], quoting *Lemon, supra*, 403 U.S. at p. 620 [29 L.Ed.2d at p. 760].) The establishment clause also prohibits state inspection and evaluation of the religious content of speech. (*Aguilar* v. *Felton* (1985) 473 U.S. 402, 410-411 [87 L.Ed.2d 290, 298-299, 105 S.Ct. 3232].) Such activities pose an "intolerable risk" of excessive government entanglement with religion. (See *Tony & Susan Alamo Foundation* v. *Sec'y of Labor* (1985) 471 U.S. 290, 305 [85 L.Ed.2d 278, 291, 105 S.Ct. 1953].)

The practice of including prayers at public high school graduation ceremonies impermissibly entangles government in religious matters in two ways: It involves governmental selection or approval of religious speakers and governmental approval of the content of public prayer.

Graduation ceremonies are official functions, and school administrators must either select the individuals who will give the invocations and benedictions, or approve in the final instance the students' selections of religious speakers.

As mentioned previously, at one of the four high schools the same minister has given both the invocation and benediction every year since 1977. This practice is constitutionally impermissible because the selection of the same minister or ministers of the same religion for graduation ceremonies over a number of years conveys a powerful message of endorsement of a single religion, thereby violating the "effect" test of *Lemon, supra*, 403 U.S. 602. At the other high schools, however, the District chooses annually among the clergy or adherents of various religions to deliver the graduation prayers. The process of making these selections impermissibly entangles the District in religious matters.

How is the public school official to choose a speaker to deliver a religious message? On what basis does the official determine which religion or creed will be represented and which adherent or member of the clergy will be acceptable? Because the tendency is great to make such choices dependent on the religious preference of the school official, or on the religious preferences of the majority of the school community, the degree of entanglement is unacceptably high.

There is a second problem with the District's practices that creates an impermissible risk of entanglement of civil authorities with religious matters. If a school district permits members of the clergy or adherents of various religions to deliver graduation prayers, how will it ensure against promotion of specific religious beliefs or concepts? Local school officials would have to evaluate the content of the prayers. But such prophylactic government monitoring of religious speech is constitutionally impermissible.

The United States Supreme Court has held that " 'for [a state] to be "certain," as it must be, that . . . [religious] personnel do not advance the religious mission' " of their churches in the public school setting, would " 'necessarily give rise to a constitutionally intolerable degree of entanglement between church and state.' " (*Aguilar* v. *Felton, supra,* 473 U.S. at pp. 410-411 [87 L.Ed.2d at p. 298]; compare *Mergens, supra,* 496 U.S. 226, __ [110 L.Ed.2d 191, 217-218, 110 S.Ct. 2356, 2373] [federal law requiring equal access for campus religious clubs on same basis as other student organizations does not excessively entangle government with religion because school officials may not promote, lead, or participate in meetings and may monitor them only for custodial purposes], with *Widmar* v. *Vincent* (1981) 454 U.S. 263, 272, fn. 11 [70 L.Ed.2d 440, 449, 102 S.Ct. 269] [invasive monitoring of student group meetings to prevent religious speech would risk excessive entanglement].) To allow preventive monitoring by the state of the content of religious speech inevitably leads to gradual official development of what is acceptable public prayer. "This result is as contrary to the requirements of the Establishment Clause as is . . . composition of an official state prayer." (*Weisman* v. *Lee, supra,* 728 F.Supp. at p. 74.) This kind of surveillance creates the entanglement that the United States Supreme Court condemned in *Lemon, supra,* 403 U.S. 602. (*Bennett* v. *Livermore Unified School Dist., supra,* 193 Cal.App.3d at p. 1020.)[8]

---

[8] In his dissenting opinion, Justice Baxter concludes that some but not all of the invocations at the District's graduation ceremonies were constitutionally impermissible, and he argues that "the court can fashion guidelines" for determining what is constitutionally permissible prayer for a public school graduation ceremony. Notably, however, Justice Baxter does not specify what those guidelines might be.

To establish and administer guidelines for acceptable public prayer would require a court to address at least these questions: Does the required diversity mean that each different sect

We conclude that the official approval of religious speakers and government monitoring of the content of religious speech necessarily involved in the practice at issue impermissibly entangle government in religious matters, and therefore that government sponsorship of graduation prayers is unconstitutional.

### 4. *Applicability of Marsh v. Chambers*

■ In support of its argument that prayers at its high school graduation ceremonies are proper, the District also relies on *Marsh* v. *Chambers, supra,* 463 U.S. 783 (hereafter *Marsh*), and *Stein* v. *Plainwell Community Schools* (6th Cir. 1987) 822 F.2d 1406.

In *Marsh*, the United States Supreme Court, declining to employ the *Lemon* tests, upheld the practice of opening legislative sessions with prayer. The court based its holding in *Marsh* on the "unique history" of legislative prayer, emphasizing that the First Congress opened its sessions with prayer.[9] (463 U.S. at pp. 790-791 [77 L.Ed.2d at pp. 1026-1027].) In *County of Allegheny, supra,* 492 U.S. at p. 669 [106 L.Ed.2d at pp. 544-545, 109 S.Ct. at p. 3142], Justice Kennedy proposed an approach to establishment clause problems that would have extended *Marsh* beyond its facts and sanctioned governmental religious practices accepted in 1791 and their contemporary equivalents. The majority rejected this approach: "*Marsh* plainly does not stand for the sweeping proposition . . . that all accepted practices 200 years old and their equivalents are constitutional today. . . . [¶] [This] reading of *Marsh* would gut the core of the Establishment Clause, as this Court understands it." (492 U.S. at p. 603 [106 L.Ed.2d at p. 501, 109 S.Ct. at p. 3106].)

The high court has taken particular care to explain that *Marsh* should not be applied to determine the constitutionality of public school practices. In *Edwards* v. *Aguillard, supra,* 482 U.S. 578, the court said the historical approach taken in *Marsh* is "not useful in determining the proper roles of

---

of each religion be represented, or do only "major denominations" have a right to deliver prayers? Do clergy of what some might consider "fringe" religions possess a right to give invocations? If not, why not? And if so, how frequently? What references to a particular religion's theology or doctrine are acceptable? Are some doctrinal references permissible but not others? Is a prayer that proselytizes acceptable? If not, what is the line between judicially acceptable prayer and improper proselytizing?

Justice Baxter's approach would in effect make this court a standing committee on approved theology. This is a task for which we are, to say the least, not well equipped.

[9] *Marsh, supra,* 463 U.S. 783, is properly understood as deriving in part from the judiciary's deference to the legislative branch in the management of that branch's own internal affairs (see *Van Zandt* v. *Thompson* (7th Cir. 1988) 839 F.2d 1215, 1219), a deference not implicated in this case.

church and state in public schools, since free public education was virtually nonexistent at the time the Constitution was adopted."[10] (482 U.S. at p. 583, fn. 4 [96 L.Ed.2d at pp. 518-519].)

In *Stein* v. *Plainwell Community Schools, supra,* 822 F.2d 1406 (hereafter *Stein*), a federal appellate court concluded that religious invocations and benedictions at high school commencement exercises were constitutionally permissible in principle, although it also concluded that the specific invocations and benedictions at issue violated the establishment clause because they "employ[ed] the language of Christian theology and prayer." (*Id.* at p. 1410 (lead opn. of Merritt, J.).) In reaching these conclusions, the court relied on *Marsh, supra,* 463 U.S. 783, but made no reference whatsoever to the United States Supreme Court's statement in *Edwards* v. *Aguillard, supra,* 482 U.S. at page 583, footnote 4 [96 L.Ed.2d at pages 518-519], that *Marsh* has no application to religion in the public schools. Because it disregarded this explicit limitation imposed by the high court, we conclude that *Stein* represents an improper extension of *Marsh.*

Moreover, the approach of the *Stein* court, *supra,* 822 F.2d 1406, requires judges or other officials to pass on the acceptability of specific religious references in public prayers. ■ Yet "it is no part of the business of government to compose official prayers for any group of the American people to recite as a part of a religious program carried on by government." (*Engel* v. *Vitale, supra,* 370 U.S. at p. 425 [8 L.Ed.2d at p. 605].) Judges and other government officials have no more authority to edit public prayers than they have to compose them.

Finally, we observe that in this case the District's practices would not pass constitutional muster even under *Stein, supra,* 822 F.2d 1406. The prayers at the District's graduation ceremonies contained religious references indistinguishable from those in one of the prayers held unconstitutional in *Stein.* (*Id.* at p. 1407, fn. 1.)

B. *The Religion Clauses of the California Constitution*

■ The California Constitution contains guarantees of the separation of religion and state in addition to those found in the federal Constitution. In language virtually identical to the First Amendment's establishment clause, our state Constitution declares, "The Legislature shall make no law

---

[10] The Chief Justice suggests in his concurring opinion that by this statement the United States Supreme Court meant only that the *Marsh* analysis has no application to cases involving classroom instruction. We cannot accept this interpretation. We presume that the high court chooses its words with care and precision, and that in this instance it meant what it said.

respecting an establishment of religion." (Cal. Const., art. I, § 4.) ▪ Although federal cases may supply guidance for interpreting this provision, California courts must independently determine its scope. (Cal. Const., art. I, § 24; see *Bennett* v. *Livermore Unified School Dist.*, *supra*, 193 Cal.App.3d at p. 1017.) ▪ The practice of government endorsement of graduation prayers not only violates the establishment clause of the federal Constitution but independently violates the separation of religion and government set forth in the corresponding clause of the California Constitution.

Two other provisions of the state Constitution, having no counterparts in the federal charter, provide additional guarantees that religion and government shall remain separate. Section 4 of article I guarantees the "[f]ree exercise and enjoyment of religion without discrimination or preference . . . ." The Attorney General of this state has observed that "[i]t would be difficult to imagine a more sweeping statement of the principle of governmental impartiality in the field of religion" than that found in the "no preference" clause (25 Ops.Cal.Atty.Gen. 316, 319 (1955)), and California courts have interpreted the clause as being more protective of the principle of separation than the federal guarantee (*Fox* v. *City of Los Angeles*, *supra*, 22 Cal.3d 792). As we noted earlier, when the government sponsors prayers at public school ceremonies it appears to take positions on religious questions. The practice at issue independently violates the "no preference" clause of the California Constitution.

The California Constitution further provides: "Neither the Legislature, nor any county, city and county, township, school district, or other municipal corporation, shall ever make an appropriation, or pay from any public fund whatever, or grant anything to or in aid of any religious sect, church, creed, or sectarian purpose . . . ." (Cal. Const., art. XVI, § 5.) This section prohibits not only material aid to religion, but *any* official involvement that promotes religion. (*California Educational Facilities Authority* v. *Priest* (1974) 12 Cal.3d 593, 605, fn. 12 [116 Cal.Rptr. 361, 526 P.2d 513].) As we have explained, government sponsorship of prayer promotes religion. Accordingly, religious invocations and benedictions at public school graduation ceremonies are prohibited by article XVI, section 5 of the state Constitution as well.

### III. CONCLUSION

Ours is a religiously diverse nation. Within the vast array of Christian denominations and sects, there is a wide variety of belief and practice. Moreover, substantial segments of our population adhere to non-Christian

religions or to no religion.[11] Respect for the differing religious choices of the people of this country requires that government neither place its stamp of approval on any particular religious practice, nor appear to take a stand on any religious question. In a world frequently torn by religious factionalism and the violence tragically associated with political division along religious lines, our nation's position of governmental neutrality on religious matters stands as an illuminating example of the true meaning of freedom and tolerance.

Because the practice of officially endorsed prayers at public school graduation ceremonies cannot be reconciled with the constitutional principles of religious freedom and official neutrality, we reverse the judgment of the Court of Appeal. The matter is remanded to the Court of Appeal with directions to affirm the judgment of the trial court.

Mosk, J., and Broussard, J., concurred.

LUCAS, C. J., Concurring.—This is a difficult and important case. As the opinions of the justices reveal, the issue of prayer at high school graduations and ceremonies has been judicially debated across the nation. The United States Supreme Court has recently granted certiorari in *Lee* v. *Weisman* (cert. granted Mar. 18, 1991, __ U.S. __ [113 L.Ed.2d 240, 111 S.Ct. 1305]) (hereafter *Lee*), in which the Court of Appeals for the First Circuit (*Weisman* v. *Lee* (1st Cir. 1990) 908 F.2d 1090) held that a public prayer delivered by a clergyman at the close of a high school graduation ceremony violated the establishment clause of the First Amendment as construed in *Lemon* v. *Kurtzman* (1971) 403 U.S. 602 [29 L.Ed.2d 745, 91 S.Ct. 2105] (hereafter *Lemon*). This case raises the same issue and may reach the court in due course and in sufficient time to be considered with *Lee*.

▮▮ Reluctantly, I concur in the judgment. On issues of federal constitutional law, this court is bound under the supremacy clause of the United States Constitution by applicable decisions of the United States Supreme Court. (*Chesapeake & Ohio Ry. Co.* v. *Martin* (1931) 283 U.S. 209 [75 L.Ed. 983, 51 S.Ct. 453]; *Scott* v. *Industrial Acc. Com.* (1937) 9 Cal.2d 315, 323 [70 P.2d 940].) Based on my reading of the relevant Supreme Court authority, I conclude that the Morongo Unified School District's practice of allowing invited members of the clergy and others to offer prayers at high school graduation ceremonies violates the second prong of the high court's *Lemon* test, i.e., the primary effect of the practice is one

---

[11] According to the most recent edition of the World Christian Encyclopedia (Barrett ed. 1982), in 1980 the United States population included 7.25 million persons who belonged to the Jewish faith, 500,000 Hindus, almost 2 million Muslims, nearly 2 million members of other non-Christian religions, and 14.9 million people who identified themselves as nonreligious. (*Id.* at p. 711, table 1.)

that "advances . . . religion." (*Lemon, supra,* 403 U.S. at pp. 612-613 [29 L.Ed.2d at p. 755].)

I write separately for two reasons.

First, as revealed by recent United States Supreme Court decisions, the law is in a state of flux in this area. The First Amendment forbids government action "respecting an establishment of religion or prohibiting the free exercise thereof." (U.S. Const., 1st Amend.) State-composed and financed prayers, Bible readings, and other religious exercises, even though nominally voluntary, cannot constitutionally form a part of public instruction in this country. (*Abington School Dist.* v. *Schempp* (1963) 374 U.S. 203 [10 L.Ed.2d 844, 83 S.Ct. 1560]; *Engel* v. *Vitale* (1962) 370 U.S. 421 [8 L.Ed.2d 601, 82 S.Ct. 1261, 86 A.L.R.2d 1285].) Yet, as Justice Douglas observed: "We are a religious people whose institutions presuppose a Supreme Being." (*Zorach* v. *Clauson* (1952) 343 U.S. 306, 313 [96 L.Ed. 954, 963, 72 S.Ct. 679].) Throughout our history, government institutions have recognized our religious heritage in symbols and ceremonies that express faith and confidence in such a Supreme Being, including the offering of prayer. (*Marsh* v. *Chambers* (1983) 463 U.S. 783, 786-792 [77 L.Ed.2d 1019, 1023-1028, 103 S.Ct. 3330] (hereafter *Marsh*).) This case lies at the crossroads between public instruction and public ceremony. As such, it affords an opportunity to reexamine basic principles and values underlying the religion clauses of the First Amendment.

Second, like Justice Arabian, I would not reach the state constitutional issues raised by the parties. Resolution of those issues is not necessary to our decision. Particularly in light of the importance of this case and the climate in which it is decided, I would await the guidance that will emanate from full consideration of the First Amendment issues by the United States Supreme Court before exercising our independent powers to construe provisions of the California Constitution. In this way, we can best carry out our authority to proceed in a manner that is "informed but untrammeled" by the views of the high court. (*Reynolds* v. *Superior Court* (1974) 12 Cal.3d 834, 842 [117 Cal.Rptr. 437, 528 P.2d 45].)

## I. The First Amendment

The purpose of the establishment and free exercise clauses of the First Amendment is " 'to prevent, as far as possible, the intrusion of either [the church or the state] into the precincts of the other.' " (*Lynch* v. *Donnelly* (1984) 465 U.S. 668, 672 [79 L.Ed.2d 604, 609, 104 S.Ct. 1355] (hereafter *Lynch*), quoting *Lemon, supra,* 403 U.S. at p. 614 [29 L.Ed.2d at p. 756].) Both the general language of the First Amendment and its interpretation by

the courts suggest that bright and immutable lines and rigid, absolute views are out of place in this area of the law. The religion clauses may not be construed "with a literalness that would undermine the ultimate constitutional objective *as illuminated by history*." (*Walz v. Tax Commission* (1970) 397 U.S. 664, 671 [25 L.Ed.2d 697, 90 S.Ct. 1409], italics added; see also *Lynch, supra,* 465 U.S. at p. 678 [79 L.Ed.2d at p. 613].)

History plays two important roles in constitutional analysis. Initially, it aids in the search for core values and principles underlying the text of the Constitution that may reveal with greater specificity than the text itself the evils sought to be prevented and the benefits sought to be obtained by constitutional provisions. A proper interpretation of the clauses must comport with "what history reveals was the contemporaneous understanding of [their] guarantees." (*Lynch, supra,* 465 U.S. at p. 673 [79 L.Ed.2d at p. 610].) "Establishment Clause precedents have recognized the special relevance in this area of Mr. Justice Holmes' comment that 'a page of history is worth a volume of logic.'" (*Committee for Public Education* v. *Nyquist* (1973) 413 U.S. 756, 777, fn. 33 [37 L.Ed.2d 948, 965, 93 S.Ct. 2955], quoting *New York Trust Co.* v. *Eisner* (1921) 256 U.S. 345, 349 [65 L.Ed. 963, 983, 41 S.Ct. 506, 16 A.L.R. 660].)

History also provides a means to assess whether particular government practices have enhanced or inhibited basic constitutional values and principles over time. Although long-standing tradition alone does not constitutionally validate a policy or practice, it may be a factor of great importance in a pragmatic evaluation of its character and effect. As the Supreme Court said in upholding tax exemptions for churches: "It is obviously correct that no one acquires a vested or protected right in violation of the Constitution by long use, even when that span of time covers our entire national existence and predates it. Yet an unbroken practice of according an exemption to churches, openly and by affirmative state action, not covertly or by state inaction, is not something to be lightly cast aside. Nearly 50 years ago Mr. Justice Holmes stated: 'If a thing has been practiced for two hundred years by common consent, it will need a strong case for the Fourteenth Amendment to affect it. . . .'" (*Walz v. Tax Commission, supra,* 397 U.S. at p. 678 [25 L.Ed.2d at p. 707].)

## A. Principles Underlying the Religion Clauses

Religion played a decisive role in the colonization of the New World and the early development of the United States. The history of religious establishments in the colonies and the relationship between church and state at the time of adoption of the Constitution and the Bill of Rights, including the practice of public prayer, has been thoroughly explored by scholars.

(See, e.g., Wood, *Religion and the Bill of Rights*, in The First Freedom (1990) (hereafter Wood); Smith, Public Prayer and the Constitution (1987); Curry, The First Freedoms (1986) (hereafter Curry); Cord, Separation of Church and State (1982) (hereafter Cord); Rice, The Supreme Court and Public Prayer (1964) (hereafter Rice); Stokes & Pfeffer, Church and State in the United States (1964).) The Supreme Court has made extensive use of this history in resolving issues arising under the religion clauses. (See, e.g., *Lynch, supra,* 465 U.S. at pp. 673-678 [79 L.Ed.2d at pp. 609-613]; *Marsh, supra,* 463 U.S. at pp. 786-791 [77 L.Ed.2d pp. 1023-1027]; *Walz v. Tax Commission, supra,* 397 U.S. at pp. 677-692 [25 L.Ed.2d at pp. 706-715.)

A review of the Supreme Court precedent and the history of public ceremonial prayer referred to therein reveals two general principles underlying First Amendment law in this area. An examination of these principles will serve as a guide to discussion of the legal issues presented by this case.

## 1. Church-state Disengagement

Mindful of the pitfalls of their European heritage, the framers of the Constitution sought to prevent civil strife emanating from religious differences and to secure "freedom of conscience," i.e., the right to make individual choices in matters of religious belief and practice free from pressures, direct or indirect, applied by government. To this end, they required the state to be officially disengaged from church institutions in the sense that it could not create or sustain those institutions or favor one institution over another in making governmental decisions. Nor could it force or coerce individuals to engage in religious activity or make decisions about their rights or privileges as citizens on the basis of religious profession or lack of it.[1] I will refer to this principle as "church-state disengagement."[2]

---

[1] See, e.g., Curry, *supra,* at page 222 ("The [religion clauses] meant at least this: that each citizen had the right to free exercise of his or her religion as long as it did not 'break out into overt acts against peace and order.' Further . . . religion should be maintained and supported voluntarily . . . . [G]overnment attempts to organize and regulate such support [are a] usurpation of power [and a] violation of liberty of conscience and free exercise of religion . . . ."); Adams and Emmerich, *A Heritage of Religious Liberty* (1989) 137 U.Pa.L.Rev. 1559, 1621 ("The historical record demonstrates that when a state sought to establish a church it did so by using the 'civil sword' to compel beliefs and conduct supportive of that church. The essence of an establishment, therefore, was governmental coercion of conscience."); see also *County of Allegheny* v. *American Civil Liberties U.* (1989) 492 U.S. 573, 659-660 [106 L.Ed.2d 472, 537-538 109 S.Ct. 3086, 3136] (hereafter *County of Allegheny*) (Kennedy, J., conc. & dis.) ("[Government] may not coerce anyone to support or participate in any religion or its exercise; and it may not, in the guise of avoiding hostility or callous indifference, give direct benefits to religion in such a degree that it in fact 'establishes a [state] religion or religious faith, or tends to do so.' "), citing *Lynch, supra,* 465 U.S. at page 678 [79 L.Ed.2d at page 613].

[2] According to recent historical studies, the principle of church-state engagement has both ideological and practical roots. It is based in part on enlightenment views of human nature as

The church-state disengagement principle is an important reflection of the pluralism and diversity of American society and its religious traditions, a fact that has continued and increased in the two centuries since the Constitution was adopted. As one commentator has written: "[R]eligious diversity, not religious unity, characterized the life of the new nation. In the absence of any religious consensus among a population the vast majority of whom was unchurched . . . assurances of religious liberty were needed . . . . At the time of the ratification of the Constitution, fewer than 10 percent of the population were members of churches and synagogues and 'in 1800 there were fewer churches relative to the population at any time before or since.'" (Wood, *supra, Religion and the Constitution*, at p. 10.)

---

interpreted by the American settlers. Roger Williams, the founder of Rhode Island and an influential figure in the history of religious freedom, wrote that all individuals, regardless of their religious or nonreligious persuasions, possessed a natural capacity for conscience and a corresponding natural right to equal treatment in civil society. In urging that persons "not be deprived of their civil rights and liberties" on account of the presence or absence of religious convictions, Williams emphasized the ability of all persons to be "peaceable and quiet subjects, loving and helpful neighbors, fair and just dealers" and "true and loyal to the civil government." (Williams, Complete Writings (1963) at p. 365, quoted in Wood, *supra*, at p. 33; see also Wood, *supra*, at pp. 30-34.)

But the principle also has a pragmatic foundation. The framers were not systematic theologians who sought to foster a millennium of judicial debates on religious ideas and symbols. Rather, they were statesmen who were concerned about: (1) the potential temporal power of the visible church as a social and political *institution*; and (2) the potential ecclesiastical power of government to control its citizens through mandatory religious adherence. (*Lynch, supra*, 465 U.S. at p. 678 [79 L.Ed.2d at p. 613]; Jones, *"In God We Trust" and the Establishment Clause* (1989) 31 J. Church & State 381, 412 [" '[E]stablishment' means government support for institutions (churches) and does not concern religion in general."]; Adams & Emmerich, *supra*, 137 U.Pa.L.Rev. at p. 1615 ["[T]he Founders conceived of separation in institutional rather than cultural terms. The principal evil they sought to avoid was an alliance of civil and ecclesiastical power that would threaten religious liberty; that religion and society should be separated is a notion that would have met with uniform disapproval. The centrist position that predominated among the Founders recognized that religion was great teacher of morality and an essential pillar of civil society."].)

The framers believed that concentrations of power in the hands of any individual or institution tended to corruption and tyranny. To prevent such a concentration within government, they created a federal system with a national government of specified powers and systems of checks and balances and separations of powers. To prevent such a concentration in the church-state relationship, they prohibited national government from establishing a church or inhibiting free individual choice in church membership or religious practice. In this way, the church as an institution was to be relegated to the private sphere of life, where free competition and individual selections from among a variety of sects and denominations could be expected to produce diversity and a resulting diffusion of civil authority. (Ely, Democracy and Distrust: A Theory of Judicial Review (1980) at p. 94 ["Obviously part of the point of [the religion clauses] was to make sure the church and the government gave each other breathing space: the provision thus performs a structural or separation of powers function . . . . In addition], part of the explanation for the free exercise clause has to be that for the framers religion was an important substantive value they wanted to put significantly beyond the reach of at least the federal legislature."].)

The Supreme Court's decisions dealing with the religion clauses reflect the church-state disengagement principle, including its prohibitions of government preference among churches, government financial aid to churches, and promotion of religious practice. In striking down a Minnesota law requiring registration of some churches but not others as charitable organizations, the court observed: "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another. . . . [¶] This constitutional prohibition of denominational preferences is inextricably connected with the continuing vitality of the Free Exercise Clause." (*Larson* v. *Valente* (1982) 456 U.S. 228, 244-245 [72 L.Ed.2d 33, 54, 102 S.Ct. 1673].)

In *Lemon, supra,* 403 U.S. 602, the court invalidated a salary supplement paid to nonpublic school teachers and a reimbursement of instructional expenses at those schools, articulating a three-prong test requiring a challenged practice to have a secular purpose, to exhibit a primary effect which neither advanced nor inhibited religion, and to avoid excessive government entanglement with religion. (*Id.* at pp. 612-613 [29 L.Ed.2d at pp. 755-756].) The *Lemon* test, with its focus on the distinction between religious and secular purpose and effect, has become the standard establishment clause measuring device, extending as well to cases not involving parochial school financing. (See, e.g., *County of Allegheny, supra,* 492 U.S. 573; *Lynch, supra,* 465 U.S. 668.)

As noted above, the court has also found violations of the religion clauses in cases of government-composed and sponsored prayer and Bible reading in school classrooms. (*Abington School Dist.* v. *Schempp, supra,* 374 U.S. 203; *Engel* v. *Vitale, supra,* 370 U.S. 421.) In *Engel,* the court struck down a school prayer written and prescribed by state government for recitation in classrooms. Although it declined to impose any burden of showing "direct governmental compulsion" on a plaintiff in an establishment clause case, it observed that indirect pressure was nonetheless present: "When the power, prestige, and financial support of government is placed behind a particular religious belief, the indirect coercive pressure upon religious minorities to the prevailing officially approved religion is plain." (370 U.S. at p. 431 [8 L.Ed.2d at p. 608].)

Distinguishing between the prescription of prayer in the classroom and the provision of a forum for student activity, the Supreme Court recently upheld a federal statute providing for use of school facilities by high school student organizations on a nondiscriminatory basis. The high school in question had denied facility privileges to a Christian club composed of its students, while according privileges to nonreligious student groups. On the religion clause issues, no opinion commanded a majority of the court.

Writing for four justices, Justice O'Connor stated in part: "[T]here is a crucial difference between *government* speech endorsing religion, which the Establishment Clause forbids, and *private* speech endorsing religion, which the Free Speech and Free Exercise Clauses protect." (*Board of Education* v. *Mergens* (1990) 496 U.S. 226, ___ [110 L.Ed.2d 191, 215-216, 110 S.Ct. 2356, 2372] (hereafter *Mergens*).)

## 2. Benign Recognition of Religion as Part of American Culture

The public acknowledgement of a Supreme Being is a consistent element of American culture, specifically endorsed by the framers and upheld in the traditions of both state and national governments since the founding of the republic. In upholding the Nebraska Legislature's practice of opening its sessions with prayer offered by a government-paid and appointed chaplain, the Supreme Court observed that the First Congress had authorized payment of chaplains and adopted a tradition of legislative prayer at the same time it approved the Bill of Rights. (*Marsh, supra,* 463 U.S. at pp. 787-788 [77 L.Ed.2d at pp. 1024-1025].)[3] From its review of this history, the court concluded: "[T]he delegates [to Congress] did not consider opening prayers as a proselytizing activity or as symbolically placing the government's 'official seal of approval on one religious view' . . . . Rather, the Founding Fathers looked at invocations as 'conduct whose . . . effect . . . harmonize[d] with the tenets of *some or all religions.*' " (463 U.S. at p. 792 [77 L.Ed.2d at p. 1027], italics added.)

Since the First Congress, national government encouragement of public prayers, and other generalized references to a Supreme Being, has continued. Presidential proclamations calling upon the nation to pray and give thanks have been regularly issued. Presidential inaugural and other addresses from the founding of the republic to the present day have sought

---

[3]On the same day it approved the Bill of Rights, the First Congress passed the following resolution calling on the President to proclaim a national day of thanksgiving and prayer: "That a joint committee of both Houses be directed to wait upon the President of the United States to request that he would recommend to the people of the United States a day of *public thanksgiving and prayer, to be observed by acknowledging, with grateful hearts, the many signal favors of Almighty God,* especially by affording them an opportunity peaceably to establish a Constitution of government for their safety and happiness." (Annals of Cong. 949, cited in Rice, *supra,* at p. 48, italics added; see also *Marsh, supra,* 463 U.S. at p. 788, fn. 9 [77 L.Ed.2d at p. 1025].)

The First Amendment issue raised by the prospect of government encouragement of public prayer did not go unnoticed in Congress. Representative Thomas Tucker of South Carolina objected to the resolution, arguing in part: "this . . . is a business with which Congress have nothing to do; it is a religious matter, and, as such, is proscribed to us." (Annals of Cong. 914-915, cited in Curry, *supra,* at p. 217.) Representative Tucker also voted *against* the religion clauses as they were finally adopted by Congress. Congress obviously did not share his views as to the scope and effect of those clauses.

blessings on our nation and its leadership, and encouraged prayer. (Cord, *supra*, at p. 35; Rice, *supra*, at pp. 177-193.)[4]

Even as the nation grew and diversified in the 19th century, the view that the religion clauses did not forbid government sponsorship of public prayer continued to prevail. Thomas Cooley, one of the great constitutional scholars of the era, commented on constitutionally permissible practices involving of "solemn recognition of a superintending Providence in public transactions and exercises as the general religious sentiment of mankind inspires." He cited as examples military chaplaincies, legislative prayer, and tax exemptions for churches. Recognizing the dangers of entanglement, however, Cooley cautioned: "Undoubtedly the spirit of the Constitution will require . . . that care be taken to avoid discrimination in favor or any one denomination or sect; but the power to do any of these things will not be unconstitutional, simply because of being susceptible of abuse . . . ." (Cooley, Constitutional Limitations (1868) pp. 470-471, quoted in Cord, *supra*, at pp. 13-14.)

All three branches of our national government and state governments continue to make ceremonial references to a Supreme Being. As noted above, the practice of beginning legislative sessions with prayer has continued in Congress and in most of the state legislatures. The United States Supreme Court begins its sessions with the cry, "God save the United States and this Honorable Court." (*Marsh, supra,* 463 U.S. at pp. 786, 788-789, fns. 10-11 [77 L.Ed.2d at pp. 1024-1026].) Federal statutes call upon the President to, among other observances, set aside a national day of prayer "on which the people of the United States may turn to God in prayer and meditation at churches, in groups, and as individuals" (36 U.S.C. § 169h) and to "issue a proclamation calling upon the people of the United States to observe each May 30, Memorial Day, by praying, each in accordance with his religious faith, for permanent peace." (36 U.S.C. § 169g.) (See also *County of Allegheny, supra,* 492 U.S. at pp. 669-671 [106 L.Ed.2d at pp. 544-545, 109 S.Ct. at pp. 3141-3142] (Kennedy, J., conc. & dis.), and *Lynch, supra,* 465 U.S. at pp. 675-676, fns. 2-5 [79 L.Ed.2d at pp. 611-612] [further

---

[4] President Bush continued this tradition in his addresses to the nation about the recent war in the Persian Gulf. As the war began, he asked each American to "stop what [he or she was] doing and *say a prayer* for all the coalition forces, and especially for our men and women in uniform, who, this very moment, are risking their lives for their country and for all of us." He asked that "God bless and protect each and every one of them and . . . the United States of America." (Pres. Address, Feb. 25, 1991, as reported by the Financial Times, italics added.) When the war ended, President Bush reminded the people of the United States that "From the moment Operation Desert Storm commenced on January 16, until the time the guns fell silent at midnight one week ago, this nation has watched over its sons and daughters with pride—*watched over them with prayer*." (Pres. Address, Mar. 7, 1991, as reported by the Associated Press, italics added.)

examples of presidential proclamations and other government action acknowledging a Supreme Being].)

The motto "In God We Trust" has appeared on United States coins and currency since the Civil War. It is recognized by federal statute as our national motto. (36 U.S.C. § 186.) With respect to the continuing use of the motto, Justice Brennan wrote: "It is not that the use of these four words ["In God We Trust"] can be dismissed as 'de minimis'—for I suspect there would be intense opposition to the abandonment of that motto. The truth is that we have simply interwoven the motto so deeply into the fabric of our civil polity that its present use may well not present that type of involvement which the First Amendment prohibits." (*Abington School Dist.* v. *Schempp, supra,* 374 U.S. at p. 303 [10 L.Ed. 2d at p. 904] (Brennan, J., conc.).)

Consistent with Justice Brennan's observation, the court has upheld government practices based on traditions embedded "into the fabric of our civil policy" despite their express recognition of religion or religious ideas. (E.g., *Zorach* v. *Clauson, supra,* 343 U.S. 306 [public school children given released time from school for religious instruction]; *Walz* v. *Tax Commission, supra,* 397 U.S. 664 [tax preferences for churches]; *Marsh, supra,* 463 U.S. 783 [legislative prayer by paid chaplains].)

Despite the passage of time and even in our increasing diversity, inclusiveness, and sophistication as a nation, the invocation of a Supreme Being in public prayer on civic ceremonial occasions remains part of our heritage and culture. Whether in high school or college commencement exercises, Fourth of July celebrations, Memorial Day remembrances, or on other occasions, a Supreme Being is invoked in a spirit of thanks and praise and in supplications for help and guidance.[5] In Cooley's phrase, the "general religious sentiment of mankind" continues to be part of American culture.

In light of these principles, the religion clauses represent not a "wall of separation" but a permeable membrane. They allow the free flow of government action, based on a historical tradition that recognizes the civic importance of religion and religious ideas, but forbid overt discrimination among sects or religious groups, direct financial support of churches, government

---

[5] One explanation for the continuation of this tradition may be the stability of the general beliefs and attitudes of Americans about the general subjects of God and prayer. A 1988 Gallup Poll revealed that 94 percent of Americans believe in God or a universal spirit (exactly the same proportion who so reported in 1937). Ninety percent also reported that they prayed to God, with thirty-six percent doing so twice a day or more. However, only 40 percent report regular attendance at a church or synagogue. (Gallup Poll results (Dec. 24, 1988) reported in the Economist.)

pressure designed to require or prohibit religious acts, and other conduct which, "in reality, . . . establishes a religion or religious faith or tends to do so." (*Lynch, supra,* 465 U.S. at p. 678 [79 L.Ed.2d at p. 613].)

## B. An Analysis of This Case

This action comes to us after plaintiffs prevailed on a motion for summary judgment and obtained a permanent injunction barring any "religious" invocations or benedictions at graduation ceremonies in the Morongo Unified School District. As the moving and ultimately prevailing party, plaintiffs had the burden of demonstrating as a matter of law the unconstitutionality of the school district's policy and practice. (*Lipson* v. *Superior Court* (1982) 31 Cal.3d 362, 374 [182 Cal.Rptr. 629, 644 P.2d 822].) The facts are taken from the uncontradicted evidence in the declarations, documents, and deposition testimony before the trial court.

### 1. Facts

The occasion is a high school graduation ceremony. Its purpose is to celebrate and commemorate an event of significance in the lives of young people and their teachers, parents, families, and friends: the successful completion of a period of academic study and physical, intellectual, and emotional growth that has brought the young people to the threshold of adulthood. The ceremony is not open to the public in the general sense. Tickets are issued to graduating students, family, and guests.

The graduation ceremony takes place after the students' academic work has been completed and evaluated. Attendance is voluntary in this sense: a student who does not attend will nonetheless receive a diploma and will suffer no adverse effects in his or her academic or civil status. As the nature of the event suggests, however, most students and those close to them want to and do attend.

The opening and closing prayers (invocations and benedictions) are one part of the ceremony. They are brief, generally one minute or less each. Measured in terms of time expended, they are a very small part of the overall event (one or two minutes in the forty-five minute to ninety minute exercises). Measured in terms of focus, they are secondary to other events, e.g., graduation speeches and presentations, musical performances, and, in some of the schools, the presentation of diplomas. According the school superintendent, the invocation and benediction are included to continue a historical tradition which adds to the ceremonial nature of the graduation event and has the support of the local community.

Although the graduation ceremony is sponsored and supervised by the school district, it is an event carried on by, as well as for, the graduating students. A significant element of student choice pervades the program, including the selection of persons to deliver the invocation and benediction. A student leader chose the speakers to conduct the invocation and benediction at one of the schools in one year; a student committee regularly makes the selection at another school. Speakers have generally been chosen from the local clergy; on at least one occasion a teacher was chosen. Speakers serve voluntarily and receive no financial compensation.

The appendix to this opinion includes the texts of the invocation and benediction at one high school in 1986. The invocation, by a member of the clergy, begins with an introduction referring to the speaker's graduation from the same high school 20 years earlier and expressing hope and confidence in the future, and concludes by inviting those present to join in prayer if they were so inclined, but reminding them of their freedom *not* to do so. The three-sentence prayer addresses the "Heavenly father," gives thanks for the speaker's opportunity to see the students graduate, asks for confidence and courage in light of what the graduates had accomplished, and ends with a request for a blessing "in the name of our Lord, Amen."

The benediction speaker, a teacher, invited the audience to stand and join in prayer. Addressing the "Father," he expressed thanks for the graduates and asked for guidance, strength, happiness, good health, and other blessings. He asked these things "in Your name, Amen."

*2. Evaluation*

As the references in Justice Kennard's and Justice Panelli's opinions illustrate, the Supreme Court's recent pronouncements on the religion clauses are not altogether clear. However, current decisions have generally emphasized the importance of a detailed evaluation of the *context* of religious activity, symbolism, and expression in assessing constitutionality. Indeed, even a sectarian religious symbol such as a crèche or menorah may be constitutionally displayed in one context (*Lynch, supra,* 465 U.S. 668 [holiday display with Santa Claus house and Christmas tree]; *County of Allegheny, supra,* 492 U.S. 573 [menorah next to Christmas tree with sign referring to liberty]), but not in another (*County of Allegheny, supra,* 492 U.S. 573 [crèche standing alone in public courthouse with Roman Catholic religious society name and New Testament quotation attached]).

Full consideration of context thus appears essential to distinguish, in First Amendment terms, between "real threat" and "mere shadow" (*Abington School Dist.* v. *Schempp, supra,* 374 U.S. at p. 308 [10 L.Ed.2d at p. 907]

(conc. opn. of Goldberg, J.)). In this regard, I offer several observations regarding the graduation ceremonial prayers at issue.

*First*, the nature of the event allows all audience members a high degree of freedom.

If one elects to participate, he or she may infuse the brief exercise with personal beliefs and emotions, particularly since references to God are "weak symbols" which readily conform to individual interpretation. As one commentator observes: "[T]he religious use of the term 'God' comes as close as possible to a generic religious symbol. The symbol 'God' is a vessel that can be filled by most religious persons' specific beliefs. Not only can all traditional Western and Eastern theists interpret the symbol to fit their specific faith, but Native American Indians and even most Buddhists can do so. Robert Bellah has rightly noted that 'God' is 'a word which almost all Americans can accept but which means so many different things to so many different people that it is almost an empty sign.' Thus, the symbol permits religious diversity in our pluralistic society." (Jones, *supra*, 31 J. Church & State at p. 413.)

If one elects not to participate, he or she may simply observe the event as a cultural phenomenon. Even persons who object to the practice are free to decline, inconspicuously and without diminution in their status as citizens, to engage in it. As the New Hampshire Supreme Court said in upholding invocations at town meetings: "One [person attending the meeting] may regard an invocation as purely ceremonial, another as a throwback to another day and another as religious practice which should be forbidden. But however any individual . . . may describe the practice, it is not, on the facts of this case, an establishment of religion proscribed by the establishment clause of the First Amendment in any pragmatic, meaningful and realistic sense of that clause." (*Lincoln* v. *Page* (1968) 109 N.H. 30 [241 A.2d 799, 800-801].)

Whether one participates or declines to do so, there are no adverse consequences. Neither the speaker, nor the students who chose him or her, nor the school district that approves the choice, retains any authority to impose any penalty on a person for electing not to participate in the exercise.

*Second*, invocations and benedictions serve an important secular function at high school graduations. They provide a sense of tradition, continuity, and transcendence that evokes positive emotions and expectations. These elements, in turn, serve to unify the community and provide a foundation for moral and ethical standards. In her concurring opinion in *Lynch*, Justice O'Connor observed that practices such as legislative prayers and opening

court sessions with "God save the United States and this honorable court" serve "the legitimate secular purposes of solemnizing public occasions, expressing confidence in the future, and encouraging the recognition of what is worthy of appreciation in society." (*Lynch, supra,* 465 U.S. at pp. 692-693 [79 L.Ed.2d at pp. 622-623] (O'Connor, J., conc.); see also *County of Allegheny, supra,* 492 U.S. at pp. 628-631 [106 L.Ed.2d at pp. 518-519, 109 S.Ct. at pp. 3120-3121] (O'Connor, J., conc.).)

Although it does not appear that Justice O'Connor's "solemnization" approach to reconciling benign recognition of religion had been adopted or applied by a majority of the court (*County of Allegheny, supra,* 492 U.S. at p. 595, fn. 46 [106 L.Ed.2d at p. 496, 109 S.Ct. at p. 3103] (opn. of Blackmun, J., for two justices), that approach supports the invocation and benediction used here. All three of Justice O'Connor's functions are served by invocations and benedictions at high school graduation ceremonies. Appearing, as they do, at the beginning and end of the ceremony, invocations and benedictions serve to solemnize, highlight, and set off what goes on between. As shown by the particular invocation and benediction in this case, the speakers are recognizing the graduates and what they have accomplished and expressing confidence that their future will be a bright one. Without some sharing of these kinds of ideas and sentiments, a community is not a community.

Thus, notwithstanding that prayer is an obviously religious activity, "reasonable observers" might not view the long-standing practice of invocations and benedictions as "a disapproval of their particular religious choices, in light of the fact that they serve a secular purpose rather than a sectarian one and have largely lost their religious significance over time." (*County of Allegheny, supra,* 492 U.S. at p. 631 [106 L.Ed.2d at p. 519, 109 S.Ct. at p. 3121] (conc. opn. of O'Connor, J.).)

*Third,* considering the principle of church-state disengagement discussed above, the record contains no evidence of government sectarian bias in either intent or effect. With respect to the selection of speakers to deliver the invocation and benediction, a significant level of student choice was involved. (Cf., *Mergens, supra,* 496 U.S. at p. __ [110 L.Ed.2d at p. 216, 110 S.Ct. at p. 2372.) Although school officials retained final authority to approve student choices, there is no evidence that school officials used their authority to promote one sect or religious denomination over another. Clergy and school personnel from multiple denominations were represented.

With respect to the content of the messages, the speaker giving the invocation testified that his use of the term "Heavenly Father" referred to God, and that his phrase "Our Lord" referred to "One who is sovereign over the

universe." He denied that he was necessarily referring to Christ. Plaintiffs supplied no evidence to the contrary. Thus, the evidence shows the terms used in the prayers are generalized references to a Supreme Being, much like the legislative prayers sustained by the Supreme Court in *Marsh, supra,* 463 U.S. 783.

Of course, generalized references to God in a prayer are not consistent with the beliefs of everyone. They do not reflect the beliefs of atheists and others who may deny the existence of God or the effectiveness of prayer. But the same vice necessarily permeates the legislative prayers upheld in *Marsh, supra,* 463 U.S. 783, the symbolic displays in *Lynch, supra,* 465 U.S. 668) and *County of Allegheny (supra,* 109 S.Ct. 3086), and the released-time program in *Zorach* v. *Clauson (supra,* 343 U.S. 306). As those cases teach, respecting *the idea* of a Supreme Being by offering prayer in the context of a culture, the institutions of which presuppose its existence may not be the same as respecting *an establishment* of religion. So long as a practice does not suggest or promote favoritism or factionalism among churches and there is no direct or indirect pressure brought by government to force participation, it need not be universal.

In view of these observations, the invocation and benediction may be analogous to the prayers offered in the Nebraska Legislature which were sustained by the Supreme Court in *Marsh, supra,* 463 U.S. 783, as a benign recognition of religion as part of American culture. In *Marsh,* a six-member majority of the Supreme Court sustained the 200-year old practice of the Nebraska Legislature in opening its session with prayers offered by a government-paid chaplain. Without applying the *Lemon (supra,* 403 U.S. 602) test or positing any secular purpose for legislative prayer, the court reviewed the 200-year history of the congressional chaplaincy practice and the similar 100-year history of the Nebraska chaplaincy practice and observed: "This unique history leads us to accept the interpretation of the First Amendment draftsmen who saw no real threat to the Establishment Clause arising from a practice of prayer similar to that now challenged." (463 U.S. at p. 791 [77 L.Ed.2d at p. 1027].) The court held that the founding fathers did not regard the legislative practice of prayer as proselytizing activity or as symbolically placing the government's " 'official seal of approval on one religious view.' " (*Id.* at p. 792 [77 L.Ed.2d at p. 1027].) Rather, they saw it as "simply a tolerable acknowledgement of beliefs widely held among the people of this country." (*Ibid.* [77 L.Ed.2d at p. 1028].) As to the particular plaintiff in the case, a Nebraska legislator and taxpayer, the court observed that, as an adult, he was not readily subject to " 'religious indoctrination.' " (*Ibid.* [77 L.Ed.2d at p. 1028].)

After sustaining the general practice of legislative prayer, the court went on to sustain its particular incidents in the Nebraska Legislature. It

ultimately attributed no constitutional significance to the 16-year tenure of one Presbyterian clergyman as chaplain, the payment of the chaplain from public funds, or the Judeo-Christian tradition of the prayers offered. It noted the performance of guest chaplains and pointed to the lack of evidence of any "impermissible motive" in the chaplain's selection and tenure. (*Marsh, supra,* 463 U.S. at p. 793 [77 L.Ed.2d at p. 1028-1029].) As to the content of the prayers, it observed: "The content of the prayer is not of concern to judges where, as here, there is no indication that the prayer opportunity has been exploited to proselytize or advance any one or to disparage any other, faith or belief. That being so, it is not for us to embark on a sensitive evaluation or to parse the content of a particular prayer." (*Id.* at pp. 794-795 [77 L.Ed.2d at p. 1029].)

Like the prayers in *Marsh*, the invocation and benediction here are brief and general. There is no evidence that they were employed to proselytize or to disparage one or more religious sects or denominations. In this way, they are similar to the prayers in *Marsh* and consistent with the principle of benign recognition. Although not universal, the invocation and benediction harmonize with most religions and are a "tolerable acknowledgement of beliefs widely held among the people of this country." (*Marsh, supra,* 463 U.S. at p. 792 [77 L.Ed.2d at p. 1028].)

There is, of course, a significant difference between the Nebraska Legislature and the Morongo Unified School District. In giving effect to the principle of church-state disengagement, the Supreme Court has been particularly zealous in policing the boundary between religious teaching and practice, and instruction in the public schools. In the public school context even generalized recognition of a Supreme Being has not been regarded as "benign recognition." In light of this difference, Justice Kennard attempts to distinguish *Marsh* (*supra,* 463 U.S. 793), relying on a footnote in *Edwards* v. *Aguillard* (1987) 482 U.S. 578, 583, footnote 4 [96 L.Ed.2d 510, 518-519, 107 S.Ct. 2573], which states: "Such a historical approach is not useful in determining the proper roles of church and state in public schools, since free public education was virtually nonexistent at the time the Constitution was adopted."

While it is conceivable that the court was attempting to preclude reliance on *Marsh* in any school-related context, its dictum need not be read so broadly. *Edwards* involved an explicit state requirement that "creation science"—a religious belief—be taught in public school classrooms. Therefore, the court's statement may refer only to the explicitly instructional aspect of public school education. This reading of *Edwards* is reinforced by the court's broad statements about the potentially directive and coercive nature of *classroom instruction*: "The Court has been particularly vigilant in

monitoring compliance with the Establishment Clause in elementary and secondary schools. Families entrust public schools with the education of their children, but condition their trust on the understanding that *the classroom* will not purposely be used to advance religious views that may conflict with the private beliefs of the student and his or her family. Students in such institutions are impressionable and their attendance is involuntary. . . . The State exerts great authority and coercive power through mandatory attendance requirements, and because of the students' emulation of teachers as role models and the children's susceptibility to peer pressure." (*Edwards* v. *Aguillard, supra,* 482 U.S. at pp. 583-584 [96 L.Ed.2d at p. 519], italics added; see also *Abington School Dist.* v. *Schempp, supra,* 374 U.S. 203, 223 [10 L.Ed.2d 844, 858-859] ["These [prayer and Bible reading] exercises are *prescribed as part of the curricular activities of students who are required by law to attend school.* They are held in school buildings under the supervision and with the participation of teachers employed in those schools. None of these factors, other than compulsory school attendance, was present in the [released time for religious instruction] program upheld in *Zorach* v. *Clauson.* [Italics added.]"].)

In addition, the *Edwards* footnote observes merely that historical analysis is inapposite because free public education postdated the Constitution. But although *public instruction* does postdate the Constitution, *civic ceremonies* employing invocations and benedictions do not. They are part of a tradition dating back to the founding of the republic; they involve a practice of prayer "similar to" that involved in *Marsh* (*supra,* 463 U.S. at p. 791 [77 L.Ed.2d at p. 1027]).

In contrast to the graduation ceremony, school attendance is mandatory and the degree of freedom enjoyed by students in the classroom is demonstrably less than at graduation. Teachers and other school officials have significant and direct authority over impressionable young people in school classrooms and corridors. They are paid by the state to determine what is taught and how it is taught. They wield the power to control, evaluate, and discipline student behavior and performance. As authority figures, teachers and school administrators are not uncompensated, invited speakers whose power is limited to the inherent force of their expression. (See *Engel* v. *Vitale, supra,* 370 U.S. at p. 435, fn. 21 [8 L.Ed.2d at pp. 614-615] [distinguishing classroom prayer from "patriotic and ceremonial occasions" on which, for example, a "composer's professions of faith in a Supreme Being" were repeated]; see also *id.* at pp. 441-442 [8 L.Ed.2d at pp. 614-615] [observing that in directing a classroom prayer, the government is "performing a religious exercise" and "inserts a divisive influence" into the community (conc. opn. of Douglas, J.)].) Moreover, the graduation ceremony audience is composed of high school graduates (who are on the threshold

of adulthood) and their parents and families. (*Marsh, supra,* 463 U.S. at p. 792 [77 L.Ed.2d at pp. 1027-1028].) In these circumstances, even indirect pressure is unlikely to play a significant role in student attitudes, perceptions, or practices.

There is no clear indication in any of the several Supreme Court cases that have analyzed *Marsh* that its holding will be confined to legislative prayer. In *Lynch (supra,* 465 U.S. 668), the court relied extensively on *Marsh (supra,* 463 U.S. 783) in reaffirming a historical approach to the religion clauses, recognizing the pervasive presence of religion and religious symbols in American life, and cautioning against "rigid, absolutist" views of the First Amendment. (465 U.S. at pp. 674-678 [79 L.Ed.2d at pp. 610-613].) The court upheld a city-erected display of a crèche, Santa Claus house, and Christmas tree in a private park. In *Wallace* v. *Jaffree* (1985) 472 U.S. 38 [86 L.Ed.2d 29, 105 S.Ct. 2479] (hereafter *Wallace*), the court struck down the Alabama moment-of-silence statute, reaffirming its decision banning prayer in public schools. It noted the indirect coercive pressure brought on children by the statute and the *Marsh (supra,* 463 U.S. 783) distinction between adults not susceptible to "religious indoctrination" and children subject to "peer pressure." (*Wallace, supra,* 472 U.S. at pp. 60-61, fn. 51 [86 L.Ed.2d at p. 46].) Finally, in *County of Allegheny (supra,* 492 U.S. 573) the *Marsh* decision was integrated into the analysis of each of the principal opinions. In the portion of his opinion that was endorsed by a five-person majority of the court, Justice Blackmun took care to distinguish between what he called the "general religious" and "nonsectarian" references in the legislative prayers in *Marsh* from the "specifically Christian symbol" of the crèche which he viewed as demonstrating the "government's allegiance to a particular sect or creed." (*County of Allegheny, supra,* 492 U.S. at p. 603 [106 L.Ed.2d at p. 501, 109 S.Ct at p. 3106].) He also suggested a possible distinction between legislative prayer and government proclamations for a national day of prayer, observing that "legislative prayer does not *urge* citizens to engage in religious practices." (*Id.* at p. 603, fn. 52 [106 L.Ed.2d at p. 501, 109 S.Ct at p. 3106], italics added.)

In a portion of his opinion endorsed by Justice Stevens, Justice Blackmun offered a further interpretation of *Marsh (supra,* 463 U.S. 783) based on Justice O'Connor's concurrence in *Lynch (supra,* 465 U.S. 668): Legislative prayer is a form of "ceremonial deism" that serves the legitimate secular purpose of "solemnizing public occasions" and does not convey government approval of "particular religious beliefs." (*County of Allegheny, supra,* 492 U.S. at p. 595, fn. 46 [106 L.Ed.2d at p. 496, 109 S.Ct. at p. 3102].) Justice O'Connor viewed the legislative prayers in *Marsh* as government acknowledgements of religion which are not understood as conveying "an endorsement of particular religious beliefs" because "they serve [secular purposes

such as solemnizing the occasion] and because of their 'history and ubiquity.'" (*County of Allegheny, supra,* 492 U.S. at p. 625 [106 L.Ed.2d at p. 515, 109 S.Ct. at p. 3118].) Finally, in his opinion for four justices, Justice Kennedy stated in part: "*Marsh* stands for the proposition, not that specific practices common in 1791 are an exception to the otherwise broad sweep of the Establishment Clause, but rather that the meaning of the Clause is to be determined by reference to historical practices and understandings. Whatever test we choose to apply must permit not only legitimate practices two centuries old but also any other practices with no greater potential for an establishment of religion. . . . The First Amendment is a rule, not a digest or compendium. A test for implementing the protections of the Establishment Clause that, if applied with consistency, would invalidate longstanding traditions cannot be a proper reading of the Clause." (492 U.S. at p. 670 [106 L.Ed.2d at pp. 544-545, 109 S.Ct. at p. 3142], citation and fn. omitted.)

In view of the above, I am not prepared to isolate *Marsh* (*supra,* 463 U.S. 783) as an aberration in the mainstream of constitutional decisionmaking. Although it relies in part on a unique history, *Marsh* is not a historical artifact. Like *Zorach* v. *Clauson* (*supra,* 343 U.S. 306), *Lynch* (*supra,* 465 U.S. 668) and *Walz* v. *Tax Commission* (*supra,* 397 U.S. 664), it is an example of the principle of benign recognition of religion and religious practices and ideas that is part of our historical and cultural tradition. But, like every sufficient statement of a legal principle, *Marsh* (*supra,* 463 U.S. 783) contains within it parameters that limit its scope and confine its application: the court was careful to note the absence of discrimination, in either intent or effect, in favor of or against any religious denomination or group. The general reference to a Supreme Being, without more, placed the legislative prayers in *Marsh* within the principle of benign recognition without offending the principle of church-state disengagement. For this reason, the legislative prayers were constitutional.

Like a scientific theory, a legal principle must account for all the data, i.e., both church-state disengagement and benign recognition of religion and religious ideas in American constitutional law and civic culture. When government engages in a practice that is similar to those benign acknowledgements of a Supreme Being endorsed by the framers of the Constitution and that has stood the test of time by remaining an accepted part of culture, such practice should be upheld as constitutional unless it engages government in sectarian favoritism, financial aid to church institutions, or other conduct that pressures citizens, directly or indirectly, to believe or disbelieve. Having found none of the latter elements to be present in this case, I would, if free to do so, uphold the challenged practice of the school district.

## II. The California Constitutional Provisions

As stated above, having concluded that the practice of graduation prayers violates the establishment clause of the First Amendment as construed in light of the Supreme Court's *Lemon* (*supra*, 403 U.S. 602) test, I would not reach plaintiffs' contentions that the practice violates provisions of the California Constitution as well.

As a result of the various opinions filed in this case, three justices have concluded that the practice violates our state Constitution, two have concluded it does not, and two (myself included) have declined to reach any state constitutional issues. Therefore, our judgment does not rest on the state Constitution; any resolution of the state constitutional issues will necessarily await another day. (*County of San Mateo* v. *Dell J.* (1988) 46 Cal.3d 1236, 1241-1242, fn. 5, & 1249-1250 [252 Cal.Rptr. 478, 762 P.2d 1202] [lead opinion signed by three justices could not be relied on; concurring and dissenting opinion of four justices represented the majority view]; *Mix* v. *Ingersoll Candy Co.* (1936) 6 Cal.2d 674, 679 [59 P.2d 144] [first ground of decision expressed in judicial opinion was only the personal opinion of the writer where it was clear that other justices based their concurrence only on second ground]; *Farrell* v. *Board of Trustees* (1890) 85 Cal. 408, 415-416 [24 P. 868] [ground of decision assented to by only three justices cannot be regarded as adopted by the Supreme Court or binding as authority].)

The posture of constitutional argument in this case is frequently encountered. Legislation or government action is challenged as unconstitutional under both the state and federal Constitutions. If the statute or action is determined to be invalid under either Constitution, the case is thus disposed of; the other can, but need not, be considered. If on the other hand, the statute or action is upheld under either Constitution, the other must be considered to resolve the entire controversy between the parties. Two questions inevitably arise: (1) which constitutional ground, federal or state, should be considered first; and (2) if the case can be disposed of on the ground first considered, should the remaining ground nonetheless be reached?

The views of my colleagues are divided on these questions. My research has revealed no systematic consideration of these issues in any of our opinions and divergent patterns in our decisionmaking. Because I believe a principled approach to these questions is not only possible, but essential, I will explain why I have decided to consider the federal constitutional issues first and forgo consideration of the state constitutional issues in this case.

The California Constitution is the supreme law of our state—a seminal document of independent force that establishes governmental powers and

safeguards individual rights and liberties. (Cal. Const., art. I, § 24; *Committee to Defend Reproductive Rights* v. *Myers* (1981) 29 Cal.3d 252, 261 [172 Cal.Rptr. 866, 625 P.2d 779, 20 A.L.R.4th 1118]; *Allen* v. *Superior Court* (1976) 18 Cal.3d 520, 525 [134 Cal.Rptr. 774, 557 P.2d 65].) As the Supreme Court of California, we are the final arbiters of the meaning of state constitutional provisions. (*Raven* v. *Deukmejian* (1990) 52 Cal.3d 336, 354 [276 Cal.Rptr. 326, 801 P.2d 1077].) Our authority and responsibility in this regard is part of the basic structure of California government; it cannot be delegated to the United States Supreme Court or any other person or body. (*Id.* at pp. 354-356.) When we construe provisions of the California Constitution, we necessarily do so in light of their unique language, purposes, and histories, in accordance with general principles of constitutional interpretation established in our case law. Nor do we act differently when the state constitutional provision in issue contains the same language as a federal constitutional provision. In such a case, we are not bound by a decision of the United States Supreme Court or any other court. We must consider and decide the matter independently.

By the same token, California is not an island. We are a part of a federal system created by the Constitution of the United States. By its own declaration, that Constitution is the supreme law of the land. (U.S. Const., art. VI, cl. 2.) Our judges take oaths to support and defend the Constitution of the United States, as well as that of California, in all aspects of governmental service. (*Ibid.*; Cal. Const., art. XX, § 3.) The United States Supreme Court is the highest judicial authority in the federal system. (U.S. Const., art. III, § 1.) We have consistently emphasized in our case law that decisions of the United States Supreme Court, although not binding on questions of state constitutional law, are nonetheless entitled to great deference; we have gone so far as to say that such decisions will not be departed from in the absence of cogent and persuasive reasons. We summarized the law in this regard in *Raven* v. *Deukmejian, supra,* 52 Cal.3d 336 at page 353: "As early as 1938, we stated that 'cogent reasons must exist before a state court in construing a provision of the state Constitution will depart from the construction placed by the Supreme Court of the United States on a similar provision in the federal Constitution.'"

Our policy of deference to United States Supreme Court decisions does not signify subservience or abdication of authority. It simply recognizes certain basic realities of constitutional adjudication. The United States Supreme Court is a judicial tribunal devoted in large measure to consideration of complex constitutional rights and liberties; it is the primary interpreter and protector of the guaranties of the Bill of Rights, which is the most comprehensive and far-reaching document of civil rights and liberties in our nation. Although we only rarely consider cases like this one which raise

fundamental issues of liberty going to the central fabric of our society, such questions are daily grist for the mill of the Supreme Court. In view of these circumstances, and in the absence of other compelling considerations, we do well to invite and await its views before giving final and definitive answers to complex and difficult questions of constitutional law. In this way, we can give appropriate deference to its views (as our cases require) and proceed in a fashion that is "informed but untrammeled" by federal constitutional principles. (*Reynolds* v. *Superior Court, supra,* 12 Cal.3d at p. 842.)

If, on the other hand, we leap into the breach, finally resolving the state constitutional question, we deprive ourselves of the prospect of input not only from the high court but from other state and federal courts that may consider the issue. (*Michigan* v. *Long* (1983) 463 U.S. 1032, 1037-1044 [77 L.Ed.2d 1201, 1211-1216, 103 S.Ct. 3469] [clear statement of "adequate and independent state ground of decision" in state court opinion precludes United States Supreme Court review].)

Neither the rights of the parties nor the path of the law is imperiled by deferring consideration of a parallel state constitutional question. The party seeking to invalidate the state statute or practice has received a favorable decision and appropriate relief, subject to possible United States Supreme Court review of the federal questions decided. Even if review takes place, that party can reassert state constitutional grounds on remand, if necessary. Likewise, the losing party has no cause to complain—if its statute or practice is invalid under either the federal or state constitutions, relief is in order.

If the Supreme Court does not review our decision on the federal question, it will nonetheless be binding on the courts of this state until it is effectively overruled by a subsequent decision of this or the high court. (*Auto Equity Sales* v. *Superior Court* (1962) 57 Cal.2d 450 [20 Cal.Rptr. 321, 369 P.2d 937].) As we have observed many times, if the state constitutional issue retains significance, it will resurface in another case.

While deferral of parallel state constitutional questions is a means of obtaining the input of the Supreme Court and encouraging further national debate on complex and difficult constitutional issues, it may not be desirable in every case. For example, clear differences in the language and history of constitutional provisions may show that they are not truly parallel. In this event, high court review may not afford any valuable input into the meaning of our Constitution and the interests of judicial economy may favor disposition of both federal and state issues. There would be no point in postponing resolution of the state question if a holding of unconstitutionality on state grounds were inevitable notwithstanding the views of the high court. (See

*People* v. *Ramos* (1984) 37 Cal.3d 136, 160-161 [207 Cal.Rptr. 800, 689 P.2d 430] (conc. & dis. opn. of Lucas, J.).)

With these factors in mind, I find this to be an appropriate case for deferral. The constitutional issue involved is difficult and complex and has produced a division in state and federal decisions across the country. Because of the Supreme Court's decision to grant certiorari in *Lee* (*supra,* __ U.S. __ [113 L.Ed.2d 240, 111 S.Ct. 1305]), it is likely that we will have the benefit of a high court decision on the federal issues involved in the area of high school graduation prayers within a year.

Although the federal and state constitutional provisions involved in this case are not identically worded, a key provision of article I, section 4 of the California Constitution is identical to the establishment clause of the First Amendment. As Justice Kennard observes: "In language virtually identical to the First Amendment's establishment clause, our state Constitution declares, 'The Legislature shall make no law respecting an establishment of religion.'" (Plur. opn., *ante,* at pp. 882-883.) I would like to have the benefit of the United State Supreme Court's construction of this "virtually identical" language.

### CONCLUSION

Lying, as it does, at the crossroads of constitutional principles and American traditions, the practice at issue in this case evokes great interest and strong feelings. There are sound reasons, validated by history and tradition, for government's disengagement from religion *and* for its benign recognition of religion as part of culture in the form of prayerful acknowledgement of a Supreme Being at public ceremonies. The republic has survived and religious diversity has flourished under the parallel operation of *both* of these principles. Although a strict application of the *Lemon* (*supra,* 403 U.S. 602) test may invalidate the practice at issue here, a more sensitive and balanced application of these underlying principles may sustain it. In either event, First Amendment doctrine must fairly consider *both* principles if it is to be consistent with both the intent of the framers and the tenor of our times.

**MOSK, J.,** Concurring.—I concur in Justice Kennard's well-reasoned opinion holding that religious invocations and benedictions at public high school graduation ceremonies violate both the federal and California Constitutions. I write separately to explain further why our state charter compels this result. Federal cases to which I refer are merely illustrative; in my view our state authorities are controlling in this matter.

As Justice Brennan reminds us, "state courts cannot rest when they have afforded their citizens the full protections of the federal Constitution. State constitutions, too, are a font of individual liberties, their protections often extending beyond those required by the Supreme Court's interpretation of federal law." (Brennan, *State Constitutions and the Protection of Individual Rights* (1977) 90 Harv. L. Rev. 489, 491.) Chief Justice Rehnquist reached a similar conclusion for a unanimous court in *Pruneyard Shopping Center* v. *Robins* (1980) 447 U.S. 74, 81 [64 L.Ed.2d 741, 752, 100 S.Ct. 2035]: the states may grant "individual liberties more expansive than those conferred by the Federal Constitution. . . ."

Indeed, as the highest court of this state, we are independently responsible for safeguarding the rights of our citizens. State courts are, and should be, the first line of defense for individual liberties in the federal system. It is unnecessary to rest our decision on federal authority when the California Constitution alone provides an independent and adequate state constitutional basis on which to decide. (See, e.g., *People* v. *Brisendine* (1975) 13 Cal.3d 528, 551 [119 Cal.Rptr. 315, 531 P.2d 1099].)

In his separate concurrence the Chief Justice virtually begs the Supreme Court to relieve us of our duty under the Constitution of California. Such a supplication is unprecedented. We are not a branch of the federal judiciary; we are a court created by the Constitution of California and we owe our primary obligation to that fundamental document. Only if an issue cannot be determined with finality under state constitutional doctrine do we turn to federal authority for assistance.

The Chief Justice suggests that *after* federal review we may possibly consider state constitutional issues. This is not only the horse trailing the cart, it results in unnecessary delay, additional costs to the parties—one here being a tiny school district—and a duplicative burden on judicial resources. *State law and state constitutional principles should be our first, not our last, referent.*

The Minnesota Supreme Court experience should be a lesson to us. In *State* v. *Hershberger* (Minn. 1989) 444 N.W.2d 282, the court held the Amish are entitled to religious exemption from certain traffic requirements. The United States Supreme Court granted certiorari, took the case over, and then remanded for consideration in the light of its opinion in *Employment Div. Dept. of Human Resources of Oregon* v. *Smith* (1990) 494 U.S. 872 [108 L.Ed.2d 876, 110 S.Ct. 1595] [holding no religious exemption for peyote users].

On remand, the Minnesota court declined to follow *Smith*, and instead, relying on the state Constitution, reiterated its original conclusion (*State* v.

*Hershberger* (Minn. 1990) 462 N.W.2d 393). While the ultimate result in Minnesota was a vindication of state constitutionalism, the delay in achieving finality, the time and expense of unnecessary proceedings, and the duplicative burden on judicial resources, should caution us against traveling the same route in the instant case.

## I

It is undisputed that provisions of the California Constitution are not dependent for their meaning on the federal Constitution. (Cal. Const., art. I, § 24; *People* v. *Brisendine, supra,* 13 Cal.3d at p. 551.) Particularly with regard to the provisions of the California Constitution that apply to religion in public schools (Cal. Const., art. I, § 4, art. XVI, § 5, art. IX, § 8), the different history of our charter justifies the difference in interpretation. It is true that in *Marsh* v. *Chambers* (1983) 463 U.S. 783, 787 [77 L.Ed.2d 1019, 1024-1025, 103 S.Ct. 3330], the United States Supreme Court pointed to the entanglement of government and religion in post-Colonial America to support its conclusion that the drafters of the First Amendment would not have prohibited invocational prayer. That historical discussion, however, is irrelevant to the question of the meaning of the California Constitution. Undoubtedly, there had been considerable entanglement of church and state in Spanish California, but the delegates to the 1849 constitutional convention had no intention of returning to such a relationship.[1] Rather, the convention delegates scrutinized the United States Constitution and the constitutions of the other states, and carefully selected the language that provided the greatest level of protection to California citizens.

For example, article I, section 4, of the California Constitution (hereafter article I, section 4) had its origin in the New York Constitution, and first appeared at the New York Constitutional Convention of 1777. It was chosen by the delegates to the California Constitutional Convention of 1849 over a provision of the Virginia Constitution that referred to the duty owed the "Creator" and the duty of "Christian forbearance, love and charity." (25 Ops.Cal.Atty.Gen. 316, 319 (1955).) As originally adopted, it provided, "The free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever be allowed in this state." (Cal. Const. of 1849, art. I, § 4.) Note particularly the prohibition against *preference*.

---

[1] The first conquest of California was not accomplished by the military, but by the Franciscans. From the first mission at San Diego de Alcala in 1769, "Alta California found time somehow for the longest colonial nap on record. It basked lazily in the sun from 1769 until the American conquest in 1846." (Phillips, Big Wayward Girl: An Informal Political History of California (1968) p. 6.) But with the influx of persons of all beliefs during the gold rush years of 1848 and 1849, commentator Herbert Phillips found only one word appropriate for religiously controlled Spanish California: *Adios.* (*Id.* at p. 10.)

This absolute separation of church and state was firmly recognized from the initial days of California jurisprudence. As early as 1858, Chief Justice Terry wrote in *Ex parte Newman* (1858) 9 Cal. 502, 506-507: "When our liberties were acquired, our republican form of government adopted, and our Constitution framed, we deemed that we had attained not only toleration, but religious liberty in its largest sense—a complete separation between Church and State . . . . 'All religious despotism commences by combination and influence, and when that influence begins to operate upon the political institution of a country, the civil power soon bends under it, and the catastrophe of other nations furnishes an awful warning of the consequences. . . . What other nations call religious toleration, we call religious rights; they were not exercised in virtue of governmental indulgence, but as rights of which the government cannot deprive any portion of her citizens, however small.' "

Chief Justice Terry held invalid under the first article of the original California Constitution a legislative enactment requiring observance of the sabbath. Much like the dissent in the instant case, it was argued that the day of rest on the sabbath had merely a civil purpose, a sort of compulsory Sunday togetherness, and that mankind was "in the habit of working too much, and thereby entailing evil upon society" (9 Cal. at p. 508). Chief Justice Terry for the court brushed aside that contention: "The truth is, however much it may be disguised, that this one day of rest is a purely religious idea . . . whether it be the Friday of the Mohammedan, the Saturday of the Israelite, or the Sunday of the Christian . . . ." (*Id.* at p. 509.)

Justice Burnett agreed with Terry, and in his concurrence declared that "when there is no ground or necessity upon which a principle can rest but a religious one, then the [California] Constitution steps in and says that you *shall not enforce it by authority of law*." (9 Cal. at p. 513, italics in original.) He continued, "it is clear that the scope and purpose of the Constitution was to assert the great, broad principle of religious freedom for all—for the believer and the unbeliever." (*Ibid.*)

Justice Field, in dissent, used a dichotomy comparable to that employed by the dissent in the instant case. On the one hand he argued that the Sunday closing law dealt with "business matters, not religious duties . . . only a rule of civil conduct." (9 Cal. at p. 519.) Then, to the contrary, he defended the religious content, insisting that "Christianity is the prevailing faith of our people; it is the basis of our civilization; and that its spirit should infuse itself into and humanize our laws, is [] natural . . . ." (*Id.* at pp. 523-524.)

As Field's biographer, Carl Brent Swisher, wrote, this case tells much about Field, although "Its value for this purpose is limited by the fact that his ideas undoubtedly changed from time to time." (Swisher, Stephen J. Field: Craftsman of the Law (1963) p. 81.)

When *Ex parte Andrews* (1861) 18 Cal. 678, came before the court, Justices Baldwin and Cope had succeeded Terry and Burnett. Totally ignoring stare decisis, they joined Field in upholding a subsequent legislative enactment on Sunday closing.[2]

For additional emphasis, in 1879 the delegates to the state constitutional convention of that year amended article I, section 4, to provide that in California the free exercise of religion shall be "guaranteed," not simply "allowed." The words of the member offering the amendment demonstrate the delegates' concern about religious freedom and the separation of church and state: "The word 'allowed' conveys the idea that the right of government to disallow or deny exists. Now, sir, I deny that any Government or any power on earth has a right to grant or deny freedom of religious belief. No such power exists, and where it is attempted to be enforced, it is simply despotism." (3 Debates & Proceedings, Cal. Const. Convention 1878-1879, p. 1171 (remarks of Mr. O'Sullivan).)

The strong desire of the framers of the California Constitution for governmental neutrality in matters of religion is also evidenced by the adoption in 1879 of what is now article XVI, section 5, of the California Constitution (hereafter article XVI, section 5), which forbids governmental "aid of any religious sect, church, creed or sectarian purpose." This clause has aptly been called "the definitive statement of the principle of government impartiality in the field of religion." (37 Ops.Cal.Atty.Gen. 105, 107 (1961).)

Further proof of the framers' intent to build a Jeffersonian wall of separation between church and state in California is found in article IX, section 8, of our charter, also adopted in 1879, forbidding both support for "sectarian and denomination schools" and the teaching of sectarian and denomina-

---

[2] This court's upholding the constitutionality of Sunday closing laws does not in any way imply that the framers of the California Constitution intended anything less than a strict separation between church and state. The court in *Ex parte Jentzsch* (1896) 112 Cal. 468, 471-472 [44 P. 803], explained as follows: "In construing so-called Sunday laws, courts have variously regarded them, some from a religious view, others from a secular, and still others from an anomalous commingling of both. In this state they have never been upheld from a religious standpoint. Under a constitution which guarantees to all equal liberty of religion and conscience, any law which forbids an act not in itself *contra bonos mores*, because that act is repugnant to the beliefs of one religious sect, of necessity interferes with the liberty of those who hold to other beliefs or to none at all. . . . [¶] So it has come to be the established rule in this state to view and construe such laws as civil and secular enactments. [Citations.]"

tional doctrine in public schools. This provision among others was relied on by Attorney General Webb when he issued an opinion in 1903 that Bible reading in our public schools was unconstitutional—almost 60 years before the United States Supreme Court ruled prayer in public school to be unconstitutional. (*Engel* v. *Vitale* (1962) 370 U.S. 421 [8 L.Ed.2d 601, 82 S.Ct. 1261, 86 A.L.R.2d 1285].)

## II

Defendant Morongo Unified School District's religious invocations and benedictions violate both article I, section 4, and article XVI, section 5. I discuss each clause in turn.

*Article I, section 4*

Article I, section 4, provides, "Free exercise and enjoyment of religion without discrimination or preference are guaranteed. . . . The Legislature shall make no law respecting an establishment of religion." To be sure, the establishment clause of this section is virtually identical to its federal counterpart.[3] But the free exercise clause (hereafter the preference clause) of article I, section 4, is without parallel in the federal Constitution. The Attorney General has emphasized the broad scope of the preference clause: "It would be difficult to imagine a more sweeping statement of the principle of governmental impartiality in the field of religion." (25 Ops.Cal.Atty.Gen. 316, 319 (1955).) Our case law has also recognized the strength of this clause, and acknowledged that in some instances it might warrant a separation of church and state more strict than that called for in the federal Constitution. As we stated in *Fox* v. *City of Los Angeles* (1978) 22 Cal.3d 792, 796 [150 Cal.Rptr. 867, 587 P.2d 663], under article I, section 4, "Preference thus is forbidden even when there is no discrimination. The

---

[3] The majority conclude, and I agree, that the invocational prayers at issue here violate the establishment clause of the California Constitution under the test set forth by the United States Supreme Court in *Lemon* v. *Kurtzman* (1973) 403 U.S. 602 [29 L.Ed.2d 745, 91 S.Ct. 2105]. However, it is clear from the drafters' debates that article I, section 24, of the state Constitution ("Rights guaranteed by this Constitution are not dependent on those guaranteed by the United States Constitution") was specifically intended to allow our state courts to give greater scope to the California Constitution than that required by the federal high court to similar, or even identical, language of the United States Constitution. (See 1970 Debates, Cal. Const. Revision Com., remarks of Commissioners Newman, Kleps, and Enersen, pp. 265-279.) Therefore, although I agree with the use of the *Lemon* v. *Kurtzman* test in this case, in interpreting the state establishment clause we are not exclusively bound by any particular application of that test by federal authority. (See also *Gaffney* v. *State Department of Education* (1974) 192 Neb. 358 [220 N.W.2d 550, 554] ["The attempt to transpose and inject the First Amendment by carrying on tests of secular purpose, primary effect of aiding religion, and governmental entanglement or political divisiveness, into the interpretation of a state constitutional provision such as ours, must be rejected."].)

current interpretations of the United States Constitution may not be that comprehensive."

In *Fox*, we ruled unconstitutional the display of a large Latin cross on a city hall. We pointed out that the walls of city hall were not used as bulletin boards; and we reasoned that "To illuminate only the Latin cross . . . does seem preferential when comparable recognition of other religious symbols is impracticable." (*Fox* v. *City of Los Angeles, supra*, 22 Cal.3d at p. 797.) We rejected the city's rationalization that illumination of the cross during both Latin and Eastern Orthodox holidays constitutes "interfaith recognition" that endows the illumination of the cross with a secular purpose because of the indisputable proreligious and sectarian effect of the city's actions: "We cannot conclude here that the City, particularly as to Easter holidays, did not 'promote . . . such spiritual content.' Easter crosses differ from Easter bunnies, just as Christmas crosses differ from Christmas trees and Santa Claus." (*Id.* at p. 798.)

The preference clause was also partly relied on in *Feminist Women's Health Center, Inc.* v. *Philibosian* (1984) 157 Cal.App.3d 1076 [203 Cal.Rptr. 918]. There, the court held unconstitutional the Los Angeles District Attorney's plan to bury aborted fetuses at a memorial park that had agreed to permit a religious organization to hold a memorial ceremony. The court stressed that the preference clause looks to the effects, not the intent, of the governmental action. As the court stated: "Whatever the district attorney's motive, a preference will be objectively demonstrated if the fetuses are delivered to [the burial site] in these circumstances. As the concurring opinion observed in *Fox*: 'We must never forget that the religious freedom of every person is threatened whenever government associates its [power] with one particular religious tradition. The threat today may seem small, but the breach in principle is large.' (*Fox* v. *City of Los Angeles, supra*, at p. 805.)" (*Id.* at p. 1092.)

In *Mandel* v. *Hodges* (1976) 54 Cal.App.3d 596 [127 Cal.Rptr. 244, 90 A.L.R.3d 728], the court held unconstitutional an order by the Governor to close state offices between noon and 3 p.m. on Good Friday, partly on preference clause grounds. The court reasoned that the Governor's Good Friday order would produce both of the results that the clause prohibits: "Because it has appointed an exclusively Christian holy day as a paid 'holiday' for all pertinent purposes affecting state offices and employees, it amounts to 'discrimination' against all non-Christian religions and 'preference' of those which are Christian." (*Id.* at p. 617.)

From these decisions, we learn that the preference clause seeks to prevent government from giving *any* advantage to religion in California. The

relevant inquiry is whether government has granted a benefit to a religion or religion in general that is not granted to society at large. Once government bestows that differential benefit on religion, it has acted unconstitutionally in this state.[4]

Thus the issue is whether the challenged program of the Morongo Unified School District establishes an unconstitutional preference in violation of article I, section 4. I conclude that it does. The use of a theistic prayer to "solemnize" a high school graduation confers a benefit on a particular form of religious expression by granting it a special, rather exalted, place at the commencement of an important and otherwise secular ceremony. This form of prayer, and the religious world view that underlies it, is thereby invested with the prestige with which the importance of the occasion endows it. Further, the selection of a member of the clergy for the express purpose of performing a religious act—a prayer—clearly grants a preferential benefit to religion and to a particular religion. Such a practice is therefore unconstitutional under article I, section 4.

*Article XVI, section 5*

Morongo Unified School District's religious invocation also violates article XVI, section 5. That section provides in pertinent part, "Neither the Legislature, nor any county, city and county, township, school district or other municipal corporation, shall ever . . . grant anything to or in aid of any religious sect, church, creed, or sectarian purpose." As with article I, section 4, this clause has been interpreted broadly: "The section [] forbids more than the appropriation or payment of public funds to support sectarian institutions. It bans any official involvement, whatever its form, which has the direct, immediate, and substantial effect of promoting religious purposes." (*California Educational Facilities Authority* v. *Priest* (1974) 12 Cal.3d 593, 605, fn. 12 [116 Cal.Rptr. 361, 526 P.2d 513].)

In *Priest*, we recounted the history of article XVI, section 5: "An examination of the debates of the constitutional convention which drafted the

---

[4]One exception to this general rule should be noted. A benefit conferred on religion will not be considered an unconstitutional preference if it occurs in a forum accessible to a multitude of viewpoints and forms of expression, both religious and secular. Thus, the public library, the museum-like city hall rotunda, the multicultural billboard hypothesized in *Fox* v. *City of Los Angeles, supra,* 22 Cal.3d 792, are limited-purpose public forums (see *Perry Ed. Assn.* v. *Perry Local Educators' Assn.* (1983) 460 U.S. 37, 46, fn. 7 [74 L.Ed.2d 794, 805, 103 S.Ct. 948]; *Widmar* v. *Vincent* (1981) 454 U.S. 263, 267-268 [70 L.Ed.2d 440, 445-446, 102 S.Ct. 269]); the denial of religious expression in these forums would raise the specter of discrimination against religion. Under such circumstances, the granting of access to religious expression in a public forum does not constitute an unconstitutional preference. (See Note, *Fox* v. *City of Los Angeles: Preference of Religion and the Use of Independent State Constitutional Grounds* (1980) 68 Cal.L.Rev. 666, 672-673.)

Constitution of 1879 indicates that the provision was intended to insure the separation of church and state and to guarantee that the power, authority, and financial resources of the government shall never be devoted to the advancement or support of religious or sectarian purposes." (*California Educational Facilities Authority* v. *Priest, supra,* 12 Cal.3d at p. 604; see also *Fox* v. *City of Los Angeles, supra,* 22 Cal.3d 792, 802-803 (conc. opn. of Bird, C. J.).) We held that legislation through which colleges could obtain financing for improving facilities at a lower rate of interest than would otherwise be available through conventional financing sources was not inconsistent with the provision because "The section has never been interpreted . . . to prohibit a religious institution from receiving an indirect, remote, and incidental benefit from a statute which has a secular primary purpose." (12 Cal.3d at p. 605.)

On the other hand, in *California Teachers Assn.* v. *Riles* (1981) 29 Cal.3d 794 [176 Cal.Rptr. 300, 632 P.2d 953], we relied on article XVI, section 5, to invalidate legislation authorizing public school districts to lend secular textbooks to parochial school students. We rejected decisions of the United States Supreme Court suggesting that a statute is insulated from challenge if a child will be aided by an expenditure of public money (the "child benefit" theory), reasoning that the school itself received a benefit that could not be characterized as indirect, remote or incidental. (*Id.* at p. 810.) In doing so, we set forth a two-part test for analyzing the validity of governmental aid under article XVI, section 5: we consider first whether the aid is direct or indirect, and second whether the nature of the aid is substantial or incidental. (See Note, *Rebuilding the Wall Between Church and State: Public Sponsorship of Religious Displays Under the Federal and California Constitutions* (1986) 37 Hastings L.J. 499, 532.)

Here, the Morongo Unified School District invites to its graduation ceremonies Christian clergy who pray in religious terms. As explained above, the use of such prayers provides direct and exclusive benefit to one religion "in the intangible form of prestige and power" (*Fox* v. *City of Los Angeles, supra,* 22 Cal.3d at p. 802 (conc. opn. of Bird, C. J.)), and discriminates against those who prefer other religions or no religion.

Moreover, I cannot find that this benefit to religion is merely incidental. In *California Teachers Assn.* v. *Riles, supra,* 29 Cal.3d 794, we distinguished the textbook loan program from generalized governmental services provided to all schools (i.e., fire and police protection) partly on the ground that the latter services have no doctrinal content. Here, however, it cannot be maintained that an invocational prayer at a high school graduation has no doctrinal content; indeed, this is precisely the purpose of prayer. As a result, prayers in public school ceremonies are viewed, by proponents and

opponents alike, as state endorsement of the religious views embodied in those prayers, and as a tacit rejection of inconsistent views.[5]

An Oregon court relied on a similar provision in its state Constitution to hold that a religious invocation in a high school commencement exercise violated article I, section 5, of the Oregon Constitution. (*Kay* v. *David Douglas Sch. Dist. No. 40* (1986) 79 Ore.App. 384 [719 P.2d 875].)[6] That clause provides, "No money shall be drawn from the treasury for the benefit of any religeous [*sic*] or theological institution, nor shall any money be appropriated for the payment of any religeous [*sic*] services in either house of the Legislative Assembly." Although the expenditure of public funds was minimal, the court reasoned that "the school district's affirmative decision directing that a prayer, rather than some other appropriate non-religious statement or reading, be included in this important school event conveyed the message that it had given its endorsement to prayer and to religion. The inclusion of the prayer would have crossed the line from the accommodation of religion to an impermissible appearance of sponsorship." (719 P.2d at p. 880.)

I conclude that the religious invocations and benedictions in question here have a direct and immediate effect of promoting religious purposes in violation of article XVI, section 5.

Broussard, J., concurred.

**ARABIAN, J.,** Concurring.—I concur in the majority holding that the First Amendment of the United States Constitution forbids religious

---

[5]The dissent of Justice Panelli takes several inconsistent approaches to this case. First, it seems to argue that our Founding Fathers were religious men and therefore religion in the public schools was to be reasonably expected. Second, the dissent insists that the prayers in this case were secular in purpose, though it would seem obvious that secular prayer is an oxymoron. Next, the dissent appears to tell us that the school prayers here were not lengthy in duration and therefore not much harm would result. Finally, the opinion appears to maintain that the California Constitution and its authors really did not believe in separation of church and state.

The authorities relied on by the dissent prove unpersuasive. Reliance on "released time" cases reveals a failure to appreciate the distinction between released time—in which the religious practices take place in church and away from public schools—and this case—in which the prayers were given in a public school environment. Reliance on cases allowing the injection of religious phrases into legislative halls and some political ceremonies also fails to appreciate that same distinction: once again here the prayers took place in a public school environment.

None of the foregoing justifies the dissent's apparent approval of what it describes as "holes in the wall" of separation between church and state. Nor does it justify the dissent's proposed further demolition of that historic wall.

[6]The injunction issued by the court to prevent the religious invocation was later overturned by the Supreme Court of Oregon, solely on the ground that the ceremonies had already been held and therefore there was no longer a justiciable controversy. (*Kay* v. *David Douglas Sch. Dist. No. 40* (1987) 303 Ore. 574 [738 P.2d 1389].)

invocations and benedictions at public high school graduation ceremonies. I do not join in that portion of the opinion addressed to the California Constitution or in the separate concurring opinion of Justice Mosk which treats the same subject. While Justice Mosk is clearly correct in stating that the California Constitution may provide an independent source of protection to individual liberties, this is *not* a case in which we are compelled to look beyond the federal charter; the First Amendment as currently construed by the United States Supreme Court plainly forbids the prayers at issue here.

While conventional establishment clause doctrine may compel the majority holding, it does not adequately explain it. The question before us is not one of ephemeral interest, but belongs to the enduring historical theme of religious liberty and individual conscience. The present controversy reifies a debate over the proper relation between church and state which dates literally from the Puritans' first fragile settlements in the New World. We do not enter that debate lightly, or unaware of the passionate beliefs upon which it draws. The duty of decision under which we labor, however, compels dispassion, and the risk of some inevitable criticism.

We are not unmindful that our holding invalidates a practice which has been accepted for many years, by many well-intentioned people, as morally, religiously, and legally inoffensive. It is common to justify such rulings, which may run counter to the majority will, on the ground that the animating concern of the Constitution and the courts is with the protection of minorities. That is no doubt true. I believe, however, that judicial decisions—even unpopular ones—serve a larger and, in a sense, more democratic purpose. At their best, such decisions both reflect and define public opinion and morality. It is important, therefore, to place before the people, as Thomas Paine might have said, the common sense of the subject, not merely in the idiom of the law, but in terms so plain, firm, and true as to compel their assent.

## I.

We are a diverse nation, composed of persons with widely differing backgrounds and religious beliefs. The establishment clause serves, at a minimum, to preserve religious liberty and ensure domestic tranquility, by prohibiting official preference for one religion over another. In deciding whether a particular governmental practice threatens these basic values, *it is critical that we view the issue from the perspective of the minority*, be they discordant, harmonious or eloquently silent, for they compose a large segment of the symphony which is America.

Thus, we must ask whether, under prevailing authority, the prayers in question, though seemingly innocuous to the majority of citizens, neverthe-

less offend cherished beliefs of others, or convey, as Justice O'Connor has written, "a message to nonadherents that they are *outsiders*, not full members of the political community." (*Lynch* v. *Donnelly* (1984) 465 U.S. 668, 688 [79 L.Ed.2d 604, 619, 104 S.Ct. 1355] (conc. opn. by O'Connor, J.), italics added.)

So viewed, it is undeniable that the prayers at issue do reflect mainstream Judeo-Christian beliefs. Accordingly, those who shun public prayer, others who reject the concept of a patriarchal "Lord" or "Father," and still others who adhere to non-Western religions, or no religion at all, may view such publicly sanctioned prayers as offensive, if not indeed an official endorsement of religion. Thus viewed, the prayers in question could not pass muster under the second prong of the United States Supreme Court's *Lemon* test. (*Lemon* v. *Kurtzman* (1971) 403 U.S. 602 [29 L.Ed.2d 745, 91 S.Ct. 2105].)

Nevertheless, as explained hereafter, I believe that the spirit of religious freedom immanent in the Constitution and our common history *supports* the prayers at issue. Therefore, while constrained to concur in the majority holding, I cannot endorse its underlying reasoning and analysis.

## II.

In addition to minority rights, there is a second issue of fundamental importance which must concern us here. Historically, the "first and most immediate purpose [of the establishment clause] rested on the belief that a union of government and religion tends to destroy government and to degrade religion." (*Engel* v. *Vitale* (1962) 370 U.S. 421, 431 [8 L.Ed.2d 601, 82 S.Ct. 1261, 86 A.L.R.2d 1285].) Madison, in his famous *Memorial and Remonstrance Against Religious Assessments*, condemned the notion that a public officer "may employ Religion as an engine of civil society," and elsewhere observed that "Religion flourishes in greater purity, without than with the aid of Government." (Padover, The Complete Madison: His Basic Writings (1953) pp. 302, 308-309.) Thus, the establishment clause "stands as an expression of principle on the part of the Founders of our Constitution that religion is too personal, too sacred, too holy, to permit its 'unhallowed perversion' by a civil magistrate." (*Engel* v. *Vitale*, *supra*, 370 U.S. at pp. 431-432 [8 L.Ed.2d at p. 608].)

The present controversy demonstrates that Madison's concerns were well founded. In arguing that their purpose is to "solemnize" high school graduation ceremonies, defendants and amici curiae stress the "civil" or "nonsectarian" nature of benedictions and invocations. The irony cannot go unnoticed, however, that the government's justification for the use of religious

rituals to achieve secular ends finds expression in terms which *disparage* religion. (*Engel* v. *Vitale, supra*, 370 U.S. at p. 431 [8 L.Ed.2d at p. 608].) In essence, the government defends the references to "our Lord" and "Father" on the ground that the terms constitute little more than insipid symbols of a shared secular culture.

If, however, prayer does serve to solemnize an occasion, then we must recognize and identify it for what it is—a *religious* practice—and ask whether it has a legitimate constitutional place in a public high school graduation ceremony.

Historically, religion and prayer have always played a role in our most cherished public ceremonies. Washington, in his first inaugural address, invoked "the benign Parent of the Human Race in humble supplication" and asked for "His divine blessing . . . ." (Speeches of the American Presidents (Podell & Anzovin) p. 5.) Lincoln, at Gettysburg, predicted that from the tragedy and sacrifice of the Civil War "this Nation, under God, shall have a new birth of Freedom . . . ." (*Id*. at p. 193.) Modern times have not diminished the impulse or voice, on our most solemn public occasions, to invoke the divinity for blessing and guidance.

Here, of course, we are not concerned with a presidential inaugural, but rather a public high school graduation. Clearly, the two occasions are historically distinct. Inaugurals have changed relatively little over the course of 200 years; public education has experienced a continuous revolution. Thus, unlike the opening of a legislative session (*Marsh* v. *Chambers* (1983) 463 U.S. 783 [77 L.Ed.2d 1019, 103 S.Ct. 3330]), 18th-century practice offers little direct guidance in determining the constitutionality of prayer at a high school graduation.

If history then offers no binding precedent, it does provide perspective.[1] Public prayer is an American tradition. It has occupied, as the above examples illustrate, a long and honorable place in our public lives. Washington was a man of broad universalist beliefs; Lincoln, through his innate compassion and humanity, appealed to the "better angels of our nature . . . ." (Podell & Anzovin, *supra*, at p. 181.) Each, at a critical moment in history,

---

[1] As Chief Justice Lucas observes in his concurring opinion, the First Amendment expresses certain core principles for which history may provide a useful guide. In this regard, it is worth noting that religious images have long permeated our national culture, not only through such recent expressions as the pledge of allegiance and our national currency, but literally from the English settlers' first days in the New World, as cities and towns such as Newark, Providence, and New Haven eloquently attest. California, having experienced early influence from the Spanish missionaries, is replete with religious identification—San Francisco, Los Angeles, Sacramento, San Jose, Santa Barbara, and San Diego are but a few of the innumerable examples.

sought to bind the nation, to plant seeds of union in a period of discord. Certainly not all who heard them then, or who read their words today, believe in the one Christian God; yet their message speaks powerfully to each and every one of us.

Lincoln and Washington innately understood that the American spirit does not simply "tolerate" religious, racial, or cultural differences; it takes pride in them. They are our source of strength and the hope for our future. Respect for, and pride in, our diversity extends to a high school graduation. That a Catholic priest, a Jewish rabbi, a Presbyterian minister or a member of any other cloth may appear before a gathering of students, parents and teachers from many different faiths and briefly seek the blessing of his or her God does not reflect an official religious bias, but rather celebrates an enlarged and liberal policy of religious freedom which "gives to bigotry no sanction." (Washington's Letter to the Hebrew Congregation of Newport, R.I., Aug. 17, 1790.)

Our national experience teaches that the mutual independence of church and state is the most conducive system to religious freedom and social and political tranquility. Public prayer does not threaten that harmony or the liberty of conscience which underlies it. On the contrary, it is through such occasions that we reinforce and celebrate the rich diversity that has made us a great and noble people.

Accordingly, while I concur in the judgment, I do so reluctantly, with the hope and expectation that the high court will soon endorse another view.[2]

**PANELLI, J.,** Dissenting.—The majority holds that the establishment clause of the United States Constitution outlaws the long-standing tradition of including religious invocations and benedictions in high school graduation ceremonies. I respectfully dissent.

## I.

Before getting to the merits of the issue before us, I feel constrained to comment on the logical fallout of the majority's holding.

If the three-part test derived from *Lemon* v. *Kurtzman* (1971) 403 U.S. 602, 612-613 [29 L.Ed.2d 745, 755-756, 91 S.Ct. 2105] (*Lemon*), prohibits religious invocations and benedictions at public high school graduation ceremonies, then it also requires school officials to censor a large part of our

---

[2] See *Weisman* v. *Lee* (D.R.I 1990) 728 F.Supp. 68, affirmed (1st Cir. 1990) 908 F.2d 1090, certiorari granted *sub nom. Lee* v. *Weisman* (1991) __ U.S. __ [113 L.Ed.2d 240, 111 S.Ct. 1305].

nation's cultural heritage. In comparison with the subdued invocations heard in the Morongo Unified School District, the lyrics to traditional, ceremonial songs like "America," "God Bless America," and the "Battle Hymn of the Republic" ring out with religious emotion. Yet these songs have been sung at public school ceremonies for years.[1] Is it no longer permissible to ask the audience to stand and sing these or similar songs at high school commencement exercises? If it is still permissible to sing these songs, is it now impermissible to have a speaker read the same words to begin the program?

Despite the majority's holding in this case, it is inevitable that the language of religion will continue to find its way into public ceremonies. For this reason, the holding is unrealistic and will lead to inconsistency between what is allowed and what is not. I fear that we can expect only more inconsistencies if courts continue to press the *Lemon* test to its theoretical extremes.

## II.

The United States Constitution prohibits laws "respecting an establishment of religion . . . ." (U.S. Const., 1st Amend.) This very general language has not always lent itself to easy application. In one case, returning to fundamental principles, the United States Supreme Court identified the relevant inquiry as whether the challenged state action in reality "establishes a religion or religious faith, or tends to do so." (*Lynch* v. *Donnelly* (1984) 465 U.S. 668, 678 [79 L.Ed.2d 604, 613, 104 S.Ct. 1355].) More often, however, the court has applied complex tests, such as the "purpose and effect" test of *Abington School Dist.* v. *Schempp* (1963) 374 U.S. 203, 222 [10 L.Ed.2d 844, 858, 83 S.Ct. 1560], or the "purpose, effect, and

---

[1] For example: "Our fathers' God to Thee, / Author of Liberty, / To Thee we sing: / Long may our land be bright / With freedom's holy light; / Protect us by Thy might, / Great God our King." ("America," 4th verse.)

Judge Wellford, in his dissent in *Stein* v. *Plainwell Community Schools* (6th Cir. 1987) 822 F.2d 1406, eloquently points out the absurd results that holdings such as the majority's will cause. He wrote: "I note that had the speaker or leader at the time and place of the invocation read or led the audience in singing these words: 'My Country 'Tis of Thee' or 'Our Father's God to Thee, Author of Liberty,' I doubt that this court, or any other, would find this activity unconstitutional. Had the speaker read, or guided the audience in a benediction with Irving Berlin's famous words, 'God Bless America,' or Julia Ward Howe's opening expression in the Battle Hymn of the Republic referring to the 'glory of the Lord,' again I doubt any finding of constitutional offense. These words in favorite songs, used at innumerable public ceremonies, including graduation ceremonies, contain plain and repeated reference to the Deity and ask His Blessing or give thanks for His guidance and assistance. They are both a form of invocation and benediction which in content is known in advance; yet they do not violate the first amendment. The remarks used to open and close the ceremonies in this case are no more violative of the constitution than are these expressions referring to the Deity." (*Id.*, at p. 1417 (dis. opn. of Wellford, J.).)

entanglement" test of *Lemon (supra*, 403 U.S. at pp. 612-613 [29 L.Ed.2d at pp. 755-756]).

I do not read the high court's decisions as requiring us to apply any particular test in this case. Although the court recently granted certiorari in a case similar to the one before us *(Weisman* v. *Lee* (D.R.I. 1990) 728 F.Supp. 68, affd. (1st Cir. 1990) 908 F.2d 1090 (applying *Lemon* to bar religious invocations at junior high school graduation ceremonies), cert. granted *sub nom. Lee* v. *Weisman* (1991) __ U.S. __ [113 L.Ed.2d 240, 111 S.Ct. 1305]), the court has not yet spoken on the permissibility of invocations and benedictions at high school graduation ceremonies. I do not take it for granted that the court will apply the *Lemon* test to such cases, because it has "repeatedly emphasized [its] unwillingness to be confined to any single test or criterion in this sensitive area." *(Lynch* v. *Donnelly, supra*, 465 U.S. at p. 679 [79 L.Ed.2d at p. 613].) Indeed, the high court eschewed the *Lemon* approach altogether in the only case to date involving ceremonial prayer. In *Marsh* v. *Chambers* (1983) 463 U.S. 783 [77 L.Ed.2d 1019, 103 S.Ct. 3330], the high court upheld the Nebraska Legislature's practice of employing a chaplain to open its sessions with prayer. The court reached this result because the First Congress, which drafted the Bill of Rights and submitted it to the states for ratification, also employed chaplains. Against this historical background, the court reasoned that Congress could not have "intended the Establishment Clause . . . to forbid what they had just declared acceptable." *(Id.,* at p. 790 [77 L.Ed.2d at p. 1026].)

The lower courts have taken a variety of approaches to the question of invocations[2] at high school graduation ceremonies. Most have applied the three-part *Lemon* test.[3] Three courts, however, each of which came after the decision in *Lemon, supra*, nevertheless applied the older "purpose and effect" test.[4] Finally, one court compared religious invocations to the

---

[2] I sometimes use the term "invocations" to refer to both invocations and benedictions.

[3] *Weisman* v. *Lee, supra*, 728 F.Supp. 68, 71-73, affirmed 908 F.2d 1090, certiorari granted *sub nom. Lee* v. *Weisman, supra*, __ U.S. __ [113 L.Ed.2d 240, 111 S.Ct. 1305]; *Lundberg* v. *West Monona Community School Dist.* (N.D.Iowa 1989) 731 F.Supp. 331, 341-346; *Bennett* v. *Livermore Unified School Dist.* (1987) 193 Cal.App.3d 1012, 1019-1020 [238 Cal.Rptr. 819]; *Kay* v. *David Douglas Sch. Dist. No. 40* (1986) 79 Ore.App. 384 [719 P.2d 875, 879-880], reversed on other grounds (1987) 303 Ore. 574 [738 P.2d 1389]; *Stein* v. *Plainwell Community Schools* (W.D.Mich. 1985) 610 F.Supp. 43, 46-50, affirmed in part and reversed in part (6th Cir. 1987) 822 F.2d 1406; *Graham* v. *Central Community Sch. Dist. of Decatur* (S.D.Iowa 1985) 608 F.Supp. 531, 535-537.

[4] *Grossberg* v. *Deusebio* (E.D.Va. 1974) 380 F.Supp. 285, 289; *Wiest* v. *Mt. Lebanon School District* (1974) 457 Pa. 166 [320 A.2d 362, 365]; *Wood* v. *Mt. Lebanon Township School District* (W.D.Pa. 1972) 342 F.Supp. 1293, 1295.

Perhaps the reason these courts did not apply the *Lemon* test is that the test's third factor, "excessive entanglement," was formulated to address administrative problems arising from public financial support of religious institutions. (See *Walz* v. *Tax Commission* (1970) 397

prayers upheld in *Marsh* v. *Chambers, supra*, 463 U.S. 783. (*Stein* v. *Plainwell Community Schools, supra*, 822 F.2d at pp. 1409-1410, affg. in part and revg. in part 610 F.Supp. 43.)

Unfortunately, it appears that cases such as this are decided not by applying a test but by choosing which test to apply. Of the many courts which have applied *Lemon*, only two have found invocations permissible. One of these decisions was affirmed by the United States Court of Appeals for the Sixth Circuit, which relied instead on *Marsh* v. *Chambers, supra*. (*Stein* v. *Plainwell Community Schools, supra*, 610 F.Supp. at pp. 46-50, affd. in part and revd. in part 822 F.2d at pp. 1409-1410.) The other is now being reversed by the majority. In contrast, all of the courts which have applied tests other than *Lemon* have found religious invocations permissible. (See fn. 4, *ante*, and *Stein* v. *Plainwell Community Schools, supra*, 822 F.2d at pp. 1409-1410.)

In short, the majority's selection of the *Lemon* test has far more significance than is apparent on the face of the lead opinion. Because controlling precedent does not, in my view, compel the majority's choice, and because another approach might well lead to a different result, the parties are entitled to ask for a somewhat fuller explanation of that choice than one finds in the opinion.

### III.

In particular, the lead opinion's analysis does not take account of another line of authority which, in my view, would permit us to uphold religious invocations and benedictions at graduation ceremonies. In several opinions the high court has held that the establishment clause permits the government to accommodate expressions of religious belief in public life. (See *Zorach* v. *Clauson* (1952) 343 U.S. 306, 312-314 [96 L.Ed. 954, 961-962, 72 S.Ct. 679] (*Zorach*); *Marsh* v. *Chambers, supra*, 463 U.S. 783, 792 [77 L.Ed.2d 1019, 1027-1028] (*Marsh*); *Lynch* v. *Donnelly, supra*, 465 U.S. 668, 672-678 [79 L.Ed.2d 604, 609-613] (*Lynch*).) Invocations at high school graduation ceremonies are similar to the many accommodations which the Supreme Court has held, or assumed, to be acceptable under the First Amendment.

In *Zorach, supra*, a 1951 decision, the court upheld a program under which public school students were released from classes to attend off-campus religious exercises. The argument against the program, which obviously

---

U.S. 664, 674 [25 L.Ed.2d 697, 704-705, 90 S.Ct. 1409]; *Lemon, supra*, 403 U.S. at pp. 612-613 [29 L.Ed.2d at p. 756].) For this reason, it was not immediately apparent that the "entanglement" factor might have any relevance in other contexts.

conferred a substantial benefit on religion, was that it violated the general philosophical principle that church and state should remain separate. The court acknowledged the general principle but emphasized that "[t]he First Amendment . . . does not say that *in every and all respects* there shall be a separation of Church and State." (343 U.S. at p. 312 [96 L.Ed. at p. 961] italics added.) Under a regime of absolute separation, the court cautioned, "the state and religion would be aliens to each other—hostile, suspicious, and even unfriendly." (*Ibid.* [96 L.Ed. at p. 961].)

Having rejected the goal of absolute separation, the court upheld the release-time program as similar to many other public accomodations of religion which had always been assumed to be constitutional. To have held differently would have meant that "[p]rayers in our legislative halls; the appeals to the Almighty in the messages of the Chief Executive; the proclamations making Thanksgiving Day a holiday; 'so help me God' in our courtroom oaths—these and all other references to the Almighty that run through our laws, our public rituals, our ceremonies would be flouting the First Amendment." (*Zorach, supra,* 343 U.S. at pp. 312-313 [96 L.Ed. at p. 961].) The court refused "to press the concept of separation of Church and State to the[] extreme[]" of condemning such practices. (*Ibid.* [96 L.Ed. at p. 961].) Instead, the court reasoned that, through such practices, the state "respects the religious nature of our people and accommodates the public service to their spiritual needs. To hold that it may not would be to find in the Constitution a requirement that the government show a callous indifference to religious groups. That would be preferring those who believe in no religion over those who do believe." (*Id.,* at p. 314 [96 L.Ed. at p. 962].)

Over the ensuing decades the high court continued to assume that the First Amendment permitted the government to accommodate public expressions of religious belief. In 1962, even while holding classroom prayer unconstitutional, the court took pains to emphasize that "nothing in [its] decision" was "inconsistent with the fact that school children and others are officially encouraged to express love for our country by reciting historical documents such as the Declaration of Independence which contain references to the Deity or by singing officially espoused anthems which include the composer's professions of faith in a Supreme Being, or with the fact that there are many manifestations in our public life of belief in God. *Such patriotic or ceremonial occasions bear no true resemblance to the unquestioned religious exercise* [i.e., daily classroom prayer] *that the State . . . has sponsored in this instance.*" (*Engel* v. *Vitale* (1962) 370 U.S. 421, 435, fn. 21 [8 L.Ed.2d 601, 610, 82 S.Ct. 1261, 86 A.L.R.2d 1285], italics added.)

In time, the high court verified its assumption in these early cases that the establishment clause permitted the government to accommodate religion in

public life. The majority in *Zorach*, for example, had taken it for granted that "[p]rayers in our legislative halls" did not "flout[] the First Amendment." (*Zorach*, *supra*, 343 U.S. at pp. 312-313 [96 L.Ed. at p. 961].) In 1983 the court expressly held that the Constitution permitted the Nebraska Legislature to hire a chaplain to open its sessions with prayer. (*Marsh*, *supra*, 463 U.S. 783.) According to *Marsh*, "[t]o invoke Divine guidance on a public body entrusted with making the laws is not, in these circumstances, an 'establishment' of religion or a step toward establishment; it is simply a tolerable acknowledgement of beliefs widely held among the people of this country. As Justice Douglas observed [in *Zorach*], '[w]e are a religious people whose institutions presuppose a Supreme Being.'" (*Marsh*, *supra*, 463 U.S. at p. 792 [77 L.Ed.2d at p. 1028], quoting from *Zorach*, *supra*, 343 U.S. at p. 313 [96 L.Ed. at p. 962].)

The court in *Marsh* did not apply the *Lemon* test. Instead, it looked directly to the intent of the First Congress, which drafted the Bill of Rights and submitted it to the states for ratification. As the high court explained, "[i]t can hardly be thought that in the same week Members of the First Congress voted to appoint and to pay a chaplain for each House and also voted to approve the draft of the First Amendment for submission to the states, they intended the Establishment Clause of the Amendment to forbid what they had just declared acceptable." (*Marsh*, *supra*, 463 U.S. at p. 790 [77 L.Ed.2d at p. 1026].)

*Marsh* has profound relevance to the case before us. I do not argue that *Marsh* validates all practices that are 200 years old, or even all practices that are equivalent to 200-year-old practices. A majority of the high court has recently rejected both interpretations of *Marsh*. (*County of Allegheny* v. *American Civil Liberties U.* (1989) 492 U.S. 573, 602-609 [106 L.Ed.2d 472, 500-505, 109 S.Ct. 3086, 3106-3109] (*County of Allegheny*).) Instead, *Marsh* recognizes, as did *Zorach*, that the establishment clause was intended to permit the accommodation of religious beliefs through practices which cannot realistically be understood as governmental endorsements of religion.

The high court has itself read *Marsh* precisely in this way. In *Lynch*, *supra*, 464 U.S. 668, the court relied extensively on *Marsh* in holding that the establishment clause did not prevent a city from including a crèche, or Nativity scene, in a holiday display. The first substantive portion of the *Lynch* opinion does not rely on *Lemon*. Instead, the court began by emphasizing that the Constitution does not "require complete separation of church and state" and that "*it affirmatively mandates accommodation, not merely tolerance, of all religions, and forbids hostility toward any.*" (*Lynch*, *supra*, 465 U.S. at p. 673 [79 L.Ed.2d at p. 610], italics added.) Having stated its thesis in this way, the court went on—as in *Zorach* and *Marsh*—to

review numerous examples of official accommodation, including presidential proclamations recognizing religious holidays and prayer, the national motto, the language of the Pledge of Allegiance, religious art in the National Gallery, and Congress's provision of chapels in the Capitol. (*Lynch, supra,* at pp. 676-677 [79 L.Ed.2d at pp. 612-613].) The high court cited *Marsh* not as an anomaly, but as one more example of permissible accommodation. In the court's words, "[i]t would be difficult to identify a more striking example [than *Marsh*] of the accommodation of religious belief intended by the Framers." (*Lynch, supra,* 465 U.S. at p. 674 [79 L.Ed.2d at p. 611].)

The tradition of accommodation recognized in *Zorach* and *Marsh* underlies the *Lynch* court's holding in a substantial way. According to *Lynch,* "our history is pervaded by expressions of religious beliefs such are found in *Zorach*. Equally pervasive is the evidence of accommodation of all faiths and all forms of religious expression, and hostility toward none. Through this accommodation, as Justice Douglas observed, governmental action has 'follow[ed] the best of our traditions' and 'respect[ed] the religious nature of our people.'" (*Lynch, supra,* 465 U.S. at pp. 677-678 [79 L.Ed.2d at p. 613], quoting *Zorach, supra,* 343 U.S. at p. 314 [96 L.Ed. at p. 962].) This reasoning directly supported the court's holding that the establishment clause did not prohibit the public display of a crèche. "To forbid the use of this one passive symbol—the crèche—at the very time people are taking note of the season with Christmas hymns and carols in public schools and other public places, and while the Congress and legislatures open sessions with prayers by paid chaplains, would be a stilted overreaction contrary to our history and to our holdings." (*Lynch, supra,* 465 U.S. at p. 686 [79 L.Ed.2d at p. 618].)

In view of the *Lynch* court's strong emphasis on the tradition of accommodation, as well as its reliance on *Zorach* and *Marsh*, its application of the *Lemon* test cannot fairly be read as the sole, or necessary, basis for the *Lynch* decision. Indeed, the court took pains to avoid that inference by "emphasiz[ing] [its] unwillingness to be confined to any single test or criterion in this sensitive area." (*Lynch, supra,* 465 U.S. at p. 679 [79 L.Ed.2d at p. 613].) The court reinforced the point by describing the three factors of the *Lemon* test as "*often . . . useful*"—not indispensable. (*Ibid.* [79 L.Ed.2d at p. 613], italics added.)

The lead opinion's explanation for applying the *Lemon* test in this case does not fully address the unbroken line of authority recognizing that the establishment clause permits the government to accommodate religion in public life. To explain its approach, the majority relies principally on *Edwards* v. *Aguillard* (1987) 482 U.S. 578 [96 L.Ed.2d 510, 107 S.Ct. 2573]. In footnote 4 of that opinion the court stated that "*a historical approach* is not

useful in determining the proper roles of church and state in public schools, since free public education was virtually nonexistent at the time the Constitution was adopted." (*Id.*, at p. 583, fn. 4 [96 L.Ed.2d at pp. 518-519], italics added.) The court did not, however, repudiate its conclusion in *Lynch*, based in large part on *Marsh* and *Zorach*, that the establishment clause permits official accommodation of religion. That conclusion has very little, if anything, to do with the historical basis for the particular practice in question.[5]

For these reasons, I would interpret *Lynch*, *Marsh*, and *Zorach* as permitting us to hold, without reference to the *Lemon* test, that the government may accommodate the religious beliefs of its citizens by allowing brief religious invocations and benedictions at high school graduation ceremonies. Invocations and benedictions are so similar to other practices which the court has held or assumed to be permissible that to prohibit them would be to "read into the Bill of Rights . . . a philosophy of hostility to religion." (*Zorach*, *supra*, 343 U.S. at p. 315 [96 L.Ed. at p. 963] (maj. opn. by Douglas, J.).)

## IV.

I cannot place too much stress on the point that the United States Supreme Court's opinions do not require us to apply the *Lemon* test. (*Lynch*, *supra*, 465 U.S. at p. 679 [79 L.Ed.2d at pp. 613-614].) Nevertheless, assuming for the sake of argument that we must confine our analysis to that test's three factors, I would still uphold the practice of having religious invocations and benedictions at high school graduation ceremonies. Even the *Lemon* test, if applied without unnecessary hostility to religion, does permit some room for the accommodation of religious belief in public life.

I begin with the high court's most recent formulation of the *Lemon* test. "Under the *Lemon* analysis, a statute or practice which touches upon religion, if it is to be permissible under the Establishment Clause, must have a

---

[5]Perhaps long tradition strengthens the case for accommodating a particular practice. If so, religious invocations at graduation ceremonies present a very strong case, indeed.

According to one commentator, "the academic ceremonies of graduation date back before the foundation of our country, and indeed are largely drawn from religious ceremonies. The modern pattern is still largely a carbon copy of the ancient rites, 'consist[ing] primarily of an *invocation*, a commencement address, the awarding of earned degrees, the awarding of honorary degrees *and the benediction*.' Other features such as the academic procession, direct descendant of the clerical procession, identify the religious roots of the entire graduation ceremony. Indeed one author suggests to school administrators: 'The churches . . . have had centuries to work out the details to provide maximum dignity and impressiveness—when one is in doubt, [one] should follow the clerical pattern.' " (DuPuy, *Religion, Graduation, and the First Amendment: A Threat or a Shadow?* (1985-1986) 35 Drake L. Rev. 323, 358, footnotes omitted, quoting Sheard, Academic Heraldry in America (1962) at pp. 69, 71, italics in original.)

secular purpose; it must neither advance nor inhibit religion in its principal or primary effect; and it must not foster an excessive entanglement with religion." (*County of Allegheny, supra,* 492 U.S. at p. 592 [106 L.Ed.2d at p. 493, 109 S.Ct. at p. 3100].)[6]

The lead opinion does not discuss "secular purpose," the *Lemon* test's first prong. While I understand the opinion's statement that a challenged practice violates the *Lemon* test if it fails any of the three prongs, I question the wisdom of forbidding a practice that is deeply embedded in tradition without stopping to consider its purpose. To do so may suggest an insensitivity to widely held beliefs that the majority probably does not intend.

In my view, both the record and controlling precedent strongly support the school district's assertion that the invocations do have a valid secular purpose. According to the school district's superintendent, "the purpose of including the invocation and benediction in current ceremonies is to continue a historical tradition which adds to the ceremonial nature of the graduation ceremony and which has the support of the local community." The record contains no evidence to the contrary. The lead opinion's silence on this point suggests that the district is correct: Invocations do confer ceremony and solemnity. As Justice O'Connor has observed, it is sometimes the case that ceremonial acknowledgments of religion "serve, in the only ways reasonably possible in our culture, the legitimate secular purposes of solemnizing public occasions, expressing confidence in the future, and encouraging the recognition of what is worthy of appreciation in society." (*Lynch, supra,* 465 U.S. at p. 693 [79 L.Ed.2d at pp. 622-623] (conc. opn. of O'Connor, J.); see also *County of Allegheny, supra,* 492 U.S. at p. 595, fn. 46 [106 L.Ed.2d at p. 496, 109 S.Ct. at p. 3102] (opn. of Blackmun, J.).)

Some have objected that it is disingenuous, or that it denigrates religion, to defend religious invocations as having a secular purpose. (E.g., *Marsh, supra,* 463 U.S. at pp. 797-798 [77 L.Ed.2d at pp. 1030-1032] (dis. opn. of Brennan, J.).) The objection, however, ignores the high court's clear holding that religious and secular purposes may validly coexist. In *Lynch, supra,* the court held that the inclusion of a crèche in a holiday display was constitutionally permissible despite the crèche's undisputed religious significance. The court expressly rejected the argument that the *Lemon* test required the government to have " 'exclusively secular' objectives." (*Lynch, supra,* 465 U.S. at p. 681, fn. 6 [79 L.Ed.2d at p. 615]; see also *Wallace v. Jaffree* (1985) 472 U.S. 38, 56 [86 L.Ed.2d 29, 43, 105 S.Ct. 2479].) Instead,

---

[6]In a more recent establishment clause case, *Board of Education* v. *Mergens* (1990) 496 U.S. 226 [110 L.Ed.2d 191, 110 S.Ct. 2356], the lead opinion's treatment of the *Lemon* test did not receive five votes. (See *id.*, at pp. __-__ [110 L.Ed.2d at pp. 214-218, 110 S.Ct. at pp. 2370-2373].)

"[t]he Court has invalidated legislation or governmental action on the ground that a secular purpose was lacking . . . *only* when it has concluded there was *no question* that the statute or activity was motivated *wholly* by religious considerations." (*Lynch, supra,* at p. 680 [79 L.Ed.2d at p. 614], italics added.) Accordingly, even under the *Lemon* test it is unnecessary to deny the invocations' religious significance in order to defend them.

The argument that religious invocations add ceremony or solemnity has been advanced in prior cases. Some courts have accepted this as a legitimate secular purpose[7] and some have not.[8] Because I believe that this purpose does satisfy the first prong of the *Lemon* test, it is appropriate to examine the reasoning of those opinions which reach the opposite conclusion. In my view, each of those opinions directly conflicts with *Lynch, supra.*

A few courts have reasoned that religious invocations automatically fail the *Lemon* test's first prong, despite their secular, ceremonial purpose, because invocations are a form of prayer and prayer is inherently religious. (*Bennett* v. *Livermore Unified School Dist., supra,* 193 Cal.App.3d at p. 1020; *Graham* v. *Central Community Sch. Dist. of Decatur, supra,* 608 F.Supp. at pp. 535-536.) Explicitly or implicitly, these cases depend upon the assumption that a state may never use a religious means to achieve an otherwise legitimate state interest. This reasoning openly flouts the high court's clear holding that religious and secular purposes can validly coexist. (*Lynch, supra,* 465 U.S. at p. 680 [79 L.Ed.2d at pp. 614-615].) "Were the test that the government must have 'exclusively secular' objectives, much of the conduct and legislation [the Supreme] Court has approved in the past would have been invalidated." (*Id.,* at p. 681, fn. 6 [79 L.Ed.2d at p. 615].)

Other courts have rejected the secular purpose of adding ceremony by reasoning that a state may not use religious means to achieve a secular purpose when nonreligious, or less religious, means will suffice. (*Lundberg* v. *West Monona Community School District, supra,* 731 F.Supp. at p. 342; *Kay* v. *David Douglas Sch. Dist. No. 40, supra,* 719 P.2d at p. 880; cf. *Doe* v. *Aldine Independent School Dist.* (S.D.Tex. 1982) 563 F.Supp. 883, 886.) A

---

[7] *Stein* v. *Plainwell Community Schools, supra,* 610 F.Supp. 43, 50, affirmed in part and reversed in part 822 F.2d 1406; *Wiest* v. *Mt. Lebanon School District, supra,* 320 A.2d 362, 366. To these opinions one must add the decision of the Court of Appeal in the case before us.

[8] *Lundberg* v. *West Monona Community School Dist., supra,* 731 F.Supp. 331, 342-343; *Bennett* v. *Livermore Unified School Dist., supra,* 193 Cal.App.3d 1012, 1020; *Kay* v. *David Douglas Sch. Dist. No. 40, supra,* 719 P.2d 875, 880, reversed on other grounds 738 P.2d 1389; *Graham* v. *Central Community Sch. Dist. of Decatur, supra,* 608 F.2d 531, 534, 535.

As does the lead opinion, one court concluded that religious invocations at graduation ceremonies violate the establishment clause without considering whether such invocations have a secular purpose. (*Weisman* v. *Lee, supra,* 728 F.Supp. at p. 71, affd. 908 F.2d 1090, cert. granted *sub nom. Lee* v. *Weisman, supra,* __ U.S. __ [113 L.Ed.2d 240, 111 S.Ct. 1305].)

typical suggestion in such cases is that the state could achieve its purpose equally well by "reading passages from one of Shakespeare's plays." (E.g., *Lundberg* v. *West Monona Community School District, supra*, 731 F.Supp. at p. 343.) These opinions rely, directly or indirectly, on the least-religious-means test which Justice Brennan proposed in a concurring opinion in *Abington School Dist.* v. *Schempp, supra*, 374 U.S. at page 265 [10 L.Ed.2d at page 843]. In *Lynch*, however, the high court authoritatively rejected Justice Brennan's test, dismissing as "irrelevant" the argument that the government's objectives could have been achieved through nonreligious means. (*Lynch, supra*, 465 U.S. at p. 681, fn. 7 [79 L.Ed.2d at p. 615].)

Thus, on this point the lower court cases rejecting the desire to add ceremony as a legitimate secular purpose are simply wrong as a matter of law. They are also wrong as a matter of common sense. The many persons involved in the decision to have an invocation—the superintendent, the principal, the students—cannot be assumed to share a single objective. Some may desire an invocation as an acknowledgment of religion but others may wish to add solemnity to the proceedings or simply to continue a time-honored tradition. This is to be expected, since "[i]n a pluralistic society a variety of motives and purposes are implicated." (*Lynch, supra*, 465 U.S. at p. 680 [79 L.Ed.2d at p. 614].)

Having passed over any discussion of the school district's purpose, the lead opinion begins its application of the *Lemon* test with a conclusion: Invocations at high school graduation ceremonies convey the message that the state endorses religion. The lead opinion's reasoning on this point boils down to the proposition that, if the school district did not approve of prayer, it would not permit prayer at its graduation ceremonies.

In my view, the lead opinion mistakes an incidental benefit to religion for a significant one by adopting the "absolutist" approach to establishment clause questions that the high court has expressly disavowed. "Rather than mechanically invalidating all governmental conduct or statutes that confer benefits or give special recognition to religion in general or to one faith—as an absolutist approach would dictate—the Court has scrutinized challenged legislation or official conduct to determine whether, *in reality*, it establishes a religion or religious faith, or tends to do so." (*Lynch, supra*, 465 U.S. at p. 678 [79 L.Ed.2d at p. 613], italics added.) Based on this reasoning, the court permitted a city to display a crèche, despite its indisputable religious significance, when *viewed in context*[9] "there [was] insufficient evidence to

---

[9] "In this case, the focus of our inquiry must be on the crèche *in the context of the Christmas season*." (*Lynch, supra*, 465 U.S. at p. 679 [79 L.Ed.2d at p. 614], italics added.) Compare *County of Allegheny, supra*, 492 U.S. at page 598 [106 L.Ed.2d at page 498, 109 S.Ct. at

establish that [its] inclusion . . . [was] a purposeful or surreptitious effort to express some kind of subtle governmental advocacy of a particular religious message." (465 U.S. at p. 680 [79 L.Ed.2d at p. 614].)

Considering the context, it is difficult to believe that invocations at graduation ceremonies benefit religion in any significant way. The prayers, if one chooses to call them that, are brief—often less than a minute. They are a fleeting part of a civil ceremony that recognizes a one-time, secular achievement. The ceremony, at which attendance is voluntary, is primarily intended for mature young adults who have completed the educational process that society deems necessary for full, intelligent participation as a citizen in society. In this context, traditional invocations are not likely to be interpreted as "governmental advocacy of a particular religious message." (*Lynch, supra,* 465 U.S. at p. 680 [79 L.Ed.2d at p. 614].)

It may be true that religion receives a slight, incidental benefit whenever God is mentioned. However, slight, incidental benefits to religion do not by themselves invalidate a practice under the establishment clause. The high court's "precedents plainly contemplate that on occasion *some* advancement of religion will result from governmental action." (*Lynch, supra,* 465 U.S. at p. 683 [79 L.Ed.2d at p. 616], italics added.) Moreover, "[t]he Court has made it abundantly clear . . . that 'not every law that confers an 'indirect,' 'remote,' or 'incidental' benefit upon [religion] is, for that reason alone, constitutionally invalid." (*Ibid.* [79 L.Ed.2d at p. 616], quoting from *Committee for Public Education* v. *Nyquist* (1973) 413 U.S. 756, 771 [37 L.Ed.2d 948, 962, 93 S.Ct. 2955].) Indeed, much greater benefits to religion have been found constitutionally permissible.[10]

That some speakers might choose to employ the language of religion to confer solemnity should come as a surprise to, and confuse, no one. Modern life abounds with examples. The United States Supreme Court opens its

---

pages 3103-3104] ("Here, unlike in *Lynch, nothing in the context of the display* detracts from the crèche's religious message.") (italics added).

[10]See the high court's list of such cases in *Lynch, supra,* 465 U.S. at pages 681-682 [79 L.Ed.2d at pages 615-616]: *Marsh, supra,* 463 U.S. 783 (legislative prayers); *Roemer* v. *Board of Public Works* (1976) 426 U.S. 736 [49 L.Ed.2d 179, 96 S.Ct. 2337] (noncategorical grants to church-sponsored colleges and universities); *Tilton* v. *Richardson* (1971) 403 U.S. 672 [29 L.Ed.2d 790, 91 S.Ct. 2091] (federal grants for college buildings of church-sponsored institutions of higher education combining secular and religious education); *Walz* v. *Tax Commission, supra,* 397 U.S. 664 (tax exemptions for church properties); *Board of Education* v. *Allen* (1968) 392 U.S. 236 [20 L.Ed.2d 1060, 88 S.Ct. 1923] (expenditure of public money for textbooks supplied to students attending church-sponsored schools); *McGowan* v. *Maryland* (1961) 366 U.S. 420 [6 L.Ed.2d 393, 81 S.Ct. 1101] (Sunday closing laws); *Zorach, supra,* 343 U.S. 306 (release-time program for religious training); and *Everson* v. *Board of Education* (1947) 330 U.S. 1 [91 L.Ed. 711, 723, 67 S.Ct. 504, 168 A.L.R. 1392] (expenditure of public funds for transportation of students to church-sponsored schools).

sessions with an entreaty for God's protection. Presidents and governors place their hands on the Bible while taking the oath of office. Presidents declare Thanksgiving Day to be a national holiday. Witnesses, in some states, seek God's assistance when swearing to tell the truth. Citizens reciting the Pledge of Allegiance state that our nation is "under God." Our coins bear the legend, "In God We Trust." As Justice Brennan once wrote, such references to a deity "are uniquely suited to serve such wholly secular purposes as solemnizing public occasions, or inspiring commitment to meet some national challenge in a manner that simply could not be fully served in our culture if government were limited to purely nonreligious phrases." (*Lynch, supra*, 465 U.S. at p. 717 [79 L.Ed.2d at p. 638] (dis. opn. of Brennan, J.); see also *id.* at p. 693 [79 L.Ed.2d at pp. 622-623] (conc. opn. of O'Connor, J.); *County of Allegheny, supra*, 492 U.S. at p. 595, fn. 46 [106 L.Ed.2d at p. 496] (opn. of Blackmun, J.).)[11]

High school graduates, who have lived long enough to see that religious symbolism pervades life, are mature enough to understand that not every use of religious language conveys an official message of endorsement. The maturity of the audience, together with the ceremonial, noninstructional context, strongly distinguish religious invocations at commencement exercises from the daily classroom prayers that the high court has disapproved. (See, e.g., *Wallace* v. *Jaffree, supra*, 472 U.S. 38; *Engel* v. *Vitale, supra*, 370 U.S. 421.)

Indeed, the high court has expressly recognized that the reasoning which prohibits classroom prayer does not prohibit ceremonial references to God. In *Engel* v. *Vitale, supra*, the leading case holding classroom prayer unconstitutional, the court was careful to note that "nothing in the decision" was inconsistent with the "many manifestations in our public life of belief in God. Such patriotic or ceremonial occasions bear no true resemblance to the unquestioned religious exercise" that classroom prayer would represent. (*Engel* v. *Vitale, supra*, 370 U.S. at p. 435, fn. 21 [8 L.Ed.2d at p. 610].)

The lead opinion concludes its exposition of the *Lemon* test by predicting that invocations will entangle the state excessively in religious matters by necessitating governmental supervision of their content. I do not agree. The lead opinion's argument is based on the assumption that opening remarks at graduation ceremonies must be purged of religious allusions to pass the

---

[11] We need not accept Justice Brennan's further argument that such examples of religious language in official life are constitutional only "because they have lost through rote repetition any significant religious content." (*Lynch, supra*, 465 U.S. at p. 716 [79 L.Ed.2d at p. 638] (dis. opn. of Brennan, J.).) We need not accept the argument because the majority opinion in *Lynch*, as already discussed, teaches that religious and secular purposes can validly coexist. (*Id.* at pp. 680-681 & fn. 6 [79 L.Ed.2d at pp. 614-615].)

*Lemon* test. However, in view of the high court's holding that religious and secular purposes may validly coexist (*Lynch, supra,* 465 U.S. at pp. 680-681 & fn. 6 [79 L.Ed.2d at pp. 614-615]; *Wallace* v. *Jaffree, supra,* 472 U.S. at p. 56 [86 L.Ed.2d at p. 43]), there is no need to censor invocations to ensure pristine purity from religious influence.

In another case where the context made public prayer otherwise acceptable under the establishment clause, the high court observed that "[t]he content of the prayer is not of concern to judges where . . . there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief. That being so, it is not for us to embark on a sensitive evaluation or to parse the content of a particular prayer." (*Marsh, supra,* 463 U.S. at pp. 794-795 [77 L.Ed.2d at p. 1029].) I see no greater need for censorship in this case, since a brief, traditional invocation at a civil ceremony intended for mature young adults does not entail a realistic risk that a private speaker's use of religious language will be seen as an official endorsement of religion.

In summary, I do not view the *Lemon* test as requiring us to order the school district to purge its invocations and benedictions of all religious language. Invocations and benedictions have the secular purpose of adding tradition and ceremony to the graduation even if they also happen to include religious language. For this reason, and because their primary effect is not religious and because they need not entangle the state excessively in religious affairs, I cannot agree with the majority's conclusion.

V.

Three justices of this court would also hold that religious invocations and benedictions at high school graduation ceremonies violate the California Constitution. (Lead opn. of Kennard, J., *ante,* at pp. 882-883 (Mosk, J., and Broussard, J., conc.); conc. opn. of Mosk, J., *ante, passim* (Broussard, J., conc.).) While the court does not today resolve this issue, I consider it important to give voice to the other side of the debate.

Since 1849 the state Constitution has begun with a religious invocation: "We, the People of the State of California, *grateful to Almighty God for our freedom,* in order to secure and perpetuate its blessings, do establish this Constitution." (Cal. Const., preamble, italics added; cf. Cal. Const. of 1849, preamble.) This language, as well as the history of how it came to be included, eloquently refute the argument that the framers of the state Constitution intended to prohibit ceremonial prayer.

Ceremonial prayer pervaded the Constitutional Convention of 1849. "The first regular session was 'opened with prayer to Almighty God for His

blessing on the body, in their work, and on the country.' On the following day provision was made whereby the Convention should be opened each day with prayer. The clergy of Monterey, consisting of Rev. Padre Antonio Ramirez and Rev. [Samuel Hopkins] Willey, were requested to act as chaplains; and it was unanimously agreed 'That the officiating clergy of this House be admitted to the privileged seats of the House.'" (Hunt, The Genesis of California's First Constitution (1895) at pp. 40-41, fns. omitted; see also Conmy, The Constitutional Beginnings of California (1959) at p. 18; Report of the Debates in the Convention of California on the Formation of the State Constitution in September and October, 1849 (1850) at pp. 19, 54 (hereafter Debates of 1849.) The two clergymen alternated, "thus illustrating that there was religious harmony." (Conmy, *supra*, at p. 18.)

The preamble's religious language arose out of a pointed debate about the propriety of ceremonial references to God. The majority of the drafting committee, the Select Committee on the Constitution, proposed the religious preamble. (Debates of 1849, *supra*, at pp. 378-379.) The minority favored a much longer preamble which did not refer to God. (*Ibid.*)

The select committee's report provoked heated debate in the committee of the whole, where the preamble was frankly recognized as a prayer. Lansford W. Hastings objected to having any religious language in the Constitution, declaring that he could not "see the necessity of inserting in an instrument of this kind a prayer to Almighty God." (Debates of 1849, *supra*, at p. 379.) Myron Norton took the other side, saying that he "hope[d] some of the members of this House perceive that necessity. I think it is proper, doing so solemn an act, that we should make a due reference to the Supreme Being." (*Ibid.*)

Unable to agree, the delegates took up the matter again a few days later. Francis J. Lippitt and Charles T. Botts proposed alternative preambles which did not refer to God. Botts argued that he "had always been opposed to the abuse of the language of prayer and thanksgiving on occasions of this kind. He thought there was an inappropriateness in it." (Debates of 1849, *supra*, at p. 416.) Botts also objected to putting a prayer in the mouths of the voters, who would be asked to adopt the instrument. (*Ibid.*) In response, Myron Norton had "but a single word to remark in regard to this reference in the preamble to the Supreme Being. I think it is very appropriate; and although we may not (some of us at least) be in the habit of praying, where an opportunity occurs when it would be not only appropriate but proper to do so, that we should do it." (*Ibid.*) In the same spirit, W. M. Steuart urged that the convention "should make a due reference to the Supreme Being in performing a work of such magnitude and importance as this." (*Id.*, at p. 417.)

Following this debate the committee of the whole voted to recommend Botts's nonreligious preamble to the full convention. That same evening, however, the convention rejected Botts's preamble and adopted, with minor amendments, the religious preamble originally proposed by the select committee, including its expression of "grat[itude] to Almighty God." (Debates of 1849, *supra*, at p. 417.) The preamble continues, with minor changes, in the present Constitution.

It was against the background of daily prayer, and the well-debated decision to thank God in the preamble, that the delegates adopted a provision ensuring the free exercise and enjoyment of religion "without discrimination or preference." (Cal. Const. of 1849, art. I, § 4; see present Cal. Const., art. I, § 4.) Three justices of this court suggest that the "discrimination or preference" provision independently prohibits religious invocations at high school graduation ceremonies even if the United States Constitution does not. However, I cannot believe that the same delegates who began each day of the convention with an invocation, and went so far as to include one in the preamble, would have intended to outlaw similar invocations at graduation ceremonies.

The debates on article I, section 4, itself, offer no support for such an interpretation. The only reported substantive debate on the provision concerned whether or not to include language expressly withholding constitutional protection from illegal activities carried out in the name of religion. Botts feared that such language might be invoked to justify the suppression of unpopular sects. (Debates of 1849, *supra*, at pp. 39, 292.) Other delegates thought that such language was necessary to protect "decency and public order." (*Id.*, at pp. 39, 293 [see remarks of Myron Norton, Winfield S. Sherwood, Henry A. Tefft, and Thomas L. Vermeule].) In the end, the convention rejected Botts's position and included the proviso that "the liberty of conscience, hereby secured, shall not be so construed as to excuse acts of licentiousness, or justify practices inconsistent with the peace or safety of this State."[12] (Cal. Const. of 1849, art. I, § 4; see Debates of 1849, *supra*, at p. 293.) The present Constitution includes language to the same effect. (Cal. Const., art. I, § 4 [second sentence].)

I find nothing in the history of this provision to support the conclusion that its framers intended to erect a "wall of separation" higher than that

---

[12] In full, former article I, section 4, provided: "The free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever be allowed in this State: and no person shall be rendered incompetent to be a witness on account of his opinions on matters of religious belief; but the liberty of conscience, hereby secured, shall not be so construed as to excuse acts of licentiousness, or justify practices inconsistent with the peace or safety of this State." (Cal. Const. of 1849, art. I, § 4; see present Cal. Const., art. I, § 4.)

established by the federal establishment clause. Indeed, to the extent the concept of "separation" might counsel official toleration of illegal acts compelled by religious belief, the framers appear to have intended a somewhat lower wall.

Nor do I find support for a "separationist" interpretation of article I, section 4, in the fact that the delegates rejected alternative language from the Constitution of Virginia. The language in question, which Botts proposed as a substitute, declared "[t]hat religion, or the duty which we owe to our Creator, and the manner of discharging it, can be directed only by reason and conviction, not by force or violence; and, therefore, all men are equally entitled to the free exercise of religion, according to the dictates of conscience; and that it is the mutual duty of all to practice Christian forbearance, love, and charity towards each other." (Debates of 1849, *supra*, at pp. 38-39.) The argument against Botts's proposal was based *not* on its express acknowledgment of Christianity but instead, as already discussed, on the absence of language to protect society "from any violation of the peace." (*Id.*, at p. 39 [remarks of Myron Norton].)

Our earliest interpretation as a court of the "preference or discrimination" clause does not support a ban on ceremonial invocations. At issue in *Ex parte Andrews* (1861) 18 Cal. 678 was the constitutionality under article I, section 4, of a Sunday closing law. We unanimously upheld the law, despite the recognition that it benefited religion, because it did "not *discriminate* in favor of any sect, system, or school in the matter of their religion." (18 Cal. at p. 684, italics added.)[13]

Chief Justice Field's opinion illuminates our early understanding of the "preference or discrimination" clause: "*We understand* [the clause] *to be an interdict against all legislation, which invidiously discriminates in favor of or against any religious system.* It does not interdict all legislation upon subjects connected with religion; much less does it make void legislation, the effect of which is to promote religion, or even advance the interests of a sect or class of religionists. On the contrary, the interests and even the rites of sects have been oftentimes protected by law, as by acts of incorporation of churches, exemption from taxation in some States, protection of meetings

---

[13] In his concurring opinion, Justice Mosk cites Chief Justice Terry's separate opinion in *Ex parte Newman* (1858) 9 Cal. 502, 504, as evidence that an "absolute separation of church and state was firmly recognized from the initial days of California jurisprudence" and that the concept of separation inheres in article I, section 4. (Conc. opn. of Mosk, J., *ante*, at p. 908.) Chief Justice Terry, however, wrote only for himself. Each of the court's three justices wrote separately. Justice Field dissented. Three years later, the court unanimously overruled *Newman* and adopted Justice Field's dissenting opinion in that case. (See *Ex parte Andrews*, *supra*, 18 Cal. at p. 685; see also *McGowan* v. *Maryland*, *supra*, 366 U.S. at pp. 435-437 [6 L.Ed.2d at pp. 404-405.)

from interruption, and the like acts. *While the primary object of legislation, which respects secular affairs, is not the promotion of religion, yet it can be no objection to laws, that while they are immediately aimed at secular interests, they also promote piety."* (*Ex parte Andrews, supra,* 18 Cal. at p. 684, italics added.)

In summary, I cannot find in the "preference or discrimination" clause an intent to erect the absolute "wall of separation" that would justify a decision to ban religious invocations at high school graduation ceremonies. Instead, the clause appears to add only the requirement that the state not prefer, or discriminate against, a particular sect. (See *Ex parte Andrews, supra,* 18 Cal. at p. 684.) This requirement can be met by having the invocation delivered, on a rotating basis, by speakers representing various points of view. But the practical impossibility of accommodating all points of view on each occasion does not amount to discrimination. As we held in *Fox* v. *City of Los Angeles* (1978) 22 Cal.3d 792, 797 [150 Cal.Rptr. 867, 587 P.2d 663], "[i]n the California Constitution there is no requirement that each religion always be represented."

Three justices of this court also would hold that a ban on religious invocations is compelled by article XVI, section 5, of the state Constitution, which prohibits any "appropriation," "pay[ment]," or "grant" in aid of religion. (Cal. Const., art. XVI, § 5, formerly Cal. Const. of 1879, art. IV, § 30.) I cannot agree.

The religious-grants provision derives from California's second Constitution, which was drafted and adopted in 1879. The debates in the constitutional convention of that year do not demonstrate that the framers of this provision intended it to embody a complete wall of separation. Although some of the delegates were of that view, others were not and successfully resisted efforts to incorporate it in the Constitution.

When the committee of the whole debated the draft of the religious-grants provision, the main point of contention was whether the provision would preclude the state from supporting charitable religious institutions, such as orphanages. Abraham C. Freeman proposed an amendment which would expressly have authorized such grants. (2 Debates and Proceedings of the Constitutional Convention of the State of California Convened at the City of Sacramento, Saturday, September 28, 1878 (1880) at p. 819 (hereafter Debates of 1878-1879).) Volney E. Howard argued against the amendment, declaring his "oppos[ition] to all measures by which any connection between church and State can be run in." (*Ibid.*) He thought that "[i]f the authors of the American revolution achieved anything, or one thing more particularly than another, it was the separation of church and State." (*Ibid.*)

Although Howard's "separationist" view prevailed in committee, the full convention later rejected it time after time. The convention amended the committee's draft of the religious-grants provision to make it clear that grants to charitable religious institutions *were* permissible.[14] (3 Debates of 1878-1879, *supra*, at pp. 1272-1273.) This amendment survives in the present Constitution. (See Cal. Const., art. XVI, § 5 [final clause].) The convention also adopted a provision expressly authorizing the Legislature to fund certain religious institutions. (3 Debates of 1878-1879, *supra*, at pp. 1262-1264; see Cal. Const. of 1879, art. IV, § 22.)[15] This provision also survives. (See Cal. Const., art. XVI, § 3, subd. (6) [first clause].) Perhaps most tellingly, the delegates *rejected* an amendment intended to prohibit religious education in state-supported religious institutions by requiring the wards to attend public school. (3 Debates of 1878-1879, *supra*, at pp. 1264-1265.) The delegates clearly recognized that rejection of the amendment would lead to religious education in state-supported religious orphanages despite language in another provision prohibiting appropriations "for the support of any sectarian or denominational school." (Cal. Const. of 1879, *supra*, art. IX, § 8; see present Cal. Const., art. IX, § 8; see also 3 Debates of 1878-1879, *supra*, at pp. 1264-1266 [see remarks of Volney E. Howard, William P. Grace, Alphonse Vacquerel, V. A. Gregg, J. A. Filcher, and C. J. Beerstecher].)

Any attempt to invoke the religious-grants provision to bar religious invocations must also reckon with the preamble. This is because the delegates to the 1879 convention, just as their predecessors in 1849, voted to

---

[14]Former article IV, section 30, as amended and adopted, declared in relevant part that "[n]either the Legislature, nor any county, city and county, township, school district, or other municipal corporation, shall ever make an appropriation, or pay from any public fund whatever, or grant anything to or in aid of any religious sect, church, creed, or sectarian purpose, or help to support or sustain any school, college, university, hospital, or other institution controlled by any religious creed, church, or sectarian denomination whatever; . . . *provided, that nothing in this section shall prevent the Legislature granting aid pursuant to section twenty-two of this article.*" (Cal. Const. of 1879, art. IV, § 30, italics added; see present Cal. Const., art. XVI, § 5.)

[15]Former article IV, section 22, provided in relevant part that "no money shall ever be appropriated or drawn from the State Treasury for the use and benefit of any corporation, association, asylum, hospital, or any other institution not under the exclusive management and control of the State as a State institution . . . ; *provided, further, that* whenever any county, or city and county, or city, or town, shall provide for the support of minor orphans, or half orphans, or abandoned children, or aged persons in indigent circumstances, *such county, city and county, city, or town, shall be entitled to receive the same pro rata appropriations as may be granted to such institutions under church or other control.* . . ." (Cal. Const. of 1879, art. IV, § 22, italics added; see present Cal. Const., art. XVI, § 3, subd. (6).)

This provision illustrates the delegates' inability to agree on questions of church-state separation. While the provision expressly authorizes state financial aid to charitable religious institutions, the proponents of the underlined language hoped that it would encourage local governments to take over such functions.

retain the preamble's religious language despite substantial controversy. The 1879 convention received several petitions requesting that the Constitution include language "express[ing] our acknowledgment of Almighty God as the source of all authority in civil government" and declaring that "California is a Christian commonwealth." (*Id.*, at pp. 89, 120, 156, 217-218.) Another petition expressed opposition to mentioning God in the Constitution. (1 Debates of 1878-1879, *supra*, at pp. 602-603.) Such petitions were referred to the Committee on the Preamble and Bill of Rights (*ibid.*), which considered and slightly modified the preamble's language.[16] In the end, the full convention rejected the petitions' theocratic suggestions but retained the expression of gratitude to "Almighty God." (Cal. Const. of 1879, preamble.)

In short, the debates on the religious-grants provision do not demonstrate that the delegates to the 1879 convention intended the provision to embody an absolute wall of separation. Assuming for the sake of argument that a wall of any sort exists, it has always had holes large enough to permit state aid to religious institutions, religious instruction in such institutions, ceremonial prayer in the state constitutional convention, and a religious invocation in the Constitution, itself. By failing to consider some of these points, previous discussions in our opinions of article XVI, section 5, have greatly exaggerated the historical case for separation. (See *Fox* v. *City of Los Angeles, supra,* 22 Cal.3d at pp. 799-803 (conc. opn. of Bird, C. J.); *California Educational Facilities Authority* v. *Priest* (1974) 12 Cal.3d 593, 604 [116 Cal.Rptr. 361, 526 P.2d 513].)[17]

To be sure, the religious-grants provision shows that the framers did not want the state to fund religious organizations, with certain exceptions. However, a ban on governmental funding rests on a much narrower principle than total separation. The jump from the former to the latter finds no

---

[16]The delegates to the convention of 1879 added the italicized language: "We, the People of *the State of* California, grateful to Almighty God for our freedom, in order to secure *and perpetuate* its blessings, do establish this Constitution." (Cal. Const. of 1879, preamble (italics added); see present Cal. Const., preamble (identical language).)

[17]In *California Educational Facilities Authority* v. *Priest, supra,* 12 Cal.3d at page 604, we relied on the Court of Appeal's examination of the 1879 debates in *Gordon* v. *Board of Education* (1947) 78 Cal.App.2d 464, 472-473 [178 P.2d 488] (*Gordon*). However, we mentioned only the Court of Appeal's introductory statement that the delegates "proposed to insure separation of church and state . . . ." (*Gordon, supra,* 78 Cal.App.2d at p. 472; see *Priest, supra,* 12 Cal.3d at p. 604.) We omitted the Court of Appeal's conclusion that "[o]ur pioneer forefathers did not have the remotest idea that they were laying the foundations of the great Commonwealth of California that was to be as a jejune, godless state; they believed one of the great pillars of our national strength to be the general acceptance of religion by our people." (78 Cal.App.2d at p. 473.) In *Priest* we also neglected to mention that the court in *Gordon* upheld a law permitting public school students to be released for religious education. (*Gordon, supra,* 78 Cal.App.2d at pp. 473-476; cf. *Zorach, supra,* 343 U.S. 306.)

support in the history of article XVI, section 5. Our current interpretation of the religious-grants provision does involve that gap in logic. In *California Educational Facilities Authority* v. *Priest, supra*, 12 Cal.3d 593 (*Priest*), we interpreted the religious-grants provision to prohibit "any official involvement, *whatever its form*, which has the *direct, immediate, and substantial* effect of promoting religious purposes." (*Id.*, at p. 605, fn. 12, italics added.)

Even under the *Priest* standard, however, I would hold that religious invocations at high school graduation ceremonies do not violate article XIV, section 5. In *Priest* we held that this provision did not prohibit the state from making low-interest, government construction bonds available to private, sectarian colleges. (12 Cal.3d at pp. 596, 598 fn. 5, 603-606.) We relied in part on our earlier decision upholding tax exemptions for parochial schools. (*Lundberg* v. *County of Alameda* (1956) 46 Cal.2d 644 [298 P.2d 1]; see *Priest, supra*, 12 Cal.3d at p. 605.) If the material financial assistance to religious schools approved in these cases is not a "direct, immediate, and substantial" benefit (see *Priest, supra*, 12 Cal.3d at p. 605, fn. 12), then neither is a costless, brief, traditional invocation at a high school graduation ceremony.

## VI.

The narrow question before us is the validity of the trial court's injunction. Under its terms, defendants are forever "prohibited and enjoined from directly conducting, or attempting to conduct, religious invocations and benedictions at public school ceremonies in the Morongo Unified School District."[18] This extremely broad injunction would be proper only if no conceivable invocation or benediction could ever pass constitutional muster, no matter how slight its religious content. By affirming the injunction, the majority hold this to be the case. I cannot agree.

The lead opinion's principal error is to focus too closely on specific invocations and benedictions. Even if one were to assume that particular speakers occasionally overstepped the requirement of governmental neutrality by, for example, asking the audience to stand and join in prayer, it does not follow that no religious invocation or benediction can ever pass constitutional muster.

In my view, the injunction is too broad even under the three-pronged *Lemon* test. First, invocations that contain religious language may still have the secular purposes of respecting tradition and conferring ceremony and

---

[18]Although the injunction refers to "public school ceremonies," the only question before the trial court, and thus properly before us, is the constitutionality of religious invocations and benedictions at high school *graduation* ceremonies.

solemnity. The government need not have exclusively secular objectives. (*Lynch, supra*, 465 U.S. at p. 681, fn. 6 [79 L.Ed.2d p. 615].) Second, even if the civil, ceremonial context of the invocations and benedictions did not remove all hint of governmental endorsement, the school district could go further by identifying the speaker's views as his or her own. If despite such a disclaimer the choice of a particular speaker were thought to suggest a preference for a particular religious point of view, the district could go still further by rotating among speakers. Finally, having presented the invocations and benedictions in an appropriate context, the district need not become entangled in the content of the speaker's remarks. "The content of the prayer is not of concern to judges where, as here, there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief." (*Marsh, supra*, 463 U.S. at pp. 794-795 [77 L.Ed.2d p. 1029].)

In short, even under the *Lemon* test it is possible to conceive of religious invocations that would not violate the establishment clause. Because it is possible, it is our constitutional duty to vacate the injunction as overly broad. I fear that the majority's unwillingness to consider this aspect of the problem reflects the absolutist view that the establishment clause prohibits any practice that some observers will view as religious. However, the United States Supreme Court has never endorsed such a proposition. Instead, the court has emphatically rejected the goal of absolute separation and stressed that the Constitution "affirmatively mandates accommodation, not merely tolerance, of all religions, and forbids hostility towards any." (*Lynch, supra*, 465 U.S. at p. 673 [79 L.Ed. p. 610]; see also *Zorach, supra*, 343 U.S. at pp. 314-315 [96 L.Ed. at pp. 962-963].) I cannot reconcile that mandate with the majority's holding in this case.

For these reasons I respectfully dissent.

**BAXTER, J.,** Dissenting.—I dissent. The majority hold that *any* religious invocation or benediction in a public high school graduation ceremony is constitutionally impermissible, and direct the Court of Appeal to affirm the judgment of the superior court. While some past practices in high schools of the Morongo Unified School District are constitutionally suspect, I do not agree that either the First Amendment or the California Constitution precludes the inclusion of religious prayer in graduation ceremonies in all circumstances. Absent more explicit guidance from the United States Supreme Court, I would not conclude, as does the majority, that religious content alone mandates the exclusion of a ceremonial prayer whose purpose is to add solemnity to a public school ceremony. I would, therefore, modify and affirm the judgment of the Court of Appeal, and direct the Court of Appeal to require the superior court to issue a more limited injunction.

The majority correctly reason that the "*Lemon* test" (*Lemon* v. *Kurtzman* (1971) 403 U.S. 602, 612-613 [29 L.Ed.2d 745, 755-756, 91 S.Ct. 2105]), governs our consideration of plaintiffs' establishment clause claims. The issue in *Lemon* v. *Kurtzman, supra,* 403 U.S. 602, was whether statutes which authorized limited state financial aid to church-related elementary and secondary schools were constitutional. The question addressed in this case, whether inclusion of a "religious" invocation or benediction in a public high school graduation ceremony violates the establishment clause, was not directly presented, and the high court has not yet addressed the question.

The Supreme Court has, however, "regularly" applied the *Lemon* test to other governmental practices which touch upon religion. (*County of Allegheny* v. *American Civil Liberties U.* (1989) 492 U.S. 573, 592 [106 L.Ed.2d 472, 493-494, 109 S.Ct. 3086].) As Justice Blackmun observed: "Since *Lynch,* the court has made clear that when evaluating the effect of government conduct under the Establishment Clause [a court] must ascertain whether 'the challenged governmental action is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices.' " (*Id.*, at p. 597 [106 L.Ed.2d at p. 497].) Since the "endorsement" question reflects the second prong of the *Lemon* test, I am satisfied that under presently controlling precedent we must assess plaintiffs' First Amendment establishment clause challenge under the *Lemon* v. *Kurtzman* criteria.

In the interest of avoiding possible "entanglement" or "prior restraint" problems, however, the majority ignore the import of the tests they purport to apply. The existence of a test by which to determine the constitutional propriety of governmental action which may have an incidental relation to religious activity itself confirms that not all governmental interface with religion is prohibited. Had the high court concluded that any incidental benefit to religion or accommodation of religion in a public school activity is impermissible, there would have been no need to formulate a test by which to determine whether a particular practice offends the First Amendment. The court, however, did not hold that the First Amendment precludes any and all practices which might be viewed by some observers as "religious."

Instead, the court directed courts that are called upon to assess the constitutional propriety of a practice challenged as violative of the establishment clause to examine the practice to determine: (1) whether the practice has a secular purpose; (2) whether its principal or primary effect advances or inhibits religion; and (3) whether it fosters excessive governmental entanglement with religion. (*Lemon* v. *Kurtzman, supra,* 403 U.S. 602, 612-613

[29 L.Ed.2d at pp. 755-756].) Justice Blackmun suggests that in carrying out that mandate, the court must consider the context in which the conduct occurs to determine whether the practice sends a message to nonadherents that they are not full members of the political community, and the court must ask what the listeners might fairly understand to be the purpose of the conduct. (*County of Allegheny* v. *American Civil Liberties U.*, *supra*, 492 U.S. 573, 594-596 [106 L.Ed.2d 472, 495-496].)

The high court has provided the means by which to assess the propriety of its graduation ceremonies, and the district has asked this court for guidance in applying the test to its practice of including religious invocations in the ceremonies. The majority decline the opportunity to give the requested guidance. The majority apparently deem the *Lemon* test too cumbersome or inconvenient to utilize in this context. Rather than providing guidance as to the proper application of the *Lemon* test in the school graduation context, the majority convert the high court's holding into an absolute bar to inclusion of prayers in graduation ceremonies. In so doing they usurp the authority of the district to govern its affairs, within constitutional limits, in the manner the district determines is best suited to the needs and desires of its community.

I

### First Amendment Considerations

Based on some past practices of the district, and without considering alternatives, the majority hold that religious invocations and benedictions must necessarily fail both the "effect" and "entanglement" prongs of the *Lemon* test. The past practices of high schools within the Morongo Unified School District may have done so. During the benediction at the 1986 Yucca Valley High School graduation ceremony, for example, the speaker asked the audience to stand and join him in a prayer entreating a "Father" to bestow guidance, strength, and other blessings on the graduates. Inviting the audience at a ceremony sponsored by, and held at, a public school to join in a prayer to a deity may fairly be understood as inviting participation in a school-sponsored religious activity. Prayer invoking God's blessing is a religious activity. (*Engel* v. *Vitale* (1962) 370 U.S. 421, 424 [8 L.Ed.2d 601, 604-605, 82 S.Ct. 1261, 86 A.L.R.2d 1285].) Such a practice constitutes an endorsement of religion. The practice conveys the impression that the school both approves of and sponsors religion. Calling on the audience to participate removes the governmental neutrality mandated by the Constitution.

By contrast, the invocation delivered at the same ceremony did not involve the audience. Instead the speaker expressed his personal thanks to the

deity he recognized for the privilege of participating in the ceremony at which the former students received their diplomas, and asked that they be given virtues needed for success in the future. He introduced this prayer with an explanation that he found it personally helpful to rely on someone "greater than yourself," but made it clear that as an aspect of the freedom of religion we all enjoy, members of the audience should feel free not even to bow their heads.[1]

This invocation did not convey the impression that the district approved of its religious content or sponsored the speaker's message. It did not serve to advance religion in any measurable way, and certainly did not entangle the school or the district in religious activity. Nor, although the majority find it unnecessary to address the first prong of the *Lemon* test, could the religious aspect of this prayer be deemed as a matter of law to negate the secular purpose of the district for including a religious prayer in the ceremony—that of adding solemnity appropriate to the nature of the graduation ceremony.[2]

The speaker's explanation and disclaimer were adequate to disassociate the school from the activity and to avoid any realistic possibility that

---

[1] The full text of this invocation was:

"Graduates, faculty, friends, family. I consider it a privilege to be here this evening to do the Invocation, particularly as I look back to 20 years ago today that I graduated from high school.

"It's a real blessing to speak to you and encourage you to be confident in looking forward to the years ahead. That hope, that confidence, that indeed there are certain to be changes to come, will come. Yet every point of change is an opportunity for growth. And I want to encourage you to have confidence [in] looking forward to that.

"And so it is that I want to even extend that in a Prayer. That as you have the opportunity to grow and change, and to face things, and sometimes those things will cause you to be apprehensive, cause you to begin to doubt, I have found that for myself it's good to have something, someone to trust in that is greater than yourself.

"So if you would like to you can bow your head, *if not, feel free not to, that's what freedom is all about.*

"Heavenly father, I thank you for the privilege it is to see these graduates going forth receiving their diplomas this evening. To celebrate this time, I pray that you would give them that blessing, that confidence, courage, vision, hope, peace and gladness, and looking forward to the days to come, the years to come being confident of what they have already been able to do in receiving this diploma.

"Now I pray your blessing upon them, in the name of our Lord, amen."

[2] *Bennett* v. *Livermore Unified School Dist.* (1987) 193 Cal.App.3d 1012 [238 Cal.Rptr. 819] is distinguishable in this regard. The opinion in *Bennett* does not indicate that the court had either the text of any contemplated invocation or that of past invocations before it. The court observed that an invocation by definition was a form of prayer, and found no secular purpose for its inclusion in the ceremony. Therefore, while acknowledging that the practice was not an egregious intrusion by the state into religious activity, the court affirmed an injunction barring it. (*Id.*, at pp. 1015-1016.)

By contrast in the instant case the record reflects both a secular purpose and that the content and manner of the delivery of an invocation need not involve either the state or the audience in "invoking God's presence."

members of the audience, graduates, parents, and other interested listeners, would infer that the school endorsed or disapproved any religious choice, or religion itself. (*County of Allegheny* v. *American Civil Liberties U.*, *supra*, 492 U.S. 573, 591-593 [106 L.Ed.2d 472, 493-494].)

However, that invocation and the invocations at Sky High School, where the same Protestant minister has delivered the invocation since the founding of the school in 1977, are constitutionally suspect for another reason. The record reflects that the Yucca Valley High School speaker, also a Protestant minister, was personally selected by the vice-principal of Yucca Valley High School. In the absence of guidelines adequate to ensure a diversity of views, vesting a school official with discretion to invite a religious speaker and the repetitive selection of a minister of the same religious faith could convey the impression that the school approved of and sponsored that faith and religion itself.

The high court has noted that even the "legislative prayer" which it held to be outside the scope of the establishment clause in *Marsh* v. *Chambers* (1983) 463 U.S. 783 [77 L.Ed.2d 1019, 103 S.Ct. 3330] would not be permissible if the government was perceived to prefer or be affiliated with that faith or belief (*County of Allegheny* v. *American Civil Liberties U.*, *supra*, 492 U.S. 573, 602 [106 L.Ed.2d 472, 500]) as might occur if clergy of a single denomination deliver the prayer.

Some of the past practices of the district and its schools therefore constitute or threaten to constitute one of the evils against which the establishment clause was intended to afford protection—sponsorship of religion. (See *Lemon* v. *Kurtzman*, *supra*, 403 U.S. 602, 612 [29 L.Ed.2d 745, 755]; *Walz* v. *Tax Commission* (1970) 397 U.S. 664, 668 [25 L.Ed.2d 697, 701, 90 S.Ct. 1409].) They violate the second prong of the *Lemon* test by conveying a message of endorsement of religion and of a particular religious belief, and thereby offend the establishment clause. (*Wallace* v. *Jaffree* (1985) 472 U.S. 38, 56, fn. 42 [86 L.Ed.2d 29, 43, 105 S.Ct. 2479].) "Whether the key word is 'endorsement,' 'favoritism,' or 'promotion,' the essential principle remains the same. The Establishment Clause, at the very least, prohibits government from appearing to take a position on questions of religious belief or from 'making adherence to a religion relevant in any way to a person's standing in the political community.' " (*County of Allegheny* v. *American Civil Liberties U.*, *supra*, 492 U.S. 573, 593-594 [106 L.Ed.2d 472, 494-495].)

I agree, therefore, that plaintiffs are entitled to injunctive relief against the continuation of these practices. I do not agree, however, that the injunction issued by the superior court which prohibits the school officials from

permitting any religious invocations and benedictions in any public school ceremonies in the district should be upheld. Rather, as I have noted above, the message must be considered in the context in which it is delivered.

The question in *County of Allegheny* v. *American Civil Liberties U.*, *supra*, was whether the inclusion of religious symbols, a crèche and a menorah, in a governmental holiday display offended the establishment clause. Although the context differed from that in issue here, the holding of the high court is applicable. The government may not support or promote religious communication by religious organizations. (492 U.S. 573, 597-602 [106 L.Ed.2d 472, 497-500].)

It is clear from this, and from the high court's admonishment to consider whether the audience may perceive the practice as reflecting government approval or disapproval of their religious choices, that the majority go too far in relying on *Lemon* v. *Kurtzman* to support a ban on the inclusion of any "religious prayer" in a high school graduation ceremony. It is equally clear to me that the particular prayer offered as part of the invocation at the 1986 Yucca Valley High School graduation ceremony, and condemned by the majority without analysis of its language in the context in which it was offered, does not offend the United States Constitution, however much it may have offended the plaintiffs.

The Constitution does not mandate that the state avoid any possible offense to any person in actions that touch upon religion. (*Citizens for Parental Rights* v. *San Mateo County Bd. of Education* (1975) 51 Cal.App.3d 1, 12 [124 Cal.Rptr. 68, 82 A.L.R.3d 544].) The test here should be whether the contemplated act, inclusion of a prayer in an invocation, is likely to be perceived as governmental endorsement of prayer as a favored practice, or as a departure from the principle that government is completely neutral toward religion. (See *Wallace* v. *Jaffree, supra*, 472 U.S. 38, 60 [86 L.Ed.2d 29, 45-46].) Since a brief prayer can be delivered during an invocation without being viewed in that light by the audience, and need not be perceived as placing the power, prestige or financial support of the government behind a particular religious belief, I would not hold that prayer is in all circumstances constitutionally impermissible in a public high school graduation ceremony.

Nor am I persuaded by plaintiffs' argument that any approach short of a complete ban on any religious content in public high school invocations and benedictions will inevitably involve the school and the courts in censorship and prior restraint of speech, or impermissibly entangle government in religious activity. I am satisfied that the court can fashion guidelines which

can be conveyed to both those responsible for selecting the speakers for the graduation ceremony and to the speaker.

Because no reason appears that either would intentionally violate those guidelines, there is no need to review the content of a proposed invocation in advance of its delivery. The United States Constitution does not demand that a governmental agency which sponsors a public ceremony screen its content in order to avoid any possible offense. It requires only that the governmental agency take reasonable steps to ensure that it is not knowingly conveying the impression that it sponsors or endorses a religious message, and to prevent the continuation of past practices which may have done so.[3]

## II

### California Constitution Considerations

Because I conclude that the First Amendment does not bar all religious content in public high school graduation ceremonies, the restrictions of the California Constitution must also be addressed.

Religion is dealt with in several provisions of the California Constitution. In the fundamental charter of individual liberties, the Declaration of Rights, guarantees which parallel those of the First Amendment are established: "Free exercise and enjoyment of religion without discrimination or preference are guaranteed. This liberty of conscience does not excuse acts that are licentious or inconsistent with the peace or safety of the State. The Legislature shall make no law respecting an establishment of religion.

"A person is not incompetent to be a witness or juror because of his or her opinions on religious beliefs." (Cal. Const., art. I, § 4.)

Article I, section 4 of the California Constitution affords essentially the same guaranty of religious freedom and state neutrality as does the First Amendment, adding an express guaranty against discrimination or preference. (*Fox* v. *City of Los Angeles* (1978) 22 Cal.3d 792, 796 [150 Cal.Rptr. 867, 587 P.2d 663].) Except as noted above, where a preference may be implied by the delivery of invocations by members of the same sect over an extended period, and an endorsement may be implied if the speaker solicits audience participation in a religious prayer, the past practices of the Morongo Unified School District in permitting religious invocations at high school

---

[3] No one has suggested that other speakers at such graduation ceremonies, such as a class valedictorian or other graduates honored for academic or athletic achievement, should have their remarks censored to ensure that they do not credit a deity with their success or seek favor from a deity in their own and their classmates' careers. Remarks of this nature are not perceived as state sponsored or approved religious expression. I see no constitutional compulsion to distinguish an invocation in this regard.

graduation ceremonies are not shown by this record to have denied any rights guaranteed by article I, section 4.

More specific provisions deal with religion in the public schools and support of religion. Article IX, section 8 of the 1879 Constitution mandates complete separation of church and state in the instructional process: "No public money shall ever be appropriated for the support of any sectarian or denominational school, or any school not under the exclusive control of the officers of the public schools; nor shall any sectarian or denominational doctrine be taught, or instruction thereon be permitted, directly or indirectly, in any of the common schools of this State."

Article XVI, section 5 of the California Constitution (former art. IV, § 30) also bans any aid to religion or religious schools:

"Neither the Legislature, nor any county, city and county, township, school district, or other municipal corporation, shall ever make an appropriation, or pay from any public fund whatever, or grant anything to or in aid of any religious sect, church, creed, or sectarian purpose, or help to support or sustain any school, college, university, . . . or sectarian denomination whatever; nor shall any grant or donation of personal property or real estate ever be made by the state, or any city, city and county, town, or other municipal corporation for any religious creed, church, or sectarian purpose whatever; . . ."

The delegates to the Constitutional Convention of 1879 drafted provisions to ensure state neutrality in religious matters, and to ban governmental support for religion in any public school. The constitutional history noted by Justice Mosk in his concurring opinion in this case, and earlier in *California Educational Facilities Authority* v. *Priest* (1974) 12 Cal.3d 593, 603-607 [116 Cal.Rptr. 361, 526 P.2d 513], confirms the importance the delegates attached to these principles which had their origin in the Constitution of 1849. As the court held there, however, none of these provisions prohibits governmental conduct which results in an indirect, remote, or incidental benefit to religion.

The question in *California Educational Facilities Authority* v. *Priest, supra*, was whether making low-interest government bonds available to private, and in some cases sectarian, schools violated the Constitution. Notwithstanding the clear benefit such financing provided, the court held that the dispositive question was "not whether the Act provides such a benefit, but whether that benefit is incidental to a primary public purpose." (12 Cal.3d at p. 605.) Because the act did not "have a substantial effect of supporting religious activities" it was upheld. (*Id.*, at p. 606.)

This court revisited the question of aid to sectarian schools, and the proper construction and application of California Constitution article IX, section 8, and article XVI, section 5, in *California Teachers Assn.* v. *Riles* (1981) 29 Cal.3d 794 [176 Cal.Rptr. 300, 632 P.2d 953]. There the question was whether the Superintendent of Public Instruction could lend textbooks to nonprofit private schools. The court held the act authorizing the loans violated both provisions because such loans constituted an appropriation of public money and directly benefitted private and sectarian schools.

Although the result in *California Teachers Assn.* v. *Riles, supra,* differed, the analysis and construction of the state constitutional provisions did not. The decisive question was whether the loan constituted an appropriation of funds for the support of sectarian schools. (29 Cal.3d at p. 813.) A loan of textbooks to sectarian schools is clearly distinguishable from permitting a speaker who delivers an invocation to make reference to, or offer a brief prayer on his own behalf to, a deity.

Because there is no expenditure of funds beyond the de minimis amount of overhead expense that may be attributable to the seconds during which the speaker may recite a prayer, and that recitation need not be viewed in all cases as reflecting state endorsement or support of the religious views of the speaker, I conclude that the California Constitution does not ban the inclusion in a graduation ceremony of all invocations in which the speaker may offer a prayer or statement of religious nature.

Like the free exercise and establishment clauses of the First Amendment, therefore, the California Constitution does not prohibit all reference to religion in academic events. Again, it is sponsorship or endorsement, express or implied, of religion or a particular religion that is the evil sought to be avoided. (See, e.g., *Evans* v. *Selma Union High School Dist.* (1924) 193 Cal. 54, 60 [222 P. 801, 31 A.L.R. 1121] ["The mere act of purchasing a book to be added to the school library does not carry with it any implication of the adoption of the theory or dogma contained therein, or any approval of the book itself except as a work of literature."].)

I would affirm the judgment of the Court of Appeal insofar as it reverses the order granting an injunction against any religious prayers in high school graduation ceremonies, but would direct the Court of Appeal to require the trial court to grant a more limited injunction consistent with the views expressed above.

Appellants' petition for a rehearing was denied June 27, 1991. Panelli, J., and Baxter, J., were of the opinion that the petition should be granted.

APPENDIX

INVOCATION DELIVERED BY PASTOR TRIP KIMBALL 6/12/86

Graduates, faculty, friends, family. I consider it a privilege to be here this evening to do the Invocation, particularly as I look back to 20 years ago today that I graduated from high school.

It's a real blessing to speak to you and encourage you to be confident in looking forward to the years ahead. That hope, that confidence, that indeed there are certain to be changes to come, will come. Yet each point of change is an opportunity for growth. And I want to encourage you to have confidence [in] looking forward to that.

And so it is that I want to even extend that in a Prayer. That as you have the opportunity to grow and change, and to face things, and sometimes those things will cause you to be apprehensive, cause you to begin to doubt, I have found that for myself it's good to have something, someone to trust in that is greater than yourself.

So if you would like to you can bow your head, if not, feel free not to, that's what freedom is all about.

Heavenly father, I thank you for the privilege it is to see these graduates going forth receiving their diplomas this evening. To celebrate this time, I pray that you would give them that blessing, that confidence, courage, vision, hope, peace and gladness, and looking forward to the days to come, the years to come being confident of what they have already been able to do in receiving this diploma.

Now I pray your blessing upon them, in the name of our Lord, amen.

BENEDICTION DELIVERED BY MR. BOB HOCKET 6/12/86

Will the audience please stand and join us in prayer.

Dear Father, we thank You for these graduates who have meant so much to us. We thank You for their energy, their enthusiasm, their sense of humor and their sense for life. May the years never diminish these traits.

We ask Your guidance as these graduates try to meet the many challenges of their future years. Grant them the strength to meet these challenges with courage, confidence and faith.

We ask Your blessings so that their lives will brim with happiness and good health. And that each one experiences a life rich in friendship and rich in love.

Finally, we ask that these young men and women, mature in years, may they forever remain young at heart and free in spirit. We ask for these in Your name, amen.